## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jane Doe, | : | Civil Action |
| | : | |
| Plaintiff | : | No. |
| | : | |
| vs. | : | |
| | : | |
| The Pennsylvania State University, | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

Jane Doe ("Plaintiff"), by her undersigned counsel, brings this civil action pursuant to the law cited herein against The Pennsylvania State University ("Penn State").

## INTRODUCTION

1.     This is an action arising under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.* and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a) *et seq.*

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction to hear this action and adjudicate the claims herein pursuant to 28 U.S.C. §§ 1331, 1343.

3.     All jurisdictional prerequisites to bringing this action have been satisfied because:

(a)   On November 30, 2020, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"); and

(b)   On August 3, 2021, the EEOC issued a Dismissal and Notice of Rights Notice.

4.   Venue is appropriate in the Middle District of Pennsylvania because Penn State resides within this judicial district and/or may be served with process therein. *See* 28 U.S.C. §§ 1391(b)(1) and (d).

## **THE PARTIES**

5.   Plaintiff is an adult female and is a citizen and resident of the United States. Plaintiff resides in Bellefonte, Pennsylvania.

6.   "Jane Doe" is a pseudonym to avoid public disclosure of the sexual assault and sexual harassment she suffered as outlined below. Plaintiff will be filing a motion for permission to proceed under a pseudonym.

7.   Penn State is a domestic non-profit corporation with its headquarters located at 208 Old Main, University Park, PA 16802.

8.   Penn State employs over thirty thousand (30,000) employees.

9.   Penn State is an employer within the meaning of Title VII.

10.   Penn State is a public university receiving federal funds and thus, subject to Title IX.

11.    At all relevant times, Penn State acted by and through its agents and/or employees.

## FACTS

### Penn State Policy HR01

12.    Penn State maintains a policy titled "HR01 Fair Employment Practices" ("Policy HR01"). *See* https://policy.psu.edu/policies/hr01 (accessed October 29, 2021).

13.    According to Policy HR01, Penn State prohibits discrimination "because of age as defined by law, ancestry, color, disability or handicap, genetic information, national origin, race, religious creed, sex, sexual orientation, or veteran status." *See id.*

### Penn State Policy AD67

14.    Penn State maintains a policy titled "AD67 Disclosure of Wrongful Conduct and Protection from Retaliation" ("Policy AD67"). *See* https://policy.psu.edu/policies/ad67 (accessed October 29, 2021).

15.    According to Policy AD67, Penn State prohibits retaliation against staff who makes a "a Good Faith Report of suspected Wrongful Conduct" to Penn State. *See id.*

16.    "'Good Faith Report'" means any report, communication or other disclosure about actual or suspected Wrongful Conduct engaged in by a member of

the University faculty, staff, or student body, which is made with a good faith reason to believe that Wrongful Conduct has occurred."

17.    "'Wrongful Conduct' includes a violation of University policy . . . [and/or] a violation of a federal, state, and/or local law, rule, regulation, or ordinance . . ." *See id.*

18.    "'Retaliation' means any adverse action taken . . . against any individual on the basis of a Good Faith Report made by such individual . . . Retaliation shall include, but not be limited to, harassment, discrimination, threats of physical harm, job termination, punitive work schedule or research assignments, decrease in pay or responsibilities, or negative impact on academic progress." *See id.*

19.    According to Policy AD67, Penn State "will investigate and resolve" all Good Faith Reports of Wrongful Conduct.

## Penn State Policy AD85

20.    Penn State maintains a policy titled "AD85 Title IX Sexual Harassment" ("Policy AD85"). *See* https://policy.psu.edu/policies/ad85 (accessed October 29, 2021).

21.    According to Policy AD85, Penn State "prohibit[s] sexual harassment and misconduct, including, but not limited to, acts of sexual violence, sexual harassment, domestic violence, dating violence and stalking, in accordance with Title IX of the Education Amendments of 1972." *See id.* (Purpose).

4

22.    Policy AD85 applies to all Penn State "students, faculty, staff, affiliates, and other individuals participating or attempting to participate in University programs and activities." *See id.* (III. Applicability).

23.    Policy AD85 prohibits sexual assault, which Policy 85 defines as "any nonconsensual sexual act proscribed by Federal, tribal, or State law, including when the victim lacks capacity to consent." *See id.* (IX. Title IX Terms and Definitions (j. Prohibited Conduct)).

24.    According to Policy AD85, "[c]onsent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent must be informed, freely given and mutual.  If intimidation, threats, or physical force are used there is no consent.  If a person is mentally or physically incapacitated so that such person cannot understand the fact, nature or extent of the sexual situation, there is no consent. This includes incapacitation due to alcohol or drug consumption, or being asleep or unconscious, where the respondent knew or reasonably should have known that the person was incapacitated.  Inducement of incapacitation of another with the intent to affect the ability of an individual to consent or refuse to consent to sexual contact almost always, if not always, negates consent." *See id.* (IX. Title IX Terms and Definitions (c. Consent)).

25.    According to AD85, "[n]otice to the Title IX Coordinator, or to an official with authority to institute corrective measures on the University's behalf,

triggers the University's response obligations under this Policy. Such officials include the Title IX Coordinator, Deputy Title IX Coordinators, the Office of Sexual Misconduct Prevention & Response, the Office of Student Conduct, the Affirmative Action Office, Human Resources, and other employees with Supervisory Authority." *See id.* (IX. Title IX Terms and Definitions (i. Notice Triggering the University's Response Obligation)).

26.     According to Policy AD85, "[u]pon notice that any person has allegedly experienced actions that could constitute Title IX Prohibited Conduct, the Title IX Coordinator or their designee will respond promptly by offering Supportive Measures and an explanation of the Complainant's option to file a Formal Complaint that will initiate a formal investigation." *See id.* (X. Reporting (A. Supportive Measures)).

27.     Policy AD85 requires Penn State to "conduct an adequate, reliable, objective, and impartial investigation of all Formal Complaints." *See id.* (XII. Investigation of Formal Complaint).

28.     Policy AD85 provides for a Formal Hearing Process. *See id.* (XIII. Formal Hearing Process).

29.     Policy AD85 provides for Sanctions against Employees who violate Policy AD85. *See id.* (IVX. Sanctions).

30. According to Policy AD85, Penn State, "will provide regular, mandatory training for all" Penn State employees, including required "Title IX training within the first 30 days of employment" and "an annual Compliance Training as a reminder of reporting requirements and procedures." *See id.* (II. Policy Statement).

31. Policy AD85 also prohibits "intimidation, threats, coercion, and discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing." *See id.* (VI. Retaliation Prohibited and Corrective Action).

## **Penn State Policy AD91**

32. Penn State maintains a policy titled "AD91 Discrimination and Harassment and Related Inappropriate Conduct" ("Policy AD91"). *See* https://policy.psu.edu/policies/ad91 (accessed October 29, 2021).

33. According to Policy AD91, Penn State prohibits harassment and "because of age, race, color, ancestry, national origin, sex, sexual orientation, gender, perceived gender, gender identity, physical or mental disability, religion, creed, service in the uniformed services (as defined in state and

federal law), veteran status, marital or family status, pregnancy, pregnancy-related conditions, genetic information or political ideas." *See id.*

34.     Policy AD91 defines discrimination as "conduct of any nature that denies an individual the opportunity to participate in or benefit from a University program or activity, or otherwise adversely affects a term or condition of an individual's employment, education, or living environment, because of the individual's age, race, color, ancestry, national origin, sex, sexual orientation, gender, perceived gender, gender identity, physical or mental disability, religion, creed, service in the uniformed services (as defined in state and federal law), veteran status, marital or family status, pregnancy, pregnancy-related conditions, genetic information or political ideas." *See id.*

35.     Policy AD91 defines harassment as "behavior consisting of physical or verbal conduct that is sufficiently severe or pervasive such that it substantially interferes with an individual's employment, education or access to University programs, activities or opportunities and would detrimentally affect a reasonable person under the same circumstances. Harassment may include, but is not limited to, verbal or physical attacks, graphic or written statements, threats, or slurs. Whether the alleged conduct constitutes prohibited Harassment depends on the totality of the particular circumstances, including the nature, frequency and

duration of the conduct in question, the location and context in which it occurs and the status of the individuals involved." *See id.*

36.     Policy AD91 specifically prohibits gender-based harassment, which it defines as " verbal, nonverbal, graphic, or physical aggression, intimidation, or hostile conduct based on sex, sex-stereotyping, sexual orientation or gender identity, but not involving conduct of a sexual nature, when such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits a person's ability to participate in or benefit from the University's education or work programs or activities. For example, persistent disparagement of a person based on a perceived lack of stereotypical masculinity or femininity or exclusion from an activity based on sexual orientation or gender identity also may violate this Policy." *See id.*

37.     Policy AD91 also prohibits retaliation as defined in Policy AD67. *See id.*

## **Plaintiff's Employment With Penn State**

38.     On April 29, 2019, Penn State's Auxiliary and Business Services division hired Plaintiff as a Steward (dishwasher) at the Nittany Lion Inn.

39.     At all relevant times, Plaintiff was qualified for the Steward position because she met the minimum qualifications for the position and because she met or exceeded Penn State's reasonable expectations for the position.

40.     Plaintiff began as a Steward at the Nittany Lion Inn with the goal of working her way up to a chef position.

41.     According to The Nittany Lion Inn's Employment website, "[w]e believe in providing opportunities for advancement to employees who demonstrate the dedication, energy, and skills required to succeed in the hospitality industry. Annual staff reviews give you every opportunity to advance to the next level." *See* https://nittanylioninn.psu.edu/employment (accessed October 29, 2021).

42.     James Roe is a Cook at the Nittany Lion Inn.[1]

43.     At all relevant times, Mr. Roe was Plaintiff's direct supervisor.

44.     Jamison Steffen is Executive Sous Chef at the Nittany Lion Inn.

45.     At all relevant times, Mr. Steffen was Mr. Roe's direct supervisor.

46.     On December 13, 2019, Mr. Roe sexually assaulted Plaintiff at his residence.

47.     As a result of the December 13, 2019 sexual assault, Plaintiff became pregnant.

48.     On January 7, 2020, Plaintiff learned that she was pregnant.

49.     On or about January 7, 2020, Plaintiff informed Mr. Steffan that she pregnant because Plaintiff was a high risk pregnancy and was not allowed to lift more then 50 pounds at that time.

---

[1] Roe's name has also been replaced by a pseudonym to preserve Mr. Roe's privacy interest, should he choose to assert one.

50.     On or about January 7, 2020, Plaintiff also informed Mr. Roe that she was pregnant.

51.     After learning that Plaintiff was pregnant, Mr. Roe began harassing Plaintiff. For example:

     (a)     Mr. Roe told Plaintiff that he wanted no involvement with the baby and that she should tell people at work that she had a one night stand and did not know whose baby she had.

     (b)     Mr. Roe told Plaintiff to get an abortion.

52.     In late January 2020, Plaintiff told Mr. Roe that she was going to report his harassment of her to Mr. Steffan.

53.     In late January 2020, Plaintiff reported Mr. Roe's harassment to Mr. Steffan.

54.     Plaintiff told Mr. Steffan that Mr. Roe was the father of her baby, that Mr. Roe was pressuring her to get an abortion, and that Mr. Roe was harassing her at work.

55.     Mr. Steffan is friends with Mr. Roe.

56.     Mr. Roe had already told Mr. Steffan that he was the father of Plaintiff's baby.

57.     Mr. Steffan did not take Plaintiff's complaints seriously—he told Plaintiff that he was disappointed in Plaintiff and Mr. Roe.

58.     Mr. Steffan did not stop Mr. Roe's harassment of Plaintiff.

59.     After Plaintiff reported Mr. Roe's conduct to Mr. Steffan, Mr. Roe continued to harass and began to retaliate against Plaintiff. For example:

(a)     Mr. Roe knew that Plaintiff was a high risk pregnancy and was not allowed to lift more than 50 pounds at that time; however, Mr. Roe gave Plaintiff work assignments that required her to lift more than 50 pounds.

(b)     Mr. Roe reported Plaintiff's absences from work to Mr. Steffan; however, Plaintiff's absences were either for doctor's appointments or were doctor-excused due to her high risk pregnancy.

60.     After Plaintiff reported Mr. Roe's conduct to Mr. Steffan, Mr. Steffan began treating Plaintiff differently. For example:

(a)     Mr. Steffan stopped mentoring and helping Plaintiff.

(b)     Mr. Steffan called Plaintiff in to talk about her attendance. Mr. Steffan told Plaintiff that someone (presumably Mr. Roe, who was Plaintiff's supervisor) came to him about her attendance. Mr. Steffan, however, allowed a male employee (Duane Johnson) to be extremely late every day.

61.     On February 7, 2020, Plaintiff was forced to leave work before the end of her shift due to Mr. Roe's continued harassment.

62.     Specifically, Mr. Roe was making Plaintiff do very physical work by herself, including lifting more than 50 pounds of hot dishes and glassware, which violated her pregnancy-related work restriction.

63.     Plaintiff clocked out and left work before the end of her shift.

64.     Plaintiff contacted Mr. Steffan by phone and text. Plaintiff left messages to inform Mr. Steffan that she could no longer work at the Nittany Lion Inn because nothing had been done to stop Mr. Roe's harassment.

65.     Mr. Steffan never responded to Plaintiff's messages.

66.     On February 10, 2020, Plaintiff reported Mr. Roe's harassment of her to Carol Eicher, Human Resources Consultant.

67.     Plaintiff told Ms. Eicher that Mr. Roe sexually assaulted her on December 13, 2019 and that Mr. Roe had been harassing her since he learned that she was pregnant.

68.     Ms. Eicher told Plaintiff that Penn State would address her complaint.

69.     Approximately one week after Plaintiff reported Mr. Roe's harassment of her to Ms. Eicher, Ms. Eicher telephoned Plaintiff and stated that they spoke to Mr. Steffan and decided that they would move Plaintiff to the Nittany Lion Inn's housekeeping department.

70.     Plaintiff did not want to move to the housekeeping department because it was an entirely different job, which Plaintiff was not interested in

because she had a goal of working her way up to a chef position. The housekeeping position also required a pay cut.

71.     Penn State did not investigate Plaintiff's complaints about Mr. Roe in violation of its own policies.

72.     Further, Penn State violated Policy AD85 because it failed to:

(a)     "[R]espond promptly by offering Supportive Measures and an explanation of the Complainant's option to file a Formal Complaint that will initiate a formal investigation."

(b)     "[C]onduct an adequate, reliable, objective, and impartial investigation of all Formal Complaints."

(c)     Follow its Formal Hearing Process.

(d)     Issue Sanctions against Mr. Roe and any other employees who violated Policy AD85.

73.     Further, Penn State retaliated against Plaintiff by attempting to demote her to the housekeeping department.

74.     As a result of Mr. Roe's unwelcome sexual harassment and Penn State's retaliation, Plaintiff was forced to constructively discharge her employment.

## COUNT I
## Violation of Title VII
## <u>Sexual Harassment/Hostile Work Environment</u>

75.     Plaintiff incorporates by reference each of the foregoing paragraphs of her Complaint by reference as if set forth fully herein.

76.     Taken together, the acts outlined above constitute a hostile work environment based on sex.

77.     Mr. Roe sexually harassed Plaintiff.

78.     Mr. Roe's conduct was motivated by the fact that Plaintiff is female.

79.     Mr. Roe's conduct was unwelcome.

80.     Mr. Roe's conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

81.     Plaintiff believed her work environment to be hostile or abusive as a result of Mr. Roe's conduct.

82.     Plaintiff suffered an adverse tangible employment action as a result of the hostile work environment.

83.     Penn State is liable for Mr. Roe's actions.

84.     Penn State and its management level employees knew or should have known about the harassment but failed to take prompt and adequate remedial action.

85.    Penn State's policies and practices harmed Plaintiff with respect to the terms and conditions of her employment.

86.    Penn State acted with malice or reckless indifference to Plaintiff's federally protected rights.

87.    As a result of Penn State's actions and conduct, Plaintiff suffered and continues to suffer damages, including lost wages and emotional pain and distress, mental anguish, and loss of enjoyment of life's pleasures.

88.    Plaintiff is entitled to all legal and equitable remedies available under Title VII.

**COUNT II**
**Violation of Title VII**
**<u>Constructive Discharge</u>**

89.    Plaintiff incorporates by reference each of the foregoing paragraphs of her Complaint by reference as if set forth fully herein.

90.    As averred above, Mr. Roe sexually harassed and created a hostile work environment for Plaintiff.

91.    As averred above, after Plaintiff reported Mr. Roe's conduct, Mr. Roe retaliated against Plaintiff.

92.    As averred above, after Plaintiff reported Mr. Roe's conduct, Penn State informed Plaintiff that it was moving her to a lower-paying job in housekeeping.

93.     Plaintiff was forced to resign from her job at the Nittany Lion Inn due to Mr. Roe's sexually harassing and retaliatory conduct and Penn State's retaliation.

94.     Plaintiff's working conditions became so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

95.     Penn State's policies and practices harmed Plaintiff with respect to the terms and conditions of her employment.

96.     Penn State acted with malice or reckless indifference to Plaintiff's federally protected rights.

97.     As a result of Penn State's actions and conduct, Plaintiff suffered and continues to suffer damages, including lost wages and emotional pain and distress, mental anguish, and loss of enjoyment of life's pleasures.

98.     Plaintiff is entitled to all legal and equitable remedies available under Title VII.

**COUNT III**
**Violation of Title VII**
**<u>Retaliation</u>**

99.     Plaintiff incorporates by reference each of the foregoing paragraphs of her Complaint by reference as if set forth fully herein.

100.   As averred above, Plaintiff engaged in protected activity by complaining to Mr. Steffan and Ms. Eicher about Mr. Roe's conduct.

101.   As averred above, after Plaintiff reported Mr. Roe's conduct, Mr. Roe retaliated against Plaintiff by giving her work assignments that violated her pregnancy-related work restriction and by reporting absences that were for either doctor's appointments or were doctor-excused due to her high risk pregnancy.

102.   As averred above, after Plaintiff reported Mr. Roe's conduct, Penn State informed Plaintiff that it was moving her to a lower-paying job in housekeeping.

103.   Penn State's policies and practices harmed Plaintiff with respect to the terms and conditions of her employment.

104.   Penn State acted with malice or reckless indifference to Plaintiff's federally protected rights.

105.   As a result of Penn State's actions and conduct, Plaintiff suffered and continues to suffer damages, including lost wages and emotional pain and distress, mental anguish, and loss of enjoyment of life's pleasures.

106.   Plaintiff is entitled to all legal and equitable remedies available under Title VII.

## COUNT IV
## Violation of Title IX
## Sexual Harassment/Hostile Work Environment

107.   Plaintiff incorporates by reference each of the foregoing paragraphs of her Complaint by reference as if set forth fully herein.

108.   Taken together, the acts outlined above constitute a hostile work environment based on sex.

109.   Mr. Roe sexually harassed Plaintiff.

110.   Mr. Roe's conduct was motivated by the fact that Plaintiff is female.

111.   Mr. Roe's conduct was unwelcome.

112.   Mr. Roe's conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

113.   Plaintiff believed her work environment to be hostile or abusive as a result of Mr. Roe's conduct.

114.   Plaintiff suffered an adverse tangible employment action as a result of the hostile work environment.

115.   Penn State is liable for Roe's actions.

116.   Penn State and its management level employees knew or should have known about the harassment but failed to take prompt and adequate remedial action.

117.   Penn State's policies and practices harmed Plaintiff with respect to the terms and conditions of her employment.

118.   Penn State acted with malice or reckless indifference to Plaintiff's federally protected rights.

19

119.   As a result of Penn State's actions and conduct, Plaintiff suffered and continues to suffer damages, including lost wages and emotional pain and distress, mental anguish, and loss of enjoyment of life's pleasures.

120.   Plaintiff is entitled to all legal and equitable remedies available under Title IX.

**COUNT V**
**Violation of Title IX**
**<u>Retaliation</u>**

121.   Plaintiff incorporates by reference each of the foregoing paragraphs of her Complaint by reference as if set forth fully herein.

122.   As averred above, Plaintiff engaged in protected activity by complaining to Mr. Steffan and Ms. Eicher about Mr. Roe's conduct.

123.   As averred above, after Plaintiff reported Mr. Roe's conduct, Mr. Roe retaliated against Plaintiff by giving her work assignments that violated her pregnancy-related work restriction and by reporting absences that were for either doctor's appointments or were doctor-excused due to her high risk pregnancy.

124.   As averred above, after Plaintiff reported Mr. Roe's conduct, Penn State informed Plaintiff that it was moving her to a lower-paying job in housekeeping.

125.   Penn State's policies and practices harmed Plaintiff with respect to the terms and conditions of her employment.

126.   Penn State acted with malice or reckless indifference to Plaintiff's federally protected rights.

127.   As a result of Penn State's actions and conduct, Plaintiff suffered and continues to suffer damages, including lost wages and emotional pain and distress, mental anguish, and loss of enjoyment of life's pleasures.

128.   Plaintiff is entitled to all legal and equitable remedies available under Title IX.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to:

(1)   Issue a Declaratory Judgment declaring that Penn State's actions as set forth in this Complaint are unlawful and violate Title VII and Title IX.

(2)   Issue equitable/injunctive relief including:

(a)   Issue preliminary and permanent injunctions enjoining and restraining The Pennsylvania State University, its officers, agents, employees, and those acting in participation with The Pennsylvania State University, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of Title VII and Title IX.

(b)   Order The Pennsylvania State University to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under Title VII and Title IX—with the training specifics

to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(c)     Order The Pennsylvania State University to electronically deliver to its employees a copy of the jury verdict and trial court judgment.

(d)     Order The Pennsylvania State University to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under Title VII and Title IX—with the reporting specifics to be tailored based on the evidence.

(e)     Order The Pennsylvania State University to reinstate Plaintiff upon such terms and conditions as will put Plaintiff in the position she would have occupied had The Pennsylvania State University not unlawfully discriminated and retaliated against her.

(3)     Enter judgment in favor of Plaintiff and against The Pennsylvania State University for back pay, including wages and fringe benefits.

(4)     Enter judgment in favor of Plaintiff for front pay in lieu of reinstatement.

(5)     Enter judgment in favor of Plaintiff and against The Pennsylvania State University for compensatory damages for emotional distress, mental anguish, humiliation, and embarrassment.

(6)     Enter judgment in favor of Plaintiff and against The Pennsylvania State University for punitive damages, as allowable by law.

(7)     Award Plaintiff reasonable attorney's fees together with the costs of this action.

(8)     Award Plaintiff pre-judgment and post-judgment interest.

(9)     Enter judgment in favor of Plaintiff for any other monetary losses as a direct result of The Pennsylvania State University's violation of Title VII and Title IX, including but not limited to negative tax consequence damages.

(10)    Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Plaintiff's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## JURY DEMAND

Plaintiff demands a jury to try all claims triable by jury.

Dated: November 1, 2021

Stephanie J. Mensing
PA ID No. 89625
Mensing Law LLC
1635 Market Street, Suite 1600
Philadelphia, PA 19103
(215) 586-3751; (215) 359-2741 fax
stephanie@mensinglaw.com
Attorney for Plaintiff