**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jane Doe, | : | Civil Action |
| | : | |
| Plaintiff | : | No. 21-cv-01862-MWB |
| vs. | : | |
| | : | |
| The Pennsylvania State University, | : | |
| | : | |
| Defendant | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Submitted by:

Stephanie Mensing
Mensing Law LLC
PA ID No. 89625
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-586-3751; 215-359-2741 (fax)
stephanie@mensinglaw.com
Attorney for Plaintiff

Dated: July 26, 2023

## I.      Introduction

The Pennsylvania State University ("Penn State" or "Defendant") violated Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.* and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a) *et seq.* when it failed to protect Plaintiff from a sexual hostile work environment and retaliated against Plaintiff for reporting a sexual hostile work environment, which forced Plaintiff to leave her job.

The issues in this case are jury questions that turn on Defendant's motivations and the credibility of Defendant's witnesses and documents. As set forth in this Memorandum, Plaintiff has met her burden at this stage to present sufficient evidence from which a reasonable juror could conclude that Defendant violated Title VII and Title IX. Accordingly, Defendant's Motion must be denied.

## II.     Material Facts and Inferences That Preclude Summary Judgment

### A.      Plaintiff's Employment with Penn State

During the period of time at issue in this litigation, Penn State owned an on-campus hotel called the Nittany Lion Inn ("NLI"). [Def. Facts ¶ 17; Pl. Facts ¶ 17]. In 2018 and 2019, Plaintiff applied for multiple positions at Penn State. [Def. Facts ¶ 18; Pl. Facts ¶ 18].

In March 2019, Plaintiff applied to work as an Overnight Cleaner at the NLI. [Def. Facts ¶ 21; Pl. Facts ¶ 21]. Plaintiff applied for a position at the NLI

because she wanted to work her way up in the culinary department. Plaintiff did not need a degree to work her way up to become a chef. [Pl. Facts ¶ 8].

Plaintiff's direct supervisor at the NLI was Culinary Support Specialist (a/k/a "Chef"), Jamison Steffen who oversaw the entire kitchen and also planned banquet dinners. [Def. Facts ¶ 23; Pl. Facts ¶¶ 23, 305]. There was various positions in the kitchen, including hot line and cold line cooks, chefs, kitchen workers, and dish stewards. [Pl. Facts ¶ 306].

In July 2019, Plaintiff asked Mr. Steffen if she could move to a daytime shift at the NLI when a position became available. [Def. Facts ¶ 33; Pl. Facts ¶ 33]. Plaintiff wanted to move to the daytime shift at NLI because she "wanted to pursue a culinary career" and Steffen "told me to start there and then he was mentoring me." [Pl. Facts ¶¶ 33, 43, 309].

In September 2019, a second shift part-time dishwasher (a/k/a "Steward") position at the NLI became vacant. [Def. Facts ¶¶ 43-44; Pl. Facts ¶¶ 43-44]. On the second shift, Plaintiff worked from around 3:00 p.m. or 4:00 p.m. until 11:00 p.m., midnight, or 1:00 a.m. [Pl. Facts ¶ 44]. Around the time that Plaintiff became a dish steward, Steffen told her there was going to be a full-time dish steward position available that she would be moved into. [Pl. Facts ¶ 310].

Plaintiff spoke with Steffen about future careers within Penn State and told him she had an interest in culinary foods. [Pl. Facts ¶ 307]. Steffen told Plaintiff his

story about how he started out as a dish steward and worked his way up to a chef and that he was willing to mentor Plaintiff in doing that, if she was interested. [Pl. Facts ¶ 308].

After Plaintiff moved to the second shift Steffen mentored Plaintiff to help her learn and pursue a career in culinary. [Pl. Facts ¶ 311]. Steffen mentored Plaintiff two to three days per week. Plaintiff was in the dish room the rest of the time. [Pl. Facts ¶ 312]. Steffen "showed [Plaintiff] how to cut, he had [Plaintiff] prepping, he had [Plaintiff] doing plate-up for events and banquets, he had [Plaintiff] learning the cold bar, which is like all salad, he had [Plaintiff] working with other cooks to learn like chef cooking skills. [Pl. Facts ¶ 313]. Steffen also allowed Plaintiff to work some events where she carved the meat. [Pl. Facts ¶ 314]. Plaintiff did these culinary duties in addition to her regular duties. [Pl. Facts ¶ 315].

After moving to the second shift, Plaintiff and Trea Vanburen, who also worked in the NLI kitchen, often worked the same days and they got to know Vanburen at work. [Def. Facts ¶¶ 54-59, 67; Pl. Facts ¶ 67]. Steffen was Plaintiff's direct supervisor; however, every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis.[1] [Pl. Facts ¶¶

---

[1] In Defendant's response to Plaintiff's EEOC Charge, Defendant claimed that "Vanburen was a full-time Overnight Steward (supervisor of the dishwasher area)." [Pl. Facts ¶ 62-64].

62-64, 66-67].

Plaintiff, her partner (Kasha Perry), Vanburen, and Vanburen's wife and sometimes other NLI employees socialized together outside of work a few times. [Pl. Facts ¶¶ 69, 73].

## B. Vanburen Sexually Assaults Plaintiff Outside of Work and Plaintiff Becomes Pregnant

On or about December 13, 2019, Vanburen sexually assaulted Plaintiff outside of work. Plaintiff was under the influence of alcohol. [Pl. Facts ¶¶ 75, 123].

On January 7, 2020, Plaintiff learned that she was pregnant as a result of the sexual assault. [Pl. Facts ¶¶ 76-77]. Plaintiff told Vanburen that she was pregnant the same day she found out. [Def. Fact ¶¶ 78-79; Pl. Facts ¶¶ 78-79].

After learning that Plaintiff was pregnant, Vanburen pressured Plaintiff to have an abortion. Plaintiff refused to have an abortion "[b]ecause the baby had a heartbeat and my own personal religious beliefs." [Def. Fact ¶¶ 101-102; Pl. Facts ¶¶ 101-102]. Vanburen also instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Facts ¶¶ 104, 252-253].

## C. Plaintiff Informs Steffen of Her Pregnancy and Requests an Accommodation Due to a Lifting Restriction Related to Her Pregnancy

In January 2020, Plaintiff told Steffen that she was pregnant and provided both a "Due Date Verification" and a separate restriction letter regarding her

pregnancy lifting restriction to Steffen.[2] [Def. Facts ¶ 91; Pl. Facts ¶¶ 87, 90-91, 94, 96-100]. Plaintiff also told Steffen that Vanburen was the father of her baby and that he wanted her to get an abortion. [Def. Facts ¶ 92; Pl. Facts ¶ 92].

Plaintiff went to Steffen because Plaintiff's position required her to lift more than fifty pounds. [Pl. Facts ¶ 99]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Pl. Facts ¶¶ 87, 90, 96-100]. After Plaintiff provided her lifting restriction letter to Steffen, he informed Vanburen and Johnson that Plaintiff was not supposed to lift more than fifty pounds and that they were supposed to make sure that Plaintiff was not doing mats or so they would help her with anything heavy.[3] [Pl. Facts ¶ 100].

### D. Vanburen Harasses Plaintiff at Work; Plaintiff Reports Vanburen's Harassment to Steffen

After December 13, 2019, Plaintiff next worked on December 15, 2019. Between December 15, 2019 and February 7, 2020, Plaintiff and Vanburen worked together on nineteen days. [Pl. Facts ¶ 123]. Every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift

---

[2] Plaintiff's August 6, 2020 medical record states that Plaintiff had been diagnosed with a "high-risk pregnancy." [Pl. Facts ¶ 86]. On August 11, 2020, Plaintiff's baby was born about 36 weeks premature. [Pl. Facts ¶ 89].

[3] Although Defendant disputes Plaintiff's lifting restriction, Defendant concedes that Steffen instructed Vanburen and others "to perform the heavier lifting tasks in the kitchen so Plaintiff would not have to do that while she was pregnant." [Def. Facts ¶ 100].

and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. [Pl. Facts ¶¶ 124, 126].

"[E]verything became really bad" around the middle of January after Plaintiff refused Vanburen's demand that she have an abortion. [Pl. Facts ¶ 119].

Although Vanburen concedes that everyone knew that Plaintiff was not supposed to lift more than fifty pounds [Pl. Facts ¶ 99-100], following Steffen's instruction that Plaintiff was not to be lifting more than fifty pounds, Vanburen required Plaintiff to lift more than fifty pounds three to five times between January 7, 2020 and February 7, 2020. [Pl. Facts ¶ 100]. Plaintiff testified, "[a]t the end of the night, we had to take like the big heavy rubber mats off the floor and send them through the dish machine and then take them like off the conveyer of the dish machine and load them onto a big rack." [Pl. Facts ¶ 100]. Steffen had instructed Vanburen that Plaintiff was not to do mats because of her restrictions. [Pl. Facts ¶ 100]. When Vanburen required Plaintiff to lift more than fifty pounds, Plaintiff reported this to Steffen. [Pl. Facts ¶ 100].

Vanburen also made comments to Plaintiff at work, including telling Plaintiff that she really needed to think about getting an abortion and calling Plaintiff names like "bitch" and "whore." [Pl. Facts ¶¶ 115, 119, 120, 127, 152]. Plaintiff reported Vanburen's comments to Steffen almost every time it happened. [Pl. Facts ¶¶ 115, 119, 120, 152].

Vanburen also smashed Plaintiff's hands in the dish machine numerous times between mid-January and February 7, 2020 [Pl. Facts ¶ 119]; talked about Plaintiff to other workers [Pl. Facts ¶ 119]; stalked Plaintiff's home [Pl. Facts ¶ 119]; and intimidated Plaintiff by telling her that he was gang involved and had an advantage of whether Plaintiff kept her job [Pl. Facts ¶ 119].

Between mid-January and February 7, 2020, Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards her because she would not abort the baby. [Pl. Facts ¶¶ 127, 129, 152]. Plaintiff also told Steffen that Vanburen wanted her to get an abortion. [Pl. Facts ¶ 119]. Plaintiff told Steffen that she was upset by Vanburen's treatment of her. [Pl. Facts ¶ 119].

Plaintiff told Steffen that she did not want to work around Mr. Vanburen anymore. [Def. Facts ¶ 119; Pl. Facts ¶ 119]. Plaintiff asked Steffen if she could be moved to work different shifts than Mr. Vanburen. [Def. Facts ¶ 120; Pl. Facts ¶ 120]. Steffen switched Plaintiff's shift to dayshift for about a week but then told her she would have to return to the second shift to work with Vanburen. [Pl. Facts ¶¶ 120-122].

Plaintiff also complained to Duane Johnson about Vanburen's behavior. [Pl. Facts ¶ 119]. Plaintiff also reported Vanburen's harassment, including his smashing

of Plaintiff's hands in the dish machine, to Bill Lindemuth, a supervisor who started at the NLI shortly before Plaintiff's last day. [Pl. Facts ¶ 119].

### E. Steffen Claims That After He Spoke with Plaintiff, He Spoke to Vanburen to Address Plaintiff's Concerns

Steffen concedes that Plaintiff spoke to him about Vanburen in December 2019 or January 2020. [Pl. Facts ¶¶ 127, 142]. Steffen told Plaintiff that he spoke with Vanburen. [Pl. Facts ¶¶ 128, 142].

### F. After Plaintiff Reports Vanburen's Harassment, Steffen Stops Mentoring Plaintiff and Speaks to Plaintiff About Her Attendance

In January 2020, after Steffen learned that Plaintiff was pregnant and Vanburen was the baby's father, Steffen stopped mentoring Plaintiff. [Pl. Facts ¶ 316].

Defendant concedes that Steffen did not discipline Plaintiff for any allege attendance issues prior to January 2020. [Def. Facts ¶¶ 38, 40, 42]. Despite alleged documented issues with Plaintiff's attendance [Def. Facts ¶ 36], Steffen never addressed Plaintiff's attendance until **_after_** Plaintiff reported Vanburen's harassment. [Pl. Facts ¶¶ 38, 40, 42].

Before February 7, 2020, Steffen—for the first time—spoke with Plaintiff about her attendance. [Pl. Facts ¶¶ 131-133]. Vanburen reported Plaintiff's attendance to Steffen between January and February 2020. [Pl. Facts ¶¶ 131-133].

### G.  On February 7, 2020, Plaintiff Leaves Work Due to Vanburen's Continued Harassment

Despite addressing her concerns about Vanburen with Steffen, Vanburen's conduct continued. [Pl. Facts ¶ 152]. Plaintiff testified that on February 7, 2020, Vanburen "had smashed my hands in the dish machine several times. He had shoulder checked me, purposely running into me, being in my way, the comments" (*i.e.*, "bitch" and "whore"). [Pl. Facts ¶¶ 140, 152]. Plaintiff felt that she had no choice but to leave work early. [Def. Facts ¶ 140; Pl. Facts ¶ 140].

Plaintiff texted Steffen after she left work; Steffen never responded to Plaintiff. [Def. Facts ¶ 141; Pl. Facts ¶ 141]. Steffen has provided contradictory sworn testimony regarding this issue. Steffen claimed at a hearing that he made "multiple attempts" to contact Plaintiff; however, in his Affidavit that Defendant filed with its Motion, Steffen claims, "I intended to speak to Plaintiff during this next shift about her text messages." [Pl. Facts ¶ 153].

After Plaintiff left work on February 7, 2020, she intended to remain employed with Penn State because she wanted a career at Penn State; however, Plaintiff never returned to work at the NLI. [Def. Facts ¶¶ 140, 154; Pl. Facts ¶¶ 140, 154].

### H.  On February 10, 2020, Plaintiff Contacts Eicher for Help

After Plaintiff had gone to Steffen, Plaintiff asked Leonard Ellenberger, another NLI employee, who she could contact to report harassment and hostile

9

work environment. [Pl. Facts ¶ 155]. Ellenberger told Plaintiff to contact Eicher and gave Eicher's contact information to Plaintiff. [Pl. Facts ¶ 155].

On February 10, 2020, Plaintiff sent an email titled "work related issue" to Eicher to report the problems with Vanburen. [Pl. Facts ¶ 155]. Plaintiff sent the February 10, 2020 email from her Gmail address (destmcg5757@gmail.com). [Pl. Facts ¶ 155]. Plaintiff's email states that Plaintiff has been dealing with a lot of problems with a co-worker [Vanburen] and that Plaintiff had addressed the problems with her boss [Steffen] but the problems were continuing. [Def. Facts ¶ 155; Pl. Facts ¶ 155].

## I.   Eicher's Testimony About Her Call with Plaintiff Contradicts Plaintiff's Testimony About the Call

After receiving Plaintiff's email, Eicher called Plaintiff at the number Plaintiff provided in her email. [Def. Facts ¶ 160; Pl. Facts ¶ 160]. Plaintiff's account of their conversation significantly differs from Eicher's account. Plaintiff told Eicher what happened on December 13, 2019—that Vanburen sexually assaulted her, that she was pregnant, and that Vanburen wanted her to get an abortion. [Pl. Facts ¶¶ 163-164, 168, 172, 251]. Plaintiff also told Eicher after that after she refused to get an abortion, "that's when the hostile work environment and the harassment really escalated," which included Vanburen's comments to Plaintiff (calling her a bitch and a whore), standing in Plaintiff's way at work, shoulder checking Plaintiff, and smashing Plaintiff hands in the dish machine. [Pl. Facts ¶¶ 164, 168, 172]. Plaintiff

also told Eicher that she had a lifting restriction due to her pregnancy. [Pl. Facts ¶¶ 164, 168, 172]. Plaintiff also told Eicher that after Plaintiff complained to Steffen about Vanburen's harassment, Steffen told Plaintiff that he was going to talk to Vanburen. Steffen later told Plaintiff that he spoke with Vanburen. [Pl. Facts ¶ 166, 172]. Plaintiff also told Eicher that Steffen had tried to switch her schedule. [Pl. Facts ¶ 167]. Plaintiff also told Eicher that she no longer wished to work with Vanburen. [Pl. Facts ¶ 169].

Plaintiff also told Eicher "exactly what happened" on February 7, 2020, including that she left work early and texted Steffen. [Pl. Facts ¶¶ 154, 170, 172]. Plaintiff told Eicher that she had future shifts scheduled because she did not want to look like she had abandoned her job. [Pl. Facts ¶¶ 154, 170, 217]. Plaintiff did not tell Eicher that she quit her job. [Def. Facts ¶ 171; Pl. Facts ¶ 171].

Eicher told Plaintiff that she would speak with Steffen and reach out to Penn State's Affirmative Action Office regarding Plaintiff's complaint and that she would follow up with Plaintiff. [Pl. Facts ¶¶ 170, 176, 222]. Eicher never said anything else about reaching out to Penn State's Affirmative Action Office to Plaintiff. [Pl. Facts ¶¶ 175-176]. None of Eicher's subsequent communications to Plaintiff mention anything about Eicher having reached out to Penn State's Affirmative Action Office. [Pl. Facts ¶ 222].

Eicher denies that Plaintiff told her about the sexual assault or that

Vanburen pressured her to get an abortion. According to Eicher, Plaintiff mentioned only "comments to her at work" and that Vanburen "stood in her way in the NLI kitchen." [Def. Facts ¶¶ 161- 172; Pl. Facts ¶¶ 168, 172]. Alan Finnecy, who responded to Plaintiff's EEOC Charge on Defendant's behalf, testified that Eicher told him that Plaintiff reported to her that Vanburen "was pressuring her to have an abortion, which she didn't want." [Pl. Facts ¶¶ 410-443].

Eicher claims that Plaintiff asked to move to the Housekeeping department and told her that she wanted to work in the Housekeeping department. [Def. Facts ¶¶ 172-173]. At no time did Plaintiff tell Eicher anything about transferring to the Housekeeping department. [Pl. Facts ¶¶ 172-173].

### J.   After Speaking With Plaintiff, Eicher Speaks With Steffen

Eicher spoke with Steffen on February 12, 2020, after speaking with Plaintiff. [Def. Facts ¶ 181; Pl. Facts ¶ 181]. Steffen told Eicher that Plaintiff was pregnant with Vanburen's baby. [Def. Facts ¶ 182; Pl. Facts ¶ 182]. Eicher also testified that Steffen told her that Plaintiff "was in a relationship with a same sex domestic partner." [Pl. Facts ¶ 182]. According to Eicher, Steffen told her that "he had talked to Mr. Van Buren. He had made it very clear to Mr. Van Buren, that whatever went on outside of work was not to be brought into the workplace" and that "they should not be together at work." [Pl. Facts ¶ 183].

Since Plaintiff had never told Steffen that Vanburen sexually assaulted her,

only that he was the father of her baby, Steffen did not know that Plaintiff alleges that Vanburen sexually assaulted her at the time he spoke with Eicher.

Eicher asked Steffen to send her a timeline. Steffen prepared a "Timeline of events" per Eicher's request, which is not accurate. [Def. Facts ¶¶ 191-192; Pl. Facts ¶¶ 36, 37, 39, 41, 46, 183, 192, 193]. Eicher did not verify the accuracy of Steffen's "Timeline of events."[4] [Pl. Facts ¶ 38].

### K.  After Speaking With Steffen, Eicher Speaks With Employee Relations

After speaking with both Plaintiff and Steffen, Eicher spoke with Penn State's Employee Relations. [Pl. Facts ¶ 330]. Eicher's shorthand notes indicate that Employee Relations asked Eicher if there were "solid grounds" to terminate Plaintiff. [Pl. Facts ¶ 348(g)]. Employee Relations did not suggest moving Vanburen to another position. [Pl. Facts ¶ 333].

After speaking with Employee Relations, Eicher emailed Steffen on February 14, 2020 instructing Steffen to file a Share Report "because of so many elements that fall under Title [IX]" and stated that since Steffen is "most aware of the whole picture, Employee Relations recommends that you complete the report":

---

[4] Eicher claims that the only thing she verified in Steffen's "Timeline of events" was "her working schedule, the last few lines." [Pl. Facts ¶ 38].

**Eicher, Eldonna Carolyn**

| | |
|---|---|
| **From:** | Eicher, Eldonna Carolyn |
| **Sent:** | Friday, February 14, 2020 5:02 PM |
| **To:** | Steffen, Jamison M |
| **Subject:** | Confidential:  destiny mcgovern .docx |

Hi, Jamie;
Sorry I tried to call when you are so busy, but I did get to speak with Tom so he can fill you in.  I reviewed the situation with Employee Relations and because of so many elements that fall under Title 9, we need you to complete an online Share Report.  When received and evaluated, it will be determined if the Title 9 office will take over the issue or if it will remain an HR issue.  Because you are most aware of the whole picture, Employee Relations recommends that you complete the report.  You can find it online by clicking on the following site: https://studentaffairs.psu.edu/titleix.  There you will find instructions for completing a Share Report.   Please do so at your earliest opportunity.

With regard to the claims that Destiny has made that Trea has taken actions that are creating a hostile working environment, e.g. blocking her way in the workplace, making snide comments, etc., you can indicate those were reported to you although you have not personally observed them.  Provide as much detail as you can; the timeline you so helpfully provided should be included and will assist that office in making a determination.

You can also include that in addition to changing her schedule, NLI has proactively taken steps to reassign a work department to her.  You don't need to give great detail.

Let me know if you have any questions.

I hope your weekend meets your expectations.

Thank you for your help,
Carol

[Pl. Facts ¶ 191]. Eicher does not recall speaking with Steffen after sending the February 14, 2020 email. [Pl. Facts ¶ 190].

A Share Report is the reporting system used to report a Title IX issue to Penn State's Affirmative Action Office.[5] [Pl. Facts ¶ 190]. Eicher understands that Title IX "has to do with sexual harassment." [Pl. Facts ¶ 190]. Eicher testified that submitting a Share Report to the Affirmative Action Office "triggers an investigation." [Pl. Facts ¶ 190].

---

[5] A Share Report is a report that someone can submit " if you suspect like sexual harassment or gender discrimination." [Pl. Facts ¶ 368].

**L.     Eicher Informs Plaintiff That She's Being Transferred to the Housekeeping Department; Plaintiff Did Not Ask to Transfer to the Housekeeping Department**

After Eicher and Plaintiff spoke on the phone, Eicher left a voicemail for Plaintiff informing Plaintiff that she was expected to transfer to the Housekeeping department that Monday.[6] [Pl. Facts ¶¶ 173].

Eicher's original shorthand notes indicate that Defendant unilaterally decided to transfer Plaintiff to the Housekeeping department. Eicher's original shorthand notes, state, "go ahead and transfer her." [Pl. Facts ¶¶ 173, 348(i)]. Further, Eicher typed notes, which purport to be an accurate transcription of Eicher's original shorthand notes, include an exchange that does not appear in Eicher's original shorthand notes:

> DM:  I have spoken to Paula.  I would like to work in Housekeeping.
> CE:  I will follow up on that as well.

 [Pl. Facts ¶¶ 173, 348(k)].

Plaintiff does not know Paul Barton. Plaintiff has never spoken with Barton. Plaintiff never told anyone that. She spoke with Barton. [Pl. Facts ¶¶ 349-351]. Further, Plaintiff never told Eicher that she wanted to work in Housekeeping. Plaintiff did not want to transfer to the Housekeeping department because it was an

---

[6] Eicher testified that Employee Relations "requested" that they "go ahead and move" Plaintiff to the Housekeeping department, which is "a total different department." [Pl. Facts ¶ 332].

entirely different job that she was interested in. Plaintiff never asked to be transferred to a job in the Housekeeping department. Plaintiff never applied for a job in the Housekeeping department. Plaintiff wanted to pursue a culinary career and Steffen was mentoring her. Plaintiff never told anyone she wanted to work in the Housekeeping department.  [Pl. Facts ¶¶ 173, 174].

### M.    Steffen Submits the Share Report; Penn State's Affirmative Action Office Does Not Investigate the Title IX Report

Even though Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards me because she would not abort the baby, Steffen submitted the following on the Share Report:

Provide a description of the incident or conduct being reported:
**please see attached sheet for time line of events. Destiny made the accusation that Trea was creating a hostile work environment. I had a conversation with Trea Vanburen and explained that such behavior would not be tolerate. No one on the management team has witnessed said behavior.**

[Def. Facts ¶ 193; Pl. Facts ¶ 193].

On February 18, 2020, Pasko emailed to Plaintiff's Penn State work email address (dmm6961@psu.edu), which Plaintiff did not use and does not believe she had access to after February 7, 2020. [Def. Facts ¶ 230; Pl. Facts ¶¶ 229-231, 236]. On May 6, 2020, Pasko sent a second email to Plaintiff's Penn State work email address. [Def. Facts ¶ 237; Pl. Facts ¶ 237]. Pasko did not know if Plaintiff was still employed with Penn State when she sent the May 6, 2020 email. [Pl. Facts ¶ 237].

Plaintiff did not receive either email. [Pl. Facts ¶¶ 230-239, 241, 243]. Plaintiff first learned that Penn State's Title IX office reached out to her during discovery in this case. [Pl. Facts ¶ 230].

No one in Penn State's Title IX office tried to contact Plaintiff using Plaintiff's cell phone number. [Pl. Facts ¶ 230]. No one in Penn State's Title IX office tried to contact Plaintiff using Plaintiff's personal email address. [Pl. Facts ¶ 230].

Naviglia did not investigate the Share Report. [Pl. Facts ¶ 238]. Naviglia never spoke to Plaintiff. Pl. Facts ¶ 238].

### N.   Perry Returns Eicher's Phone Call on Plaintiff's Behalf; Eicher Denies Speaking with Perry

Eicher left a voicemail for Plaintiff after their initial phone call. [Def. Facts ¶ 200; Pl. Facts ¶ 200]. Eicher "said to expect a transfer to housekeeping starting that Monday and to expect to hear from Jacquie Weyer, the head of housekeeping." [Pl. Facts ¶ 204].

On February 14, 2020, Eicher also sent Plaintiff an email (to Plaintiff's personal email address) indicating that she attempted to call her and left a voicemail message. [Def. Facts ¶ 209; Pl. Facts ¶ 209]. Eicher's email indicates that Defendant was transferring Plaintiff to Housekeeping:

---

**Eicher, Eldonna Carolyn**

| | |
|---|---|
| **From:** | Eicher, Eldonna Carolyn |
| **Sent:** | Friday, February 14, 2020 5:12 PM |
| **To:** | destmcg5757@gmail.com |
| **Subject:** | work related issue |

Hello, Destiny;

As promised, I followed up on the information you provided. I tried to call you and left a voicemail so that I can update you. I left my phone number in case you have opportunity to call.

If we don't speak before Monday, be aware that you should be hearing from Jacki Weyer regarding a transfer to Housekeeping. I have provided her with your phone number and email address.

In the meantime, have a nice weekend,

Carol

---

[Pl. Facts ¶ 209].

Kasha Perry called Eicher on Plaintiff's behalf because Plaintiff was upset and emotional. [Pl. Facts ¶¶ 202-204, 207, 211]. Perry was engaged to Plaintiff and, as Plaintiff testified, "was speaking on my behalf because of the whole situation and the assault and everything. It was very emotional for me." [Pl. Facts ¶¶ 206-207].

Eicher denies ever speaking with Perry with certainty. When asked, "to the best of your recollection, you never spoke with Destiny's partner [Perry]?," Eicher answered, "I'm sure of it." Eicher even denies hearing Perry's name until this litigation. [Pl. Facts ¶¶ 202-204, 206, 208].

## O.   Plaintiff Was Forced to Leave Her Position at the NLI

As discussed above, Plaintiff wanted to work at the NLI in order to pursue a culinary career. Indeed, both Vanburen and Steffen worked their way up in the

kitchen. Vanburen started at the NLI as a part-time dishwasher when he was nineteen years old and worked his way up to a full-time dishwasher. [Def. Facts ¶¶ 54-56, 59, 62]. Vanburen remains a full-time employee of Penn State. [Def. Facts ¶ 60].

Eicher wrote a letter dated March 9, 2020, which falsely claims, "[a]s you inquired, we are able to transfer you from Stewarding to the Housekeeping Department." [Pl. Facts ¶ 218]. As discussed above, Plaintiff never asked about transferring to the Housekeeping department.

Eicher's letter also states, "If we do not hear from you by the end of business day on Monday, March 16, we will assume you have no interest in continuing your employment with The Nittany Lion Inn and will consider you to have voluntarily quit your employment." [Pl. Facts ¶ 218].

Plaintiff never received Eicher's letter and Eicher has **<u>no</u>** proof, not even a postmark on the U.S. Postal Service Certified Mail Receipt that she mailed the latter. [Pl. Facts ¶¶ 218-222].

## P.    Eicher Has a Credibility Problem

Eicher took notes in shorthand of her conversation with Plaintiff on a printout of Plaintiff's February 10, 2020 email. [Pl. Facts ¶ 334]. Eicher testified that she transcribed her shorthand notes of her conversation with Plaintiff. [Pl. Facts ¶ 335]. Eicher testified that her transcription of her shorthand notes of her

conversation with Plaintiff is word-for-word what her shorthand notes say. [Pl. Facts ¶ 336].

Eicher also took notes in shorthand of her conversation with Steffen. [Pl. Facts ¶ 337]. Eicher testified that she transcribed her shorthand notes of her conversation with Steffen. [Pl. Facts ¶ 338]. Eicher testified that the "top two-thirds" of the document Bates stamped Penn State 24 is the transcription of her shorthand notes of her conversation with Steffen. [Pl. Facts ¶ 339]. Eicher testified that her transcription of her shorthand notes of her conversation with Steffen is word-for-word what her shorthand notes say. [Pl. Facts ¶ 340].

Eicher also took shorthand notes of her conversation with Penn State's Employee Relations. [Pl. Facts ¶ 341]. Eicher testified that she transcribed her shorthand notes of her conversation with Employee Relations, which are at the bottom of the document Bates stamped Penn State 24 beginning with the heading "Notes from Phone conversation with Employee Relations:" [Pl. Facts ¶ 342].

Eicher's typed notes are not a fully accurate translation/transcription of her shorthand notes of her conversations with Plaintiff, Steffen, and Employee Relations. [Pl. Facts ¶ 345-347]. The differences between Eicher's shorthand notes and Eicher's typed translation/transcription are:

(a)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "I have spoken to Trea Van Buren." Eicher's original

shorthand notes read "I do think need to talk to Trey Van Buren." Also, not transcribed in Eicher's typed notes, but in Eicher's original shorthand is what looks like "threatening him."

(b)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "She was in their Friday, Saturday . . ." This could also say she was "not" there, since the symbol for "not" and "in" is the same.

(c)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "Notes from Phone conversation with Employee Relations:" This heading is not in Eicher's original shorthand notes.

(d)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "When talking to Destiny, ask her these questions:" This is not in Eicher's original shorthand notes.

(e)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "Ask Jamie to do a Share Report:" "Ask Jamie to do a" is not in Eicher's original shorthand notes.

(f)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "We have an obligation to report this to the Title 9 office. Don't be surprised if you hear from that office." Following this sentence, in Eicher's original shorthand notes (Eicher Dep. Ex.

13 at Penn State 21) is what looks like "on the basis of a relationship."

(g)   Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "Tell her she still has to work her job." In Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21), here is what looks like, "ER: do we have a solid grounds for terming?" This does not appear in Eicher's typed notes.

(h)   Following the sentence in Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24), which states, "Tell her she still has to work her job," in in Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21), here is what looks like, "should we go that route."

(i)   Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "If there is opportunity and she agrees, go ahead and transfer her." "If there is opportunity and she agrees" is not in Eicher's original shorthand notes. Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21) state, "go ahead and transfer her."

(j)   Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 25) state, "Have you talked to Paula* about opportunities in another

department or building?" Eicher's original shorthand notes
(Eicher Dep. Ex. 12 at Penn State 22) read, "Call Paula re
opportunities in another department, building," not "Have you
talked to Paula* about opportunities in another department or
building?"

(k)    Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 25) state:

DM: I have spoken to Paula. I would like to work in Housekeeping.
CE: I will follow up on that as well.

This two line exchange is not in the original shorthand notes.

[Pl. Facts ¶ 348-351].

## III.    Summary Judgment Standard

Summary judgment may only be granted "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). If there are
any genuine issues of material fact such that a reasonable jury could return a
verdict for the plaintiff, summary judgment should be denied. *Doe v. C.A.R.S.*
*Protection Plus, Inc.* 527 F.3d 358, 362 (3d Cir. 2008).

At the summary judgment stage, the role of the trial judge is to determine
whether or not there is a genuine issue of material fact, as "[c]redibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must view the facts in the light most favorable to the non-moving party —here, Plaintiff— and must draw all inferences in favor of Plaintiffs. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On a motion for summary judgment, a "district court must resolve all inferences, doubts, and issues of credibility against the non-moving party." *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).

"The burden on summary judgment remains unalterably with the employer as movant." *C.A.R.S.*, 527 F.3d at 362. The employer retains the burden of persuading the Court that, "even if all the inferences which would reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Marzano v. Computer Science Corp.*, 91 F.3d 497, 502 (3d Cir. 1996). If there is any record evidence from which a reasonable inference may be drawn in favor of the non-moving party, summary judgment must be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 113 S. Ct. 1262 (1993).

A court cannot make an inference detrimental to the nonmoving party's case when a favorable inference is also possible, even when certain facts are undisputed. *Hunt v. Cromartie*, 526 U.S. 541, 119 S. Ct. 1545 at 1551-52 (1999) (Where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage).

Motions for summary judgment are subject to additional safeguards in employment discrimination actions. *Aman v. Cort Furniture Rental Co.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (cautioning courts to look especially carefully in modern-day discrimination cases to make sure discrimination had not been "coat[ed]" with the "appearance of propriety"); *see also Williams v. URS Corp.*, No. 04-1055, 2005 WL 361573 at *4 (3d Cir. Feb. 16, 2005) (not precedential) ("[S]ummary judgment must not become a procedural expedient for resolving claims that raise a genuine issue of fact even though courts may be skeptical of the merits of plaintiff's underlying claim").

Defendant cannot prevail on its Motion because Defendant has not demonstrated by admissible evidence that no reasonable jury could find in Plaintiff's favor on her claims of sexual harassment, retaliation, and constructive discharge.

## IV.   Legal Argument

### A.   A Jury Must Decide Plaintiff's Title VII Hostile Work Environment Claim

To establish a prima facie hostile work environment claim under Title VII and the PHRA, a plaintiff must show: (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

The Supreme Court has directed courts "to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

"The determination of whether the environment at the workplace is sufficiently hostile or abusive is not "a mathematically precise test . . . rather, the court must review all of the circumstances . . . In particular, "'in some cases the mere presence of an employee who has engaged in particularly severe or pervasive

harassment can create a hostile working environment.'" *McGuinn-Rowe v. Foster's Daily Dem.*, U.S. Dist. Ct. Dist. New Hampshire, No. 94-623-SD (attached as Exhibit A).

Regarding the first element, sexual harassment can take on different forms, both overtly sexual and facially neutral. *See Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 598 (M.D. Pa. 2002). Offensive conduct need not necessarily include obvious sexual overtones or proposition in order to constitute unlawful harassment or discrimination. *Andrews*, 895 F.2d at 1485. *Aman v. Cort Furniture Rental Co.*, 85 F.3d 1074, 1083 (3d Cir.1996); s*ee also, Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139,148 (3d Cir. 1999).

Here, Plaintiff has shown that the harassment was because of her sex (female). As discussed above, Vanburen sexually assaulted her and Plaintiff became pregnant as a result of the assault. After Vanburen learned that Plaintiff was pregnant, he harassed her at work, including pressuring her to get an abortion, calling her names such as "bitch" and "whore," and physically harassing Plaintiff by smashing her hands and shoulder checking her. A reasonable juror could infer that Vanburen harassed Plaintiff because of her sex.

In *McGuinn-Rowe*, the court noted that "[a]fter the sexual assault, plaintiff was not only exposed to the 'mere presence' of McSweegan at her place of work, but was subjected to additional harassment by McSweegan and others[.] Such

conduct may have been sufficiently related to the prior incident at the bar to constitute a continuation of sexual harassment. *See, e.g. Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 784 n.3 (10th Cir. 1995) (continuing sexual harassment may have occurred where perpetrator of previous acts of sexual harassment allegedly stared threateningly at plaintiff after she reported." *See also See Pucino v. Verizon Wireless Communications, Inc.*, *supra*, 618 F.3d 112, 118 (2d Cir. 2010) (plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex based).

Regarding the second element, the determination of whether the environment at the workplace is sufficiently hostile or abusive is not "a mathematically precise test," but a plaintiff must show that her workplace was "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 20. Workplace conduct may be severe, pervasive, or both: "a single incident of severe harassment in the workplace may contaminate the work place to such a high degree that it will be considered hostile. Where harassment is not severe, incidents of harassment must occur either in concert or with regularity." *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 428 (E.D. Pa. 2010) (internal citations omitted). Notably, "the severity and pervasiveness evaluation is particularly unsuited for summary judgement [sic] because it is 'quintessentially a question of fact.'" *Id.* at

429 (*quoting O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

"In some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment." *McGuinn-Rowe v. Foster's Daily Dem.*, U.S. Dist. Ct. Dist. New Hampshire, No. 94-623-SD at p. 7 (attached as Exhibit A), quoting *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 718 (3d Cir. 1997).

The Third Circuit expressly held that "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally" may serve as evidence of a hostile environment. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990); *see also Flick v. Aurora Equip. Co.*, No. CIV.A. 03-CV-2508, 2004 WL 220859, at *6 (E.D. Pa. Jan. 13, 2004) (holding that the combination of sex-specific derogatory terms such as "fucking bitch" and "regular instances of hostility directed at Plaintiff by her co-workers creates an inference of a hostile work environment sufficient to survive summary judgment").

Here, Plaintiff has shown that the harassment was severe or pervasive. Plaintiff worked with Vanburen on nineteen days following the sexual assault. The mere presence of Vanburen created a hostile work environment, which worsened after Plaintiff told him she was pregnant. After that, Vanburen regularly harassed Plaintiff every time they worked together – from calling her a "bitch" and a "whore" and telling her to get an abortion to physically harassing Plaintiff by

smashing her hands and shoulder checking her.

Regarding the third element, if a plaintiff "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21–22. No single factor is required, but "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." Id. at 22.

Here, Plaintiff has shown that Vanburen's harassment detrimentally affected her. Plaintiff told Steffen that she did not want to work around Mr. Vanburen anymore. [Def. Facts ¶ 119; Pl. Facts ¶ 119]. Plaintiff asked Steffen if she could be moved to work different shifts than Mr. Vanburen. [Def. Facts ¶ 120; Pl. Facts ¶ 120]. Steffen switched Plaintiff's shift to dayshift for about a week but then told her she would have to return to the second shift to work with Vanburen. [Pl. Facts ¶¶ 120-122]. Vanburen knew how important Plaintiff's job was to her. [Pl. Facts ¶ 444]. On several occasions, Plaintiff cried at work. [Pl. Facts ¶ 445]. Some of Plaintiff's co-workers commented to Plaintiff about how Vanburen was treating her at work. [Pl. Facts ¶ 446]. Plaintiff testified that she felt "[d]epressed, full of anxiety, overwhelmed" as a result of what happened at Penn State, that Vanburen's treatment of her made her feel "awful," and that "it kind of spilled over into work because he brought it to work." [Pl. Facts ¶ 447]. Plaintiff testified that how her

employment with Penn State ended made her feel "[s]hitty." [Pl. Facts ¶ 448].

Plaintiff has been going to counseling at Centre Safe for the December 2019 assault

and what happened at work after the December 2019 assault. [Pl. Facts ¶ 449].

Regarding the fourth factor, a plaintiff must show that "a reasonable person

in the plaintiff's position, considering all of the circumstances," would be

detrimentally affected. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81

(1998) (internal quotation marks omitted). As discussed above, Vanburen sexually

assaulted Plaintiff and then harassed her at work every day they worked together

after she refused to get an abortion. Given these facts, a jury should be permitted to

decide whether a reasonable person in Plaintiff's position would have been

detrimentally affected.

Regarding the fifth element, to show respondeat superior liability for

nonsupervisory harassment, a plaintiff must establish three elements: (1)

management level employees (2) had actual or constructive knowledge of the

harassment and (3) failed to take prompt and appropriate remedial action. See

*Huston*, 568 F.3d at 104; *see also Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007)

(noting that an employer will be liable for nonsupervisory harassment if the

employer is shown to be "negligent or reckless in failing to train, discipline, fire, or

take remedial action upon notice of the harassment").

Here, Steffen and Eicher, both management level employees had actual

notice of the harassment and failed to take action. As discussed above, Steffen spoke to Vanburen but the harassment continued. As discussed above, Eicher tried to conceal the fact that Plaintiff reported Vanburen's conduct − the assault, pressuring her to have an abortion. Eicher actually spoke to Employee Relations about whether they could fire Plaintiff. Instead of reporting this to the Affirmative Action Office herself, she had Steffen do it, because she knew that he did not know about the assault. Once the AAO received the Share Report, they sent two emails to an email address Plaintiff never used. They never called her cell phone or emailed her personal email address. They never investigated the complaint, including interviewing Vanburen. They never disciplined Vanburen and he still works for Defendant.

Defendant also does not have an effective policy. First, Plaintiff did not understand Defendant's policies. [Pl. Facts ¶¶ 145-4148]. Second, Eicher does not even know if Vanburen's conduct, if true, would violate Defendant's policies. [Pl. Facts ¶¶ 406-409]. If Eicher does not know this, then Defendant clearly has not failed to train its employees.

**B.    A Jury Must Decide Plaintiff's Title IX Hostile Work Environment Claim**

As discussed above, Plaintiff has established the first four elements of the first four prongs of her hostile work environment claim. As Defendant notes, in the Title IX context, the fifth element is a showing of deliberate indifference, which

requires more than negligence.

As discussed above, Plaintiff has shown intentional conduct to cover up her complaints instead of addressing them. Eicher is a seasoned Human Resources professional who has worked in Human Resources since 1969 and for Penn State since 1997. [Pl. Facts ¶¶ 317-326]. Eicher understands that if a Penn State employee reports harassment to a supervisor or manager, the supervisor or manager has a duty to report it to "the Title IX representative at the Affirmative Action Office . . . [a]s soon as they can." [Pl. Facts ¶¶ 324-327].

As discussed above, Plaintiff told Eicher that Vanburen sexually assaulted her and that he had been harassing her at work after she refused to get an abortion. Eicher did not write any of this information down in her notes. Instead, she called Employee Relations and, according to Eicher's original shorthand notes, Employee Relations asked if there was a basis to terminate Plaintiff. This shows that Defendant was looking to get rid of Plaintiff.

Eicher tried to conceal the fact that Plaintiff reported Vanburen's conduct – the assault, pressuring her to have an abortion. Eicher than told Steffen—knowing that he did not know that Vanburen sexually assaulted Plaintiff—to make the Share Report because she knew he would not alert the Affirmative Action Office to the sexual assault.

Once the AAO received the Share Report, they sent two emails to an email address Plaintiff never used. Defendant never investigated Plaintiff's complaint. Defendant knew Plaintiff's cell phone number and personal Gmail address, but never attempted to contact her after Pasko did not hear back from the two emails she sent to Plaintiff's work email address. Defendant never spoke to Vanburen about Plaintiff's complain. [Pl. Facts ¶¶ 365-405].

### C. A Jury Must Decide Plaintiff's Title VII Constructive Discharge Claim

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). Courts apply an objective test and ask: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.* "[A] reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993). However, it is not "require[d] that such steps be taken in all cases. An employee may be able to show working conditions were so intolerable that a reasonable employee would feel forced to resign without remaining on the job for the period necessary to take those steps." *Id.* at 1161 n. 6.

As Defendant states, "[f]actors frequently considered in making the above

determination include: threats of termination or suggested resignation, demotions, reductions in pay and benefits, transfer to less desirable positions, alteration of job responsibilities, and/or poor performance evaluations. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)."

Here, as discussed above, despite addressing her concerns about Vanburen with Steffen, Vanburen's conduct continued. Plaintiff testified that on February 7, 2020, Vanburen "had smashed my hands in the dish machine several times. He had shoulder checked me, purposely running into me, being in my way, the comments" (*i.e.*, "bitch" and "whore"). Plaintiff felt that she had no choice but to leave work early.

After Plaintiff left work on February 7, 2020, she intended to remain employed with Penn State because she wanted a career at Penn State; however, Plaintiff never returned to work at the NLI. Plaintiff texted Steffen after she left work; Steffen never responded to Plaintiff.

Since Plaintiff intended to remain employed with Penn State, she reached out to Eicher for help. Instead of helping Plaintiff, Eicher spoke to Employee Relations about whether they could fire Plaintiff.

The Housekeeping position was the third shift (overnight). The work hours were 11:30 p.m. to 7:00 a.m. [Pl. Facts ¶ 352]. Eicher testified that the Housekeeping position requires "[m]inimal skill" and that the duties are "primarily

cleaning public space, vacuuming, dusting, cleaning, replenishing bathrooms" and sometimes doing "something in one of the rooms," which could be "cleaning it and preparing it for the next guest." [Pl. Facts ¶ 353]. According to Jacqueline Weyer, Director of Housekeeping at the NLI for fifteen years, there was only one job (technical service) in the Housekeeping department at the NLI, so there was no opportunity to move up. [Pl. Facts ¶¶ 354-356 332]. The overnight Housekeeping position's duties were "[d]eep cleaning the public space areas," which included scrubbing the carpet, floors, kitchen, and walls, running floor care, and waxing floors. [Pl. Facts ¶ 358].

As discussed above, Plaintiff's goal was to work her way up in a culinary position like Steffen had done. In January 2020, Steffen stopped mentoring Plaintiff. Defendant, however, unilaterally decided to move Plaintiff to the Housekeeping department, which is a different department. Instead of admitting this, Defendant claims that Plaintiff asked to move to Housekeeping. Eicher even tried to cover her tracks by adding a two-line exchange to her notes of her conversation with Plaintiff that never occurred.

When Perry spoke with Eicher, Eicher said she would get back to them, but never did. Ultimately, Plaintiff's employment ended when Eicher wrote a letter Eicher wrote a letter dated March 9, 2020, which falsely claims, "[a]s you inquired, we are able to transfer you from Stewarding to the Housekeeping Department." As

discussed above, Plaintiff never asked about transferring to the Housekeeping department.

Eicher's letter also states, "If we do not hear from you by the end of business day on Monday, March 16, we will assume you have no interest in continuing your employment with The Nittany Lion Inn and will consider you to have voluntarily quit your employment." Plaintiff never received Eicher's letter and Eicher has **no** proof, not even a postmark on the U.S. Postal Service Certified Mail Receipt that she mailed the latter.

Defendants attempt to transfer Plaintiff to the less desirable Housekeeping positions and alteration of her job responsibilities since the Housekeeping position had different responsibilities establish Plaintiff's constructive discharge claim. Further, Eicher told Perry that she would look into other options (from Hosuekeeping) and get back to Plaintiff, but she never did.

### D.  A Jury Must Decide Plaintiff's Title VII and Title IX Retaliation Claims

Under the *McDonnell Douglas* framework, the plaintiff must first establish the existence of a prima facie case. To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d

Cir. 2006), as amended (Sept. 13, 2006).

Under the *McDonnell Douglas* framework, once the plaintiff establishes her prima facie case of retaliation, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment action the plaintiff suffered. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07. To defeat summary judgment when the employer advances a legitimate, non-discriminatory reason, the plaintiff must show pretext by pointing to some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons. *Id.* at 765 (internal quotation marks and citation omitted; alteration in original).

As discussed above, Plaintiff engaged in protected activity when she complained to Steffen and again when she complained to Eicher. As discussed above, Steffen knew that Plaintiff was pregnant and Vanburen was the father. Plaintiff made numerous complaints to Steffen about Vanburen telling Plaintiff that

she really needed to think about getting an abortion and calling Plaintiff names like "bitch" and "whore." Plaintiff reported Vanburen's comments to Steffen almost every time it happened.

Between mid-January and February 7, 2020, Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards her because she would not abort the baby. Plaintiff also told Steffen that Vanburen wanted her to get an abortion. Plaintiff told Steffen that she was upset by Vanburen's treatment of her. Further, When Vanburen required Plaintiff to lift more than fifty pounds, Plaintiff reported this to Steffen.

As discussed above, after Plaintiff complained to Steffen, he stopped mentoring her and spoke to her about her attendance for the first time, despite alleged documented prior attendance issues. This is an adverse action.

When Plaintiff spoke with Eicher in February 2020, Plaintiff told Eicher what happened on December 13, 2019—that Vanburen sexually assaulted her, that she was pregnant, and that Vanburen wanted her to get an abortion. Plaintiff also told Eicher after that after she refused to get an abortion, "that's when the hostile work environment and the harassment really escalated," which included Vanburen's comments to Plaintiff (calling her a bitch and a whore), standing in Plaintiff's way at work, shoulder checking Plaintiff, and smashing Plaintiff hands in

the dish machine. Plaintiff also told Eicher that she had a lifting restriction due to her pregnancy. Plaintiff also told Eicher that after Plaintiff complained to Steffen about Vanburen's harassment, Steffen told Plaintiff that he was going to talk to Vanburen. Steffen later told Plaintiff that he spoke with Vanburen. Plaintiff also told Eicher that Steffen had tried to switch her schedule. Plaintiff also told Eicher that she no longer wished to work with Vanburen.

Defendant understood Plaintiff's complaint to be protected activity. As discussed above, when Eicher instructed Steffen to file the Share Report, Eicher stated, "because of so many elements that fall under Title [IX]." A Share Report is the reporting system used to report a Title IX issue to Penn State's Affirmative Action Office. Eicher understands that Title IX "has to do with sexual harassment."

After Plaintiff complained to Eicher, Eicher spoke with Employee Relations about whether they could fire Plaintiff. Defendant then unilaterally transferred Plaintiff to the less desirable Housekeeping position. On February 14, 2020, Thomas Neely, General Manager of the NLI, sent an email, which states that Employee Relations wanted the NLI to move Plaintiff to the Housekeeping department. [Pl. Facts ¶ 364]. This is an adverse action.

As discussed above, Eicher claims that Plaintiff asked to move to the Housekeeping department and told her that she wanted to work in the

Housekeeping department; however, at no time did Plaintiff tell Eicher anything about transferring to the Housekeeping department. Defendant's intent is demonstrated by their actions.

Ultimately, Plaintiff's employment ended when Eicher wrote a letter Eicher wrote a letter dated March 9, 2020, which falsely claims, "[a]s you inquired, we are able to transfer you from Stewarding to the Housekeeping Department." As discussed above, Plaintiff never asked about transferring to the Housekeeping department.

Eicher's letter also states, "If we do not hear from you by the end of business day on Monday, March 16, we will assume you have no interest in continuing your employment with The Nittany Lion Inn and will consider you to have voluntarily quit your employment."  Plaintiff never received Eicher's letter and Eicher has **<u>no</u>** proof, not even a postmark on the U.S. Postal Service Certified Mail Receipt that she mailed the latter.

Finally, based on the facts discussed above, Plaintiff has shown a causal link between the adverse action and Plaintiff's complaint, based upon (1) the temporal proximity, (2) the pattern of antagonism after the protected act and (3) the record as a whole. *See Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 530 (E.D. Pa. 2014). The adverse actions occurred immediately after Plaintiff complained. Defendant then tried to transfer Plaintiff to a Housekeeping position and cover it

up by claiming that Plaintiff wanted to work in Housekeeping.

Regarding pretext, Defendant claims that its "exploration of a transfer opportunity for Plaintiff was done for the legitimate, non-retaliatory reason that it sought to accommodate Plaintiff's request to refrain from working with Mr. Vanburen." However, as discussed in detail above, Plaintiff establishes pretext because a reasonable juror could disbelieve Eicher who discussed firing Plaintiff with Employee Relations and whose credibility issues are detailed above on pages 19-23.

## V.      Conclusion

Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

                               Respectfully submitted,

Dated: July 26, 2023           /s/ Stephanie J. Mensing
                               Stephanie Mensing
                               Mensing Law LLC
                               PA ID No. 89625
                               1515 Market Street, Suite 1200
                               Philadelphia, PA 19102
                               215-586-3751; 215-359-2741 (fax)
                               stephanie@mensinglaw.com
                               Attorney for Plaintiff