## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jane Doe, | : | Civil Action |
| | : | |
| Plaintiff | : | No. 21-cv-01862-MWB |
| vs. | : | |
| | : | |
| The Pennsylvania State University, | : | |
| | : | |
| Defendant | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Jane Doe ("Plaintiff") submits the following Response to Defendant's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment. Plaintiff does not agree with any characterizations or argument contained in Defendant's headings but repeats Defendant's headings for the Court's convenience.

### I.    **Procedural History**

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Undisputed.

1

## II.    Background

### A. Plaintiff's Background Generally

5.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

6.     Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Plaintiff worked for UPS for one day in August 2021. [Def. Ex. D at Appx. 297]. By way of further response, Plaintiff has made efforts to find employment since her employment with Penn State terminated. [Plaintiff's Third Amended Objections and Answers to Defendant's First Set of Interrogatories Directed to Plaintiff at pp. 14-17 (Pl. Ex. 1); Pl. Dep. 189:19-190:16, 192:14-194:9, 247:8-18 (Def. Ex. C)].

7.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

8.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff testified that she "looked into" what programs Penn State had to offer. Plaintiff applied for a position at the Nittany Lion Inn because she wanted to work her way up in the culinary department. Plaintiff did not need a degree to work her way up to become a chef. [Pl. Dep. 22:19-23:10, 196:22-197:3 (Def. Ex. C)].

9.     Undisputed; however, this is not material to the Court's disposition of

2

Defendant's Motion for Summary Judgment.

10.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

11.     Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's citation does not support its claim that Plaintiff was "was twice convicted of Driving Under the Influence ("DUI") within a one-year period." [Pl. Dep. 61:10-14 (Def. Ex. D)]. Plaintiff testified that she was "charged with two DUIs." [Pl. Dep. 61:10-14 (Def. Ex. D)].

12.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's citation does not support its claim "[a]s a result of her multiple DUI convictions within one year." [Pl. Dep. 209:6-13 (Def. Ex. D)]. Plaintiff testified that she entered a guilty plea for both offenses. [Pl. Dep. 209:6-13 (Def. Ex. D)]. Undisputed that Plaintiff served five (5) days in jail, was placed on probation, and had her Pennsylvania driver's license suspended.

13.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's citation does not support its claim "[p]ursuant to 75 Pa.C.S. § 3805 . . ." [Pl. Dep. 61:15-62:1 (Def. Ex. D)]. Undisputed that Plaintiff testified in order to get her license back, she would have to pay a large amount of money to install a breathalyzer in her vehicle for a

3

year. [Pl. Dep. 61:15-62:1 (Def. Ex. D)].

14.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

15.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

16.     Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's citation does not support its claim that "Plaintiff did not own a vehicle in 2019 or 2020." [Pl. Dep. 62:19-23 (Def. Ex. D)].

### B. Plaintiff's Employment with Penn State

17.     Undisputed.

18.     Disputed in part. Undisputed that Plaintiff applied for multiple positions at Penn State. Disputed that these positions were all with Penn State's hotels. Defendant's citation does not support that statement. Disputed that the document Bates numbered Penn State 418-422 is accurate.[1] For example, the first job listed on Penn State 418 is Steward/Dishwasher, Nittany Lion Inn and indicates that Plaintiff applied for this job on January 25, 2022. [Penn State 418 (Def. Ex. G)]. Plaintiff was already working as a Steward/Dishwasher at the Nittany Lion Inn as

---

[1] Penn State 418-422 is Pl. Dep. Ex. 14 (Def. Ex. C). Defendants also submitted Penn State 418-422 in Def. Ex. G.

of January 25, 2020, so she did not apply for this position on that date. [Pl. Dep. 243:9-244:5 (Def. Ex. C)].

19.   Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Undisputed that Penn State 421 indicates that Plaintiff applied for a Guest Room Attendant position in the Auxiliary and Business Services department; however, Plaintiff does not recall applying for this position. [Pl. Dep. 140:11-141:15, 142:14-24 (Def. Ex. C)]. By way of further response, disputed that the document Bates numbered Penn State 418-422 is accurate. For example, the first job listed on Penn State 418 is Steward/Dishwasher, Nittany Lion Inn and indicates that Plaintiff applied for this job on January 25, 2022. [Penn State 418 (Def. Ex. G)]. Plaintiff was already working as a Steward/Dishwasher at the Nittany Lion Inn as of January 25, 2020, so she did not apply for this position on that date. [Pl. Dep. 243:9-244:5 (Def. Ex. C)].

20.   Undisputed even though Defendant's citation does not support that statement; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff does not recall applying for a guest room attendant position. [Pl. Dep. 140:11-141:15 (Def. Ex. C)].

21.   Undisputed.

22.   Disputed in part. Undisputed that Plaintiff was hired by Penn State and began working as a part-time Overnight Cleaner at the NLI on or about April 29,

2019. Disputed that Plaintiff was "performing housekeeping services." Defendant's citation does not support this statement. [Pl. Resp. to Def.'s Interrog. No. 8 (Def. Ex. D); Pl. Dep. 23:11-18, 24:14-17 (Def. Ex. C); Steffen Affidavit ¶ 27 (Def. Ex. E); Vanburen Affidavit ¶ 14 (Def. Ex. F)]. Plaintiff testified that the overnight Cleaner's job duties were to detail the whole kitchen, including the grills, fryers, and stovetop. [Pl. Dep. 45:5-9 (Def. Ex. C)]. Eicher testified that "housekeeping" duties  are "primarily cleaning public space, vacuuming, dusting, cleaning, replenishing bathrooms" and sometimes doing "something in one of the rooms," which could be "cleaning it and preparing it for the next guest." [Eicher Dep. 171:6-23 (Def. Ex. H)]. By way of further response, on the overnight shift, Plaintiff worked from around 9:00 p.m. or 9:30 p.m. until 4:00 a.m. or 5:00 a.m., sometimes even 6:00 a.m. [Pl. Dep. 27:6-8 (Def. Ex. C)].

23.    Undisputed. By way of further response, William Lindemuth also supervised Plaintiff. [Pl. Dep. 38:18-39:14 (Def. Ex. C)

24.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

25.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

26.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

27.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Further, Defendant's citation to Eicher Dep. Ex. 29 does not support its statement.

28.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

29.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

30.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

31.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

32.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

33.     Undisputed. By way of further response, Plaintiff moved to the daytime shift at NLI because she "wanted to pursue a culinary career" and Steffen "told me to start there and then he was mentoring me." [Pl. Dep. 24:6-13, 26:20-22, 27:17-24 (Def. Ex. C)]. Steffen mentored Plaintiff to help her learn and pursue a career in culinary. [Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)].

34.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Undisputed that Penn State 418

indicates that Plaintiff applied for a Guest Room Attendant position in the Auxiliary and Business Services department; however, Plaintiff does not recall applying for this position. [Pl. Dep. 140:14-141:14 (Def. Ex. C)]. By way of further response, disputed that the document Bates numbered Penn State 418-422 is accurate. For example, the first job listed on Penn State 418 is Steward/Dishwasher, Nittany Lion Inn and indicates that Plaintiff applied for this job on January 25, 2022. [Penn State 418 (Def. Ex. G)]. Plaintiff was already working as a Steward/Dishwasher at the Nittany Lion Inn as of January 25, 2020, so she did not apply for this position on that date. [Pl. Dep. 243:9-244:5 (Def. Ex. C)].

35.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff does not recall applying for this position. [Pl. Dep. 140:14-141:14 (Def. Ex. C)].

36.     Disputed that Steffen contemporaneously documented the attendance alleged issues. Defendant claims that Steffen documented the alleged attendance issues in mid-February 2020, after Eicher asked him to provide a timeline regarding Plaintiff's employment. [Def. Facts ¶¶ 191-192]. By way of further response, Plaintiff disputes the accuracy of Steffen's timeline of alleged attendance issues is accurate. [Pl. Dep. 255:18-257:2 (Def. Ex. C)].

37.     Disputed in part. Undisputed that Steffen made this notation. Disputed that Steffen contemporaneously documented the attendance alleged issues.

Defendant claims that Steffen documented the alleged attendance issues in mid-February 2020, after Eicher asked him to provide a timeline regarding Plaintiff's employment. [Def. Facts ¶¶ 191-192]. By way of further response, Plaintiff disputes the accuracy of Steffen's timeline of alleged attendance issues is accurate. [Pl. Dep. 255:18-257:2 (Def. Ex. C)]. Plaintiff testified that she may have called off work due to being sick "[m]aybe once." [Pl. Dep. 96:5-8 (Def. Ex. C)].

38.   Disputed in part. Undisputed that Steffen did not discipline Plaintiff for any alleged absences between July 29, 2019 and August 7, 2019. Disputed that Steffen's "Timeline of events" is accurate. [Pl. Dep. 95:22-98:5, 254:18-257:2 (Def. Ex. C)]. Eicher testified that the only thing she verified in Steffen's "Timeline of events" was "her working schedule, the last few lines." [Eicher Dep. 130:15-131:6 and Eicher Dep. Ex. 15 (Def. Ex. H)]. By way of further response, Defendant's citation indicates that Plaintiff testified that Steffen spoke to Plaintiff about her attendance on February 7, 2020; however, Plaintiff did not testify to this. Plaintiff testified, "Or when he addressed my attendance on the 7th, the day I walked out, **but that was way previously before February 7th because someone had gone to him,** I'm assuming Trea, **about me being off work**, but Jamie knew I was off work due to my pregnancy." [Pl. Dep. 256:21-257:2 (Def. Ex. C) (Emphasis added)].

39.   Disputed in part. Undisputed that Steffen made this notation. Disputed

that Steffen contemporaneously documented the attendance alleged issues. Defendant claims that Steffen documented the alleged attendance issues in mid-February 2020, after Eicher asked him to provide a timeline regarding Plaintiff's employment. [Def. Statement of Facts at ¶¶ 191-192]. By way of further response, Plaintiff disputes the accuracy of Steffen's timeline of alleged attendance issues is accurate. [Pl. Dep. 255:18-257:2 (Def. Ex. C)]. Plaintiff testified that she never called off work due to a family emergency. [Pl. Dep. 96:5-18 (Def. Ex. C)].

40.    Undisputed. By way of further response, Defendant's citation indicates that Plaintiff testified that Steffen spoke to Plaintiff about her attendance on February 7, 2020; however, Plaintiff did not testify to this. Plaintiff testified, "Or when he addressed my attendance on the 7th, the day I walked out, **but that was way previously before February 7th because someone had gone to him,** I'm assuming Trea, **about me being off work**, but Jamie knew I was off work due to my pregnancy." [Pl. Dep. 256:21-257:2 (Def. Ex. C) (Emphasis added)].

41.    Disputed in part. Undisputed that Steffen made this notation. Disputed that Steffen contemporaneously documented the attendance alleged issues. Defendant claims that Steffen documented the alleged attendance issues in mid-February 2020, after Eicher asked him to provide a timeline regarding Plaintiff's employment. [Def. Statement of Facts at ¶¶ 191-192]. By way of further response, Plaintiff disputes the accuracy of Steffen's timeline of alleged attendance issues is

accurate. [Pl. Dep. 255:18-257:2 (Def. Ex. C)]. Plaintiff testified that she never called off work due to a family emergency. [Pl. Dep. 96:5-18 (Def. Ex. C)].

42.     Undisputed. By way of further response, Defendant's citation indicates that Plaintiff testified that Steffen spoke to Plaintiff about her attendance on February 7, 2020; however, Plaintiff did not testify to this. Plaintiff testified, "Or when he addressed my attendance on the 7th, the day I walked out, **but that was way previously before February 7th because someone had gone to him,** I'm assuming Trea, **about me being off work**, but Jamie knew I was off work due to my pregnancy." [Pl. Dep. 256:21-257:2 (Def. Ex. C) (Emphasis added)].

43.     Undisputed. By way of further response, Plaintiff moved to the second shift Steward position because she "wanted to pursue a culinary career" and Steffen "told me to start there and then he was mentoring me." [Pl. Dep. 24:6-13, 26:20-22, 27:17-24 (Def. Ex. C)]. Steffen mentored Plaintiff to help her learn and pursue a career in culinary. [Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)].

44.     Undisputed. By way of further response, Plaintiff moved to the second shift Steward position because she "wanted to pursue a culinary career" and Steffen "told me to start there and then he was mentoring me." [Pl. Dep. 24:6-13, 26:20-22, 27:17-24 (Def. Ex. C)]. Steffen mentored Plaintiff to help her learn and pursue a career in culinary. [Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)]. On the second shift, Plaintiff worked from around 3:00 p.m. or 4:00 p.m. until 11:00 p.m., midnight,

or 1:00 a.m. [Pl. Dep. 27:8-10 (Def. Ex. C)].

45.     Disputed in part. Undisputed that Steffen made this notation. Disputed that Steffen contemporaneously documented the attendance alleged issues. Defendant claims that Steffen documented the alleged attendance issues in mid-February 2020, after Eicher asked him to provide a timeline regarding Plaintiff's employment. [Def. Statement of Facts at ¶¶ 191-192]. By way of further response, Plaintiff disputes the accuracy of Steffen's timeline of alleged attendance issues is accurate. [Pl. Dep. 255:18-257:2 (Def. Ex. C)]. Also, Defendant's citation to Plaintiff's deposition does not support its statement.

46.     Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Plaintiff never told Steffen she was late for work on November 17, 2019 because the police were at her apartment for a domestic dispute involving Plaintiff's former fiancée, Kasha Perry. [Pl. Dep. 97:3-15 (Def. Ex. C)].

47.      Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Plaintiff did not report to work at the NLI with bruises. [Pl. Dep. 118:9-12 (Def. Ex. C)].

48.     Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Steffen did not offer Plaintiff information about Penn State's Employee Assistance Program ("EAP") or refer her

to the Centre County Women's Resource Center, which is now called Centre Safe. [Pl. Dep. 97:16-20 (Def. Ex. C); Plaintiff hearing testimony 84:1-8 (Pl. Ex. 9 at Plaintiff 358)].

49.     Disputed because Defendant's citation does not support its claim that "Plaintiff denies that Ms. Perry was ever violent towards her;" however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. The deposition testimony cited is about Plaintiff's alleged conversation with Steffen in November of 2019. Plaintiff denies telling Steffen that she was late to work because the police were at her apartment as a result of a domestic abuse phone call. [Pl. Dep. 97:3-9 (Def. Ex. C)].

50.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's citation does not support its claim that Perry "has a history of convictions for drug charges, theft, and disorderly conduct related to fighting." [Pl. Dep. 233:17-20 (Def. Ex. C); Plaintiff 399-400 (Def. Ex. 399)]. Undisputed that Perry has convictions for receiving stolen property, a misdemeanor of the first degree (2008); retail theft (2017); retail theft (2020). [Plaintiff 399-400 (Def. Ex. I)].

51.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Undisputed that Perry was incarcerated as of March 20, 2023. Disputed that Perry was incarcerated "related to

her most recent criminal charges." Defendant's citation does not support this statement.

### C. Plaintiff's Pregnancy with NLI Coworker

52.     Undisputed.

53.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

54.     Undisputed.

55.     Undisputed.

56.     Undisputed.

57.     Undisputed.

58.     Undisputed.

59.     Undisputed.

60.     Undisputed.

61.     Undisputed.

62.     Disputed. Every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-

160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)].

63.     Disputed as stated. Every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)].

64.     Disputed in part. Disputed that Vanburen did not supervise any NLI employees. Every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)]. Undisputed that Vanburen did not create work schedules or issue formal discipline.

65.     Disputed. Defendant's citation does not support its statement—it vaguely refers to the 165-page CBA without any specific reference to support its statement.

66.     Disputed. According to Defendant's response to Plaintiff's EEOC Charge, "Vanburen was a full-time Overnight Steward (supervisor of the dishwasher area)." [Finnecy Dep. 44:21-45:4 (Pl. Ex. 6) and Finnecy Dep. Ex. 36 at Penn State 61 (Pl. Ex. 7)]. Finnecy testified that he would have learned that Vanburen was supervisor of the dishwasher area from either Eicher or Steffen. [Finnecy Dep. 45:1-7 (Pl. Ex. 6)]. Further, every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 46:25-47:25, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)]. Further, Defendant's citation to Eicher's testimony does not support its statement.

67.     Undisputed. By way of further response, Plaintiff and Vanburen often worked the same days. [Pl. Dep. 32:7-13 (Def. Ex. C)]. After Plaintiff moved to the second shift, she got to know Vanburen at work. [Pl. Dep. 31:15-23 (Def. Ex. C)].

68.     Undisputed with clarification. Steffen was Plaintiff's direct supervisor; however, every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to

be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)].

69.     Disputed to the extent that Defendant suggests that Plaintiff and Vanburen socialized alone. Plaintiff testified that she, her partner (Kasha Perry), Vanburen, and Vanburen's wife and sometimes other NLI employees socialized together outside of work "[a] couple of times . . . maybe at the most five." [Pl. Dep. 54:2-16, 55:8-58:7 (Def. Ex. C)]. Further, Defendant's citation to Eicher's testimony does not support its statement.

70.     Undisputed. By way of further response, Plaintiff was unable to drive to work because she did not have a valid driver's license. Plaintiff did not live within walking distance to the NLI. Starting around September 2019 when Plaintiff moved to the second shift, Vanburen gave Plaintiff a ride to work "[e]very shift we worked together." After Vanburen realized that Plaintiff lived close by and how she got to work, he offered to give Plaintiff rides to work.[2] Sometime in January 2020, Plaintiff stopped riding to work with Vanburen. [Pl. Dep. 54:21-23, 60:10-61:2, 63:6-17,

---

[2] Plaintiff testified that they lived "less than three minutes apart. [Pl. Dep. 64:12-16 (Def. Ex. C)].

64:6-11, 64:17-24, 66:3-11 (Def. Ex. C)].

71.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Disputed to the extent that Defendant suggests that Plaintiff gave Vanburen prescription Adderall pills in exchange for every ride to work that Vanburen gave Plaintiff. Plaintiff testified that she gave Adderall pills to Vanburen "[a]ny time he asked for them." [Pl. Dep. 65:11-13 (Def. Ex. C)]. Plaintiff further testified that she also paid cash to Vanburen in exchange for rides to work. [Pl. Dep. 65:14-21 (Def. Ex. C)].

72.     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Disputed that Plaintiff and Vanburen "frequently" communicated through Facebook Messenger and Snapchat telephone apps. Plaintiff did not testify about any frequency of these communications, only that she and Vanburen communicated through "[t]ext or messenger, Snapchat." [Pl. Dep. 55:5-7 (Def. Ex. C)].

73.     Disputed in part. Disputed as to the characterization of these social events as "double dates." Defendant's citation does not support this characterization. Further, Plaintiff testified that she, her partner (Kasha Perry), Vanburen, and Vanburen's wife and sometimes other NLI employees socialized together outside of work "[a] couple of times . . . maybe at the most five." [Pl. Dep. 54:2-16, 55:8-58:7 (Def. Ex. C)].

74.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

75.    Disputed to the extent Defendant suggests that the sexual intercourse was consensual; it was not. [Pl. Dep. 66:16-21, 79:16-18, 90:5-10, 90:15-21, 135:6-137:2, 137:18-21, 139:13-23 (Def. Ex. C)]. By way of further response, Plaintiff was under the influence of alcohol. [Pl. Dep. 90:5-10 (Def. Ex. C)].

76.    Undisputed with clarification. As a result of the sexual assault, Plaintiff became pregnant. [Pl. Dep. 66:16-67:12, 74:6-8, 79:16-18, 90:5-10, 90:15-21, 108:3-5, 135:6-137:2, 137:18-21, 139:13-23 (Def. Ex. C)].

77.    Disputed to the extent that, by using the word "claims," Defendant suggests that Plaintiff's testimony is not truthful. It is undisputed that on January 7, 2020, Plaintiff first learned she was pregnant by taking a home pregnancy test. [Pl. Dep. 66:4-9, 74:6-14 (Def. Ex. C); Vanburen Affidavit at ¶ 40 (Def. Ex. F)].

78.    Undisputed. By way of further response, Plaintiff told Vanburen that she was pregnant the same day she found out. [Pl. Dep. 66:23-67:12 (Def. Ex. C)].

79.    Undisputed. By way of further response, Plaintiff told Vanburen that she was pregnant the same day she found out. [Pl. Dep. 66:23-67:12 (Def. Ex. C)].

80.    Disputed in part. Disputed that Plaintiff "assured" Vanburen via text message, that "all is cool" and said they could "remain friends." As Plaintiff testified, she told Vanburen that "all is cool" and said they could "remain friends" "because

[Vanburen] had threatened me." [Pl. Dep. 72:17-19 (Def. Ex. C); Plaintiff hearing testimony 101:24-102:10 (Pl. Ex. 9 at 375-376)]. Undisputed that Plaintiff sent the message. By way of further response, the Snapchat messages that are Bates numbered Plaintiff 1-3 were obtained from Vanburen.[3] Vanburen did not provide all of the messages he and Plaintiff exchanged during this time period, including the messages he sent to Plaintiff about "stuff about work and stuff about the abortion." Plaintiff does not have access to the missing Snapchat messages. [Pl. Dep. 241:19-243:8 (Def. Ex. C)].

81.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

82.     Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff testified that she also paid cash to Vanburen in exchange for rides to work. Sometime in January 2020, Plaintiff stopped riding to work with Vanburen. Plaintiff stopped riding to work with Vanburen when "the harassment and hostile work environment got to be too much." [Pl. Dep. 64:17-24, 65:14-21, 66:3-11, 70:4-7, 71:3-16, 107:1-9 (Def. Ex. C)].

---

[3] Plaintiff 1-3 is Pl. Dep. Ex.  5 (Def. Ex. C). Defendants also submitted Plaintiff 1-2 as Vanburen Affidavit Ex. C (Def. Ex. F)].

### D. Plaintiff's Normal Pregnancy

83.     Undisputed.

84.     Undisputed. By way of further response, January 31, 2020 was the earliest Plaintiff could get an appointment. [Pl. Dep. 75:12-16 (Def. Ex. C)].

85.     Undisputed. By way of further response, shortly after January 31, 2020, Plaintiff was put on a pregnancy restriction. [Pl. Dep. 76:10-20 (Def. Ex. C)].

86.     Disputed. Defendant cites reports from only three medical appointments. Pl. Dep. Ex. 6 is from a medical appointment on January 31, 2020 shortly after Plaintiff learned she was pregnant and indicates, "supervision of normal first pregnancy." Pl. Dep. Ex. 9 is from a medical appointment on August 6, 2020 and notes a Diagnosis of "Supervision of **high-risk pregnancy**, unspecified trimester – Primary." [Pl. Dep. Ex. 9 (Def. Ex. C at Appx. 168) (Emphasis added)]. Pl. Dep. Ex. 11 is from a post-partum medical appointment on November 20, 2020 and notes that the visit is " for a routine postpartum visit."

87.     Disputed. Plaintiff testified that she provided both a "Due Date Verification" and a separate restriction letter regarding her pregnancy lifting restriction to Steffen when she told him that she was pregnant. [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11, 85:1-16 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at Appx. 162)]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds.

[Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)]. Plaintiff's documented conversation with her medical provider in Pl. Dep. Ex. 8 indicates that Dr. Loomis had given Plaintiff a lifting restriction letter. Plaintiff's medical provider confirmed that if Dr. Loomis gave Plaintiff a manual note regarding her, they would not have a copy of it. [Pl. Dep. 80:23-83:11 and Pl. Dep. Ex. 8 (Def. Ex. C at Appx. 163-167].

88.     Disputed. Defendant's citation does not support this claim. When asked if the August 6, 2020 medical record is the first time that the medical records noted a "high-risk pregnancy," Plaintiff answered, "I don't know." [Pl. Dep. 87:9-17 (Def. Ex. C)]. Notably, Defendant cites reports from only three medical appointments. Pl. Dep. Ex. 6 is from a medical appointment on January 31, 2020 shortly after Plaintiff learned she was pregnant; Pl. Dep. Ex. 9 is from a medical appointment on August 6, 2020—over six months later; Pl. Dep. Ex. 11 is from a post-partum medical appointment on November 20, 2020.

89.     Undisputed. By way of further response, Plaintiff's baby was born about 36 weeks premature. [Pl. Dep. 88:23-89:8 (Def. Ex. C)].

90.     Disputed. Plaintiff testified that she provided both a "Due Date Verification" and a separate restriction letter regarding her pregnancy lifting restriction to Steffen when she told him that she was pregnant. [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11, 85:1-16 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at

Appx. 162)]. Plaintiff's documented conversation with her medical provider in Pl. Dep. Ex. 8 indicates that Dr. Loomis had given Plaintiff a lifting restriction letter. Plaintiff's medical provider confirmed that if Dr. Loomis gave Plaintiff a manual note regarding her, they would not have a copy of it. [Pl. Dep. 80:23-83:11 and Pl. Dep. Ex. 8 (Def. Ex. C at Appx. 163-167]. By way of further response, Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)].

### E. Penn State's Response to Plaintiff's Normal Pregnancy

91.    Undisputed.

92.    Undisputed. By way of further response, Plaintiff also told Steffen that Vanburen wanted her to get an abortion. [Pl. Dep. 249:12-18 (Def. Ex. C)].

93.    Undisputed that Steffen stated this in his Affidavit.

94.    Undisputed with clarification. Plaintiff testified that she provided both a "Due Date Verification" and a separate restriction letter regarding her pregnancy lifting restriction to Steffen. [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at Appx. 162)].

95.    Undisputed.

96.    Undisputed with clarification. Plaintiff testified that she provided both a "Due Date Verification" and a separate restriction letter regarding her pregnancy

lifting restriction to Steffen. [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at Appx. 162)]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)].

97.     Disputed. Plaintiff testified that she provided both a "Due Date Verification" and a separate restriction letter regarding her pregnancy lifting restriction to Steffen. [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at Appx. 162); Pl. Dep. Ex. 8 (Def. Ex. C at Appx. 163-167)]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)].

98.     Disputed. Plaintiff testified that she told Steffen that was pregnant "was pregnant and provided him the due date verification letter and the [lifting] restriction paper." [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at Appx. 162); Pl. Dep. Ex. 8 (Def. Ex. C at Appx. 163-167); Pl. Resp. to Def.'s Interrog. No. 22 (Pl. Ex. 1)]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)].

99.     Disputed. Plaintiff's position required her to lift more than fifty pounds. [Pl. Dep. 81:21-82:2, 83:17-20, 94:1-14, 98:7-10, 101:21-24, 103:15-104:2, 104:8-11 (Def. Ex. C)]. By way of further response, Eicher's testimony that Plaintiff's position did not require her to lift more than fifty pounds was based on Eicher's understanding that Plaintiff's position required her to lift "[d]ishes, silverware, cooking pots, empty." [Eicher Dep. 105:1-13 (Def. Ex. H)]. Further, Vanburen testified that everyone knew that Plaintiff was not supposed to lift more than fifty pounds. [Vanburen hearing testimony 24:11-18 (Pl. Ex. 8 at Plaintiff 137)]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)].

100.    Disputed in part. Disputed that "[e]ven without a doctor's note prescribing any lifting restriction, . . ." Plaintiff testified that she provided both a "Due Date Verification" and a separate restriction letter regarding her pregnancy lifting restriction to Steffen. [Pl. Dep. 77:6-21, 78:3-79:7, 80:1-16, 80:23-83:11 (Def. Ex. C); Pl. Dep. Ex. 7 (Def. Ex. C at Appx. 162); Pl. Dep. Ex. 8 (Def. Ex. C at Appx. 163-167); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)]. Steffen concedes that Plaintiff came to him about health issues related to her pregnancy and informed him that she got not lift more than fifty pounds. [Steffen hearing testimony 86:21-23, 88:5-17 (Pl. Ex. 8 at Plaintiff 199, 201)]. Undisputed that Steffen told Vanburen and

Johnson that Plaintiff was not to be lifting over fifty pounds. Vanburen testified that everyone knew that Plaintiff was not supposed to lift more than fifty pounds. [Vanburen hearing testimony 24:11-18 (Pl. Ex. 8 at Plaintiff 137)]. After Plaintiff provided her lifting restriction letter to Steffen, he informed Vanburen and Johnson that Plaintiff was not supposed to lift more than fifty pounds and that they were supposed to make sure that Plaintiff was not doing mats or so they would help her with anything heavy. [Pl. Dep. 83:17-83:24, 105:9-106:12 (Def. Ex. C); Vanburen hearing testimony 24:11-18 (Pl. Ex. 8 at Plaintiff 137)]. Disputed to the extent that Defendant is implying that Vanburen followed Steffen's instruction. Following Steffen's instruction that Plaintiff was not to be lifting over fifty pounds, Vanburen required Plaintiff to lift more than fifty pounds three to five times between January 7, 2020 and February 7, 2020. [Pl. Dep. 101:21-102:4, 103:15-23 (Def. Ex. C)]. Plaintiff testified, "[a]t the end of the night, we had to take like the big heavy rubber mats off the floor and send them through the dish machine and then take them like off the conveyer of the dish machine and load them onto a big rack." Steffen had instructed Vanburen that Plaintiff was not to do mats because of her restrictions. [Pl. Dep. 94:1-14, 98:7-10, 101:21-24, 103:15-104:2 (Def. Ex. C)]. When Vanburen required Plaintiff to lift more than fifty pounds, Plaintiff reported this to Steffen. [Pl. Dep. 103:24-104:7 (Def. Ex. C)].

### F. Plaintiff and Ms. Perry's Repeated Messages to Mr. Vanburen

101.   Disputed as stated. Vanburen pressured Plaintiff to have an abortion. [Pl. Dep. 107:22-108:5, 137:22-138:2, 242:14-17 (Def. Ex. C)]. Plaintiff did not want to have an abortion. [Pl. Dep. 108:1-2 (Def. Ex. C)].

102.   Undisputed with clarification. Plaintiff refused to have an abortion. Plaintiff testified that she could not have terminate her pregnancy "[b]ecause the baby had a heartbeat and my own personal religious beliefs." [Pl. Dep. 107:6, 108:19-24 (Def. Ex. C)].

103.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

104.   Undisputed. By way of further response, Vanburen instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Dep. 85:10-17, 119:6-12 (Def. Ex. C); Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)].

105.   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.[4] Defendant's citation does not support its claim that any text messages were "unwelcome."

106.   Disputed; however, this is not material to the Court's disposition of

---

[4] Defendant does not allege that it made any employment decision based on any alleged "unwelcome text messages."

Defendant's Motion for Summary Judgment.[5] Defendant's citation does not support its claim that any text messages were "threatening." The word "threatening" was used by defense counsel, not Plaintiff. By way of further response, Plaintiff was not aware of the allegedly threatening messages at the time they were sent. [Pl. Dep. 120:22-121:14 (Def. Ex. C)].

107.   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.[6] Vanburen Affidavit Ex. E does not support Defendant's claim.

108.   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.[7] Vanburen Affidavit Ex. E does not support Defendant's claim that Perry threatened to tell Vanburen's wife "if he did not succumb to her demands."

109.   Undisputed that Vanburen told his wife about Plaintiff's pregnancy; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

110.   Undisputed; however, this is not material to the Court's disposition of

---

[5] Defendant does not allege that it made any employment decision based on any alleged "threatening" text messages.

[6] Defendant does not allege that it made any employment decision based on any alleged text messages that Perry sent to Vanburen.

[7] Defendant does not allege that it made any employment decision based on any alleged text messages that Perry sent to Vanburen.

Defendant's Motion for Summary Judgment.

111.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

112.   Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Undisputed that Plaintiff stated in a Snapchat message to Vanburen, "from here on out...no contact" and "you have a wife. she has a vagina. an you have sperm. do your thing." Disputed that Plaintiff made these statements to Vanburen after Vanburen told Plaintiff that if she kept the baby, his mother would want him "to be a part of his or her life." The Snapchat conversation does not contain any such statement from Vanburen.

### G. Plaintiff and Mr. Vanburen's Working Relationship After January 8, 2020

113.   Undisputed that Steffen and Vanburen stated this in their Affidavits; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.[8]

114.   Undisputed that Steffen and Vanburen stated this in their Affidavits; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.[9]

---

[8] Defendant does not allege that it made any employment decision based on any alleged "unwelcome messages."

[9] Defendant does not allege that it made any employment decision based on any alleged "threatening" text messages.

115.   Disputed. Vanburen made comments to Plaintiff at work, including telling Plaintiff that she really needed to think about getting an abortion and calling Plaintiff names like "bitch" and "whore." Plaintiff reported Vanburen's comments to Steffen almost every time it happened. [Pl. Dep. 111:13-113:24 (Def. Ex. C)].

116.   Disputed. Plaintiff testified that she did <u>not</u> tell Amanda Peters or Duane Johnson that she was upset because Vanburen started ignoring her at work. [Pl. Dep. 115:9-13, 115:21-116:24 (Def. Ex. C)].

117.   Undisputed that Steffen stated this in his Affidavit.

118.   Undisputed that Steffen stated this in his Affidavit.

119.   Undisputed. By way of further response, Plaintiff testified that "everything became really bad" around the middle of January after Plaintiff refused to have an abortion. [Pl. Dep. 107:1-9, 107:18-21 (Def. Ex. C)]. Vanburen made comments to Plaintiff at work, including telling Plaintiff that she really needed to think about getting an abortion and calling Plaintiff names like "bitch" and "whore." Plaintiff reported Vanburen's comments to Steffen almost every time it happened. [Pl. Dep. 111:13-113:24 (Def. Ex. C)]. Vanburen also smashed Plaintiff's hands in the dish machine numerous times between mid-January and February 7, 2020. [Pl. Dep. 132:19-133:5 (Def. Ex. C)]. Vanburen also talked about Plaintiff to other workers. [Pl. Dep. 112:17-113:4 (Def. Ex. C)]. Vanburen also stalked Plaintiff's home. [Pl. Dep. 251:8-13 (Def. Ex. C)]. Vanburen tried to intimidate Plaintiff.

Vanburen told Plaintiff that he was gang involved and had an advantage of whether Plaintiff kept her job. [Pl. Dep. 255:5-6, 257:8-18 (Def. Ex. C); Plaintiff hearing testimony 31:9-33:18 (Pl. Ex. 9 at 305-307)]. Plaintiff told Steffen that she was upset with the name calling, the smashing of her hands in the machine. [Pl. Dep. 115:14-20 (Def. Ex. C)]. Plaintiff also told Steffen that Vanburen wanted her to get an abortion. [Pl. Dep. 249:12-18 (Def. Ex. C)]. Plaintiff also complained to Johnson about Vanburen's behavior. [Pl. Dep. 116:10-13 (Def. Ex. C)]. Plaintiff also reported Vanburen's harassment, including his smashing of Plaintiff's hands in the dish machine, to Bill Lindemuth, a supervisor who started at the NLI shortly before Plaintiff's last day. [Pl. Dep. 38:18-39:10, 134:16-135:8 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 22 (Pl. Ex. 1)].

120.   Undisputed. By way of further response, Plaintiff asked Steffen to change her shift after Plaintiff told Steffen about comments that Vanburen made to her, including telling Plaintiff that she really needed to think about getting an abortion and calling her a "bitch" and a "whore." Steffen switched Plaintiff's shift to dayshift for about a week but then told her she would have to return to the second shift to work with Vanburen. [Pl. Dep. 111:13-113:24, 114:1-20 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

121.   Disputed. Steffen switched Plaintiff's shift to dayshift for about a week but then told her she would have to return to the second shift to work with Vanburen.

Steffen told Plaintiff that they did not have enough staff on that shift to cover it. [Pl. Dep. 111:13-113:20-24, 114:1-115:1 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

122. Disputed. Steffen switched Plaintiff's shift to dayshift for about a week but then told her she would have to return to the second shift to work with Vanburen. Steffen told Plaintiff that they did not have enough staff on that shift to cover it. Steffen did not tell Plaintiff it was because she was part-time employee who was not in the Teamster's Union. Steffen did not offer any other opportunity within the NLI. [Pl. Dep. 114:1-115:5 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

## H. Plaintiff and Mr. Vanburen's Overlapping Work Shifts

123. Disputed. Plaintiff recalls working with Vanburen more than ten times. They had almost the same schedule. [Pl. Dep. 106:13-24 (Def. Ex. C)]. By way of further response, Plaintiff alleges that the sexual assault occurred on December 13, 2019. [Plaintiff's Complaint at ¶ 46 (Def. Ex. A)]. After December 13, 2019, Plaintiff next worked on December 15, 2019. [Steffen Affidavit Ex. C at Appx. 351]. Between December 15, 2019 and February 7, 2020, Plaintiff and Vanburen worked together on **nineteen days**:

| Date | Plaintiff's In Time − Out Time | Vanburen's In Time − Out Time |
|------|-------------------------------|-------------------------------|
| 12/15/2019 | 8:49 AM − 5:02 PM | |
| 12/16/2019 | 4:55 PM − 11:11 PM | 3:49 PM − 11:10 PM |

| 12/17/2019 | 5:03 PM – 11:19 PM | 3:28 PM – 11:17 PM |
|---|---|---|
| 12/20/2019 | 5:04 PM – 12:01 AM (12/21/2019) | 3:36 PM – 11:55 PM |
| 12/21/2019 | 5:34 PM – 12:00 AM (12/22/2019) | 3:26 PM – 9:02 PM 9:02 PM – 12:00 AM (12/22/2019) |
| 12/22/2019 | 12:00 AM – 12:31 AM | 12:00 AM – 12:32 AM |
| 12/23/2019 | 4:04 PM – 9:12 PM | 1:35 PM – 9:09 PM |
| 12/24/2019 | 3:08 PM – 7:30 PM | |
| 12/26/2019 | 3:56 PM – 9:22 PM | 1:29 PM – 9:17 PM |
| 12/27/2019 | 4:02 PM – 9:19 PM | 1:26 PM – 9:16 PM |
| 12/28/2019 | 4:07 PM – 9:32 PM | |
| 12/29/2019 | 7:52 AM – 1:12 PM | 1:33 PM – 9:18 PM |
| 12/30/2019 | 8:09 AM – 8:23 AM | 1:31 PM – 9:17 PM |
| 1/3/2020 | 8:38 AM – 3:59 PM | 1:39 PM – 9:24 PM |
| 1/4/2020 | 8:08 AM – 3:52 PM | 1:30 PM – 10:01 PM |
| 1/6/2020 | 5:07 PM – 9:59 PM | 1:30 PM – 10:12 PM |
| 1/7/2020 | 5:10 PM – 10:35 PM | 1:35 PM – 10:34 PM |
| 1/9/2020 | 4:58 PM – 10:33 PM | |
| 1/13/2020 | 3:51 PM – 11:13 PM | 3:32 PM – 11:12 PM |
| 1/17/2020 | 3:56 PM – 11:31 PM | |
| 1/18/2020 | 4:14 PM – 11:35 PM | |
| 1/20/2020 | 4:25 PM – 9:30 PM | |
| 1/21/2020 | 4:35 PM – 11:20 PM | 3:32 PM – 10:26 PM 10:26 PM – 11:29 PM |
| 1/24/2020 | 4:58 PM – 9:33 PM | |
| 1/26/2020 | 8:12 AM – 3:22 PM | |
| 1/27/2020 | 4:57 PM – 11:19 PM | |
| 1/28/2020 | 6:37 PM -  11:15 PM | 3:27 PM – 11:43 PM |
| 2/1/2020 | 8:03 AM – 4:26 PM | 3:32 PM – 11:51 PM |
| 2/7/2020 | 5:03 PM – 5:53 PM | 3:20 PM – 12:00 AM (2/8/2020) |

[Steffen Affidavit Ex. C (Def. Ex. E at Appx. 351-352); Steffen Affidavit Ex. D (Def. Ex. E at Appx. 354-356)].

124.   Disputed. Every time Plaintiff and Vanburen worked the same day,

Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 11:18-12:3, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)].

125.    Undisputed.

126.    Disputed. Every time Plaintiff and Vanburen worked the same day, Vanburen gave Plaintiff her job tasks for the shift and instructed Plaintiff to do things that needed to be done throughout the shift on a daily basis. Plaintiff testified, "[a]s soon as our shift started or throughout the shift, he would tell us to do something if he needed something done." [Pl. Dep. 31:19-32:13, 93:16-18, 102:8-20 (Def. Ex. C); Vanburen hearing testimony 10:11-18, 49:8-18 (Pl. Ex. 8 at Plaintiff 123-125, 159-160, 162); Steffen hearing testimony 90:24-91:15 (Pl. Ex. 8 at Plaintiff 203-204)].

127.    Undisputed. Steffen testified that Plaintiff spoke to him about Vanburen in December 2019 or January 2020. [Steffen hearing testimony 86:13-87:14, 92:7-10 (Pl. Ex. 8 at Plaintiff 199-200, 205)]. Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)]. Vanburen made comments to Plaintiff at work, including telling Plaintiff that she really needed to think about getting an abortion and calling

Plaintiff names like "bitch" and "whore." Plaintiff reported Vanburen's comments to Steffen almost every time it happened. [Pl. Dep. 111:13-113:24 (Def. Ex. C)]. Between mid-January and February 7, 2020, Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards her because she would not abort the baby. [Pl. Dep. 132:7-133:13 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)].

128.   Undisputed. Plaintiff does not have personal knowledge as to whether or not Steffen spoke with Vanburen. Steffen told Plaintiff that he spoke with Vanburen. [Pl. Dep. 133:10-20 (Def. Ex. C)].

129.   Disputed. Between mid-January and February 7, 2020, Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards me because she would not abort the baby. Further, Defendant's citations to Plaintiff's deposition do not include any question from defense counsel asking Plaintiff to identify a "specific date." [Pl. Dep. 113:20-24, 132:7-134:1 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)].

## I.  Plaintiff's Abandonment of Her Job

130.   Undisputed.

131.   Disputed. Steffen spoke with Plaintiff about her attendance. [Pl. Dep.

256:21-257:2 (Def. Ex. C)]. By way of further response, Defendant's citation indicates that Plaintiff testified that Steffen spoke to Plaintiff about her attendance on February 7, 2020; however, Plaintiff did not testify to this. Plaintiff testified, "Or when he addressed my attendance on the 7th, the day I walked out, **but that was way previously before February 7th because someone had gone to him,** I'm assuming Trea, **about me being off work**, but Jamie knew I was off work due to my pregnancy." Plaintiff testified that Vanburen reported her attendance to Steffen between January and February 2020. [Pl. Dep. 95:7-21, 256:21-257:2 (Def. Ex. C) (Emphasis added)].

132.   Disputed. Steffen spoke with Plaintiff about her attendance before February 7, 2020. [Pl. Dep. 256:21-257:2 (Def. Ex. C)]. By way of further response, Defendant's citation indicates that Plaintiff testified that Steffen spoke to Plaintiff about her attendance on February 7, 2020; however, Plaintiff did not testify to this. Plaintiff testified, "Or when he addressed my attendance on the 7th, the day I walked out, **but that was way previously before February 7th because someone had gone to him,** I'm assuming Trea, **about me being off work**, but Jamie knew I was off work due to my pregnancy." [Pl. Dep. 256:21-257:2 (Def. Ex. C) (Emphasis added)].

133.   Disputed. Steffen spoke with Plaintiff about her attendance before February 7, 2020. [Pl. Dep. 256:21-257:2 (Def. Ex. C)]. By way of further response,

Defendant's citation indicates that Plaintiff testified that Steffen spoke to Plaintiff about her attendance on February 7, 2020; however, Plaintiff did not testify to this. Plaintiff testified, "Or when he addressed my attendance on the 7th, the day I walked out, **but that was way previously before February 7th because someone had gone to him,** I'm assuming Trea, **about me being off work**, but Jamie knew I was off work due to my pregnancy." [Pl. Dep. 256:21-257:2 (Def. Ex. C) (Emphasis added)].

134.   Disputed. Plaintiff told Steffen that she suffered from high blood pressure in January 2020. [Declaration of Destiny McGovern at ¶¶ 2-5 (Pl. Ex. 2)].

135.   Disputed. Plaintiff told Steffen that she suffered from high blood pressure in January 2020. [Declaration of Destiny McGovern at ¶¶ 2-5 (Pl. Ex. 2)].

136.   Disputed. Steffen discussed Plaintiff's work schedule with Plaintiff, but not on February 7, 2020. [Declaration of Destiny McGovern at ¶ 2-9 (Pl. Ex. 2); Def. Facts ¶¶ 120-122]. By way of further response, Steffen suggested cutting Plaintiff's hours. Plaintiff told Steffen "no" because she was pregnant and needed the money. [Declaration of Destiny McGovern at ¶¶ 2-9 (Pl. Ex. 2)].

137.   Disputed in part. Plaintiff told Steffen that working alternating days would be good for her, but not on February 7, 2020. This discussion occurred when Steffen first suggested moving Plaintiff to the dayshift. [Declaration of Destiny McGovern at ¶¶ 8-9 (Pl. Ex. 2)].

138.    Disputed in part. Plaintiff told Steffen that working alternating days would be good for her, but not on February 7, 2020. This discussion occurred when Steffen first suggested moving Plaintiff to the dayshift. [Declaration of Destiny McGovern at ¶¶ 8-9 (Pl. Ex. 2)]. By way of further response, Defendant's citation to Plaintiff's deposition does not support its statement.

139.    Disputed. Plaintiff did not have this discussion with Steffen on February 7, 2020. [Pl. Dep. 256:21-257:2 (Def. Ex. C); Declaration of Destiny McGovern at ¶¶ 1-9 (Pl. Ex. 2); Def. Facts ¶¶ 120-122]. By way of further response, Defendant's citation to Plaintiff's deposition does not support its statement.

140.    Undisputed. By way of further response, Plaintiff had no choice but to leave work on February 7, 2020 because of how she was being treated. [Pl. Resp. to Def.'s Interrog. No. 23 (Pl. Ex. 1); Plaintiff hearing testimony 48:10-19, 52:13-17, 96:4-24, 97:23-25 (Pl. Ex. 9 at Plaintiff 322, 326, 370-371)]. Plaintiff left work early on February 7, 2020 because Vanburen was harassing her. Plaintiff testified that on February 7, 2020, Vanburen "had smashed my hands in the dish machine several times. He had shoulder checked me, purposely running into me, being in my way, the comments." [Pl. Dep. 131:16-132:1, 133:21-134:1 (Def. Ex. C)]. Earlier, Plaintiff testified about comments that Vanburen made to her, including telling Plaintiff that she really needed to think about getting an abortion and calling Plaintiff names like "bitch" and "whore." Plaintiff reported Vanburen's comments to Steffen almost

every time it happened. [Pl. Dep. 111:13-113:24 (Def. Ex. C)]. After Plaintiff left work on February 7, 2020, she intended to remain employed with Penn State because she wanted a career at Penn State. [Pl. Dep. 121:5-15, 241:13-18 (Def. Ex. C)].

141.  Undisputed that Plaintiff texted Steffen on February 7, 2020. The quoted text, however, is from a document that Steffen prepared, not the actual text message. [Steffen Affidavit Ex. A (Def. Ex. E)]. By way of further response, Steffen did not respond to Plaintiff's text message. [Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

142.  Disputed. Prior to February 7, 2020, Plaintiff told Steffen about comments that Vanburen made to her, including telling Plaintiff that she really needed to think about getting an abortion and calling her a "bitch" and a "whore." Plaintiff reported Vanburen's comments to Steffen almost every time it happened. [Pl. Dep. 111:13-113:24 (Def. Ex. C)]. By way of further response, Steffen concedes that Plaintiff spoke to him about Vanburen in December 2019 or January 2020. [Pl. Facts ¶ 127]. Steffen told Plaintiff that he spoke with Vanburen. [Pl. Facts ¶ 128].

143.  Disputed. As stated above, Steffen's conversation with Plaintiff about a new schedule with alternating days occurred prior to February 7, 2020. [Declaration of Destiny McGovern at ¶¶ 1-9 (Pl. Ex. 2)].

144. Disputed. Plaintiff testified that she was required to complete some training on various policies for Penn State. When asked if the training "included a workplace harassment policy," Plaintiff answered, "I guess so." When asked, "Was it your understanding as an employee of the Nittany Lion Inn that you could make an anonymous report to Penn State University about things that you had a problem with as an employee?," Plaintiff answered, "I don't recall." When asked, "you don't know of the existence of a hotline or the ability to call in to -- to human resources or to any department within Penn State that would have addressed your concerns?," Plaintiff answered, "No." When asked, "Did you have Title IX training?," Plaintiff answered, "I do believe so. I think you had to upon hire." When asked, "And those trainings told you that you could submit a report on the Title IX website if you had a problem; is that correct?," Plaintiff answered, "Possibly." When asked, "The Title IX training that you had also, Ms. McGovern, told you that you could contact the Title IX office directly if you had a problem; correct?," Plaintiff answered, "Possibly." [Pl. Dep. 149:19-151:12 (Def. Ex. C)].

145. Undisputed with clarification. Plaintiff testified that she was required to complete some training on various policies for Penn State. When asked if the training "included a workplace harassment policy," Plaintiff answered, "I guess so." When asked, "Was it your understanding as an employee of the Nittany Lion Inn that you could make an anonymous report to Penn State University about things that you

had a problem with as an employee?," Plaintiff answered, "I don't recall." When asked, "you don't know of the existence of a hotline or the ability to call in to -- to human resources or to any department within Penn State that would have addressed your concerns?," Plaintiff answered, "No." When asked, "Did you have Title IX training?," Plaintiff answered, "I do believe so. I think you had to upon hire." When asked, "And those trainings told you that you could submit a report on the Title IX website if you had a problem; is that correct?," Plaintiff answered, "Possibly." When asked, "The Title IX training that you had also, Ms. McGovern, told you that you could contact the Title IX office directly if you had a problem; correct?," Plaintiff answered, "Possibly." [Pl. Dep. 149:19-151:12 (Def. Ex. C)].

146.   Disputed. When asked, "Did you have Title IX training?," Plaintiff answered, "I do believe so. I think you had to upon hire." When asked, "And those trainings told you that you could submit a report on the Title IX website if you had a problem; is that correct?," Plaintiff answered, "Possibly." [Pl. Dep. 149:19-150:21 (Def. Ex. C)]. Further, Defendant's citation does not support its claim that Plaintiff received the training that is shown in Penn State 340-417. There is nothing in the record that shows that Plaintiff received the training that is shown in Penn State 340-417.

147.   Disputed. Defendant's citation does not support its statement. There is nothing in the record that shows that Plaintiff received the training that is shown in

Penn State 354.

148.   Disputed. Defendant's citation does not support its statement. Plaintiff testified that she was required to complete some training on various policies for Penn State. When asked if the training "included a workplace harassment policy," Plaintiff answered, "I guess so." When asked, "Was it your understanding as an employee of the Nittany Lion Inn that you could make an anonymous report to Penn State University about things that you had a problem with as an employee?," Plaintiff answered, "I don't recall." When asked, "you don't know of the existence of a hotline or the ability to call in to -- to human resources or to any department within Penn State that would have addressed your concerns?," Plaintiff answered, "No." When asked, "Did you have Title IX training?," Plaintiff answered, "I do believe so. I think you had to upon hire." When asked, "And those trainings told you that you could submit a report on the Title IX website if you had a problem; is that correct?," Plaintiff answered, "Possibly." When asked, "The Title IX training that you had also, 7 Ms. McGovern, told you that you could contact the  Title IX office directly if you had a problem; correct?, Plaintiff answered, "Possibly." [Pl. Dep. 149:19-150:21, 151:6-12 (Def. Ex. C)]. There is nothing in the record that shows that Plaintiff received the training that is shown in Penn State 355.

149.   Undisputed with clarification. There is nothing in the record that shows that Plaintiff was aware of an Ethics and Compliance Hotline. When asked, "you

don't know of the existence of a hotline or the ability to call in to -- to human resources or to any department within Penn State that would have addressed your concerns?," Plaintiff answered, "No." [Pl. Dep. 150:8-12 (Def. Ex. C)].

150.   Disputed. Defendant's citation does not support its statement. Nothing in the cited testimony indicates that "Plaintiff was aware of and had access to all Penn State policies through the University's internet site at https://policy.psu.edu/" [Pl. Dep. 149:19-14, 150:1-2, 13-21 (Def. Ex. C)].

151.   Disputed in part. Undisputed that Plaintiff never submitted a Share Report or other complaint of harassment to Penn State's Title IX office or to Penn State's Ethics and Compliance hotline. [Pl. Dep. 150:23-151:5 (Def. Ex. C)]. Disputed that Plaintiff did not submit a harassment complaint to Penn State. As Plaintiff testified, she complained to Steffen and Carol Eicher, who is a Human Resources Consultant for Penn State. Eicher told Plaintiff that she would be reaching out to Penn State's Affirmative Action Office regarding Plaintiff's complaint. [Pl. Dep. 150:23-151:1, 155:13-24 (Def. Ex. C); Eicher Dep. 25:2-3 (Def. Ex. H)]. By way of further responses, Defendant's citations to Plaintiff's testimony do not mention "Office of Sexual Misconduct Prevention & Response" ("OSMPR") or Affirmative Action Office ("AAO")."

152.   Disputed. Defendant's citation does not support its statement. Further, as stated above, the discussion about Plaintiff working alternating days occurred

before February 7, 2020, at the time when Steffen first suggested moving Plaintiff to the dayshift. [Declaration of Destiny McGovern at ¶¶ 8-9 (Pl. Ex. 2)]. Further, Vanburen made comments to Plaintiff at work, including telling Plaintiff that she really needed to think about getting an abortion and calling Plaintiff names like "bitch" and "whore." Plaintiff reported Vanburen's comments to Steffen almost every time it happened. [Pl. Dep. 111:13-113:24 (Def. Ex. C)]. Between mid-January and February 7, 2020, Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards me because she would not abort the baby. [Pl. Dep. 113:20-24, 132:7-134:1 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)]. Despite addressing her concerns about Vanburen with Steffen, Vanburen's conduct continued and, as Plaintiff testified, on February 7, 2020, on February 7, 2020, Vanburen "had smashed my hands in the dish machine several times. He had shoulder checked me, purposely running into me, being in my way, the comments." [Pl. Dep. 131:16-132:1 (Def. Ex. C)].

153.   Undisputed that Steffen stated this in his Affidavit; however, his claim, "Since Plaintiff and I already spoke about her attendance and I agreed to schedule her for alternating shifts . . ." is incorrect. As stated above, Steffen's conversation with Plaintiff about a new schedule with alternating days occurred prior to February 7, 2020. [Declaration of Destiny McGovern at ¶¶ 1-9 (Pl. Ex. 2)]. By way of further

response, Steffen's Affidavit states, "I intended to speak to Plaintiff during this next shift about her text messages" [Steffen Affidavit at ¶ 129 (Def. Ex. E)]; however, Steffen claimed at a hearing that he made "multiple attempts" to contact Plaintiff. [Steffen hearing testimony 93:20-94:94:3 (Pl. Ex. 8 at Plaintiff 206-207)]. Steffen did not respond to Plaintiff's text message. [Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

154.   Disputed in part. Undisputed that Plaintiff never reported to work at the NLI again. Disputed that Plaintiff "did not call." Plaintiff testified that she told Eicher "that I did have future shifts scheduled like because I didn't want to look like I wasn't just going to show up at work. And [Eicher] said that she was going to talk to Jamison and then get in contact with somebody else about my situation, and then she would follow up with me about what we would do." [Pl. Dep. 138:6-15 (Def. Ex. C)]. Eicher testified that Plaintiff told Eicher that she had not been back to work. [Eicher Dep. 118:18-20 (Def. Ex. H)]. By way of further response, after Plaintiff left work on February 7, 2020, she intended to remain employed with Penn State because she wanted a career at Penn State. [Pl. Dep. 121:5-15, 241:13-18 (Def. Ex. C)].

### J. Plaintiff's Complaint to Human Resources and Penn State's Timely Response

155.   Undisputed. By way of further response, after Plaintiff had gone to Steffen, Plaintiff asked Leonard Ellenberger, another NLI employee, who she could

contact to report harassment and hostile work environment. [Pl. Dep. 34:14-35:19, 127:14-16, 237:6-9 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)]. Ellenberger told Plaintiff to contact Eicher and gave Eicher's contact information to Plaintiff. [Pl. Dep. 35:20-23, 126:3-6, 127:14-16, 237:21-23 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)]. On February 10, 2020, Plaintiff sent an email titled "work related issue" to Eicher to report the problems with Vanburen. [Pl. Dep. 126:7-127:20 and Pl. Dep. Ex. 13 (Def. Ex. C)]. Plaintiff sent the February 10, 2020 email from her Gmail address (destmcg5757@gmail.com). [Pl. Dep. 128:22-129:5 and Pl. Dep. Ex. 13 (Def. Ex. C)]. When Plaintiff contacted Eicher, she hoped that Eicher would "[a]ddress the problem or see why it wasn't being addressed with Jamison." [Pl. Dep. 130:22-24 (Def. Ex. C)].

156.   Undisputed with clarification. Eicher also testified that she "support[s] the Human Resource function for Auxiliary and Business Services," which includes Hospitality Services. [Eicher Dep. 25:2-20 (Def. Ex. H)].

157.   Disputed in part. Undisputed that Eicher testified that her role in investigating reports of harassment or discrimination is to understand what report is being made, talk to the individual making the report, and talk with the supervisor about the allegations made in the report. Disputed that Eicher testified her role is also to talk with "other necessary employees." Eicher testified that if the report involves a "another employee," her role involves talking to that the employee.

46

[Eicher Dep. 41:24-42:12 (Def. Ex. H)].

158.   Disputed in part. Undisputed that Eicher testified that "there was training with guidelines" for the people who investigate good-faith reports; however, Eicher has no recollection of when this training occurred or what guidelines the training covered. [Eicher Dep. 44:8-24 (Def. Ex. H)]. Undisputed that Eicher is familiar with Penn State's Policy AD67. By way of further response, Penn State also maintains a policy titled "AD85 Title IX Sexual Harassment" a policy titled "AD91 Discrimination and Harassment and Related Inappropriate Conduct," which Eicher is also familiar with. [Eicher Dep. 47:20-50:3, 53:11-12, 54:19-55:21; Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 715-739; Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 740-748)].

159.   (a)   Undisputed. By way of further response, according to Penn State's Policy AD 67, "Wrongful Conduct" includes sexual harassment. [Eicher Dep. 39:12-41:11 (Def. Ex. H)].

(b)   Undisputed. By way of further response, Eicher concedes that it is important to fully investigate a Good Faith Report of suspected Wrongful Conduct so that Penn State can figure out what happened, resolve the matter, enforce Penn State's policies, encourage others to make reports, and help make sure the wrongful conduct doesn't happen again. Eicher also concedes that it is important to train people who investigate good-faith reports on how

to investigate a report for "[c]onsistency." [Eicher Dep. 42:13-43:8, 44:25-45:6 (Def. Ex. H)].

      (c)    Undisputed. By way of further response, Eicher understands that retaliation "means any adverse action taken by a member of the faculty, staff or student body." Eicher concedes that an adverse action could be firing or re-assigning someone to another job. Eicher testified, "If that person requested that be a --- a resolution, I wouldn't consider that an adverse action." [Eicher Dep. 45:7-46:16 (Def. Ex. H)].

160.   Undisputed. By way of further response, Eicher called Plaintiff at the number Plaintiff provided in her email. [Pl. Dep. 135:6-14 (Def. Ex. C)].

161.   Undisputed. By way of further response,

162.   Undisputed. By way of further response, Eicher testified that after receiving Plaintiff's February 10, 2020 email, she called Plaintiff and Plaintiff informed her that she and Vanburen "were working in the same department" and that "[t]hey became friends through a group of employees who started going out after work." [Eicher Dep. 84:11-85:13 (Def. Ex. H)]. Eicher testified that Plaintiff said that "she had decided that she wanted to sever that relationship. And that it was uncomfortable for her to be at work when he was at work. And that she had talked to her --- her supervisor about it. And she wasn't --- she didn't feel the --- that it had been resolved." [Eicher Dep. 85:9-23 (Def. Ex. H)].

163.   Disputed. Defendant's citation does not support its statement. When asked, "Did you tell her -- you told her that you went to the bar though with Trea and that everybody at work was talking about it?," Plaintiff answered, "No, I had told her that I had been at a bar one night. I don't think I worked that -- no, I did not work that day and it was my day off. And I was at the bar with a friend for a birthday and I had told her about Trea coming into that same bar and then that night being assaulted." [Pl. Dep. 136:3-11 (Def. Ex. C)]. Further, when Eicher used the term "relationship" when referring to Plaintiff and Vanburen, she clarified, "[s]he said that they had become friends." [Eicher Dep. 84:15-85:13 (Def. Ex. H)].

164.   Undisputed. By way further response, Plaintiff also told Eicher that Vanburen sexually assaulted her and that Vanburen wanted her to get an abortion and that after Plaintiff refused to get an abortion, "that's when the hostile work environment and the harassment really escalated," which included Vanburen's comments to Plaintiff (calling her a bitch and a whore), standing in Plaintiff's way at work, shoulder checking Plaintiff, and smashing Plaintiff hands in the dish machine. Plaintiff also told Eicher that she had a lifting restriction due to her pregnancy. [Pl. Dep. 111:13-113:24, 136:24-138:5 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1); Plaintiff hearing testimony 80:9-13 (Pl. Ex. 9 at Plaintiff 354)].

165.   Undisputed that Eicher testified to this. By way further response, Eicher testified that when she asked Plaintiff, "did you tell him that you did not want to have

any further connection with --- or relationship with him," that Plaintiff "said yes." [Eicher Dep. 91:9-14 (Def. Ex. H)].

166.   Undisputed with clarification. After Plaintiff complained to Steffen about Vanburen's harassment, Steffen told Plaintiff that he was going to talk to Vanburen. Steffen later told Plaintiff that he spoke with Vanburen. [Pl. Dep. 133:10-20 (Def. Ex. C)]. Plaintiff does not have personal knowledge as to whether or not Steffen spoke with Vanburen.

167.   Disputed in part. Undisputed that Plaintiff told Eicher that Steffen had tried to switch her schedule. [Pl. Dep. 137:15-17 (Def. Ex. C)]. Disputed that Plaintiff told Eicher that Steffen "was having difficulty continuing to do so." Defendant's citation does not support its statement. Plaintiff did not testify to this. [Pl. Dep. 137:15-17 (Def. Ex. C)]. Eicher testified, "And she said that she had talked to her supervisor about changing their schedules. And she was not --- that wasn't working out." Eicher also testified that Plaintiff "was not happy with the --- the scheduling situation. She wanted to work a different schedule than Mr. Van Buren." Eicher also testified that Steffen told her that "he had switched the schedules around as much as he could without them both being there at the same time. And it was -- it was a challenge to do that." Eicher also testified that Steffen "was able to do that, all except for, I think he said one shift." [Eicher Dep. 86:18-87:3, 88:8-15, 96:19-97:5, 97:12-21 (Def. Ex. H)].

168.   Undisputed. By way further response, Plaintiff also told Eicher that Vanburen sexually assaulted her and that Vanburen wanted her to get an abortion and that after Plaintiff refused to get an abortion, "that's when the hostile work environment and the harassment really escalated," which included Vanburen's comments to Plaintiff (calling her a bitch and a whore), standing in Plaintiff's way at work, shoulder checking Plaintiff, and smashing Plaintiff hands in the dish machine. Plaintiff also told Eicher that she had a lifting restriction due to her pregnancy. [Pl. Dep. 111:13-113:24, 136:24-138:5 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1); Plaintiff hearing testimony 80:9-13 (Pl. Ex. 9 at Plaintiff 354)]. Eicher testified that she was not aware that Plaintiff alleges that Vanburen told her to get an abortion. [Eicher Dep. 103:15-20 (Def. Ex. H)].

169.   Undisputed.

170.   Undisputed. By way of further response, Plaintiff testified, "I told her exactly what happened on February 7th and that I had walked out and sent Jamie a message and that I did have future shifts scheduled like because I didn't want to look like I wasn't just going to show up at work. And she said that she was going to talk to Jamison and then get in contact with somebody else about my situation, and then she would follow up with me about what we would do." [Pl. Dep. 138:6-15 (Def. Ex. C)]. Eicher testified that Plaintiff told Eicher that she had not been back to work. [Eicher Dep. 118:18-20 (Def. Ex. H)].

171.   Undisputed.

172.   Disputed in part. Undisputed that Eicher testified to this. Disputed that Eicher recorded all of the information that Plaintiff told Eicher. Plaintiff testified that she told Eicher "that I had been at a bar one night. I don't think I worked that -- no, I did not work that day and it was my day off. And I was at the bar with a friend for a birthday and I had told her about Trea [Vanburen] coming into that same bar and then that night being assaulted." [Pl. Dep. 136:3-11 (Def. Ex. C)]. Plaintiff told Eicher that Vanburen sexually assaulted her. [Pl. Dep. 136:24-137:2, 137:18-21, 139:13-23 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1); Plaintiff hearing testimony 80:9-13 (Pl. Ex. 9 at Plaintiff 354)]. Plaintiff told Eicher that she was pregnant and that Vanburen "wanted me to get an abortion, and that's when the hostile work environment and the harassment really escalated after I refused to get one." [Pl. Dep. 137:22-138:2, 249:6-11 (Def. Ex. C)]. Eicher testified that she was not aware that Plaintiff alleges that Vanburen told her to get an abortion. [Eicher Dep. 103:15-20 (Def. Ex. H)]. Plaintiff told Eicher that she had a lifting restriction due to her pregnancy. [Pl. Dep. 138:3-5 (Def. Ex. C)]. Plaintiff told Eicher that Vanburen was making comments to her. [Pl. Dep. 137:3-6 (Def. Ex. C)]. Plaintiff told Eicher that Vanburen was standing in her way and "shoulder checking me and smashing my hands in the dish machine." [Pl. Dep. 137:7-10 (Def. Ex. C)]. Plaintiff told Eicher that Steffen told her that would spoke with Vanburen and that

he later told Plaintiff that he had spoken with Vanburen. [Pl. Dep. 137:11-14 (Def. Ex. C)]. Plaintiff did not discuss working in a different department at the NLI with Eicher. [Pl. Dep. 138:19-21 (Def. Ex. C)]. Plaintiff did not discuss moving to the Housekeeping department with Eicher. [Pl. Dep. 138:24-139:3 (Def. Ex. C)]. Further, Eicher did not accurately transcribe her original shorthand notes of her conversation with Plaintiff. [Declaration of Claire Szostak at ¶¶ 6-11 (Pl. Ex. 3)].

173.   Disputed in part. Undisputed that Eicher testified to this. Eicher testified that Plaintiff asked to move to the Housekeeping department and told her that she wanted to work in the Housekeeping department.  [Eicher Dep. 127:23-128:3, 135:19-136:5, 191:1-3 (Def. Ex. H)]. Eicher also testified that Plaintiff had applied to work in the Housekeeping department. [Eicher Dep. 135:19-136:5 (Def. Ex. H)].

Disputed that Plaintiff said she wished to work in housekeeping. Plaintiff testified that Eicher "had left me a voicemail after following up with who she said she needed to follow up with and Jamison saying that I was expected to transfer to housekeeping that Monday" and that she "never asked to be moved to housekeeping" or told anyone she wanted to work in housekeeping. Plaintiff did not want to move to housekeeping; Defendant was moving Plaintiff to housekeeping without her consent. [Pl. Dep. 139:4-12, 143:7-15, 144:18-21, 145:5-8, 244:6-15 (Def. Ex. C)]. Further, Eicher Dep. Ex. 14 is not credible. Eicher Dep. Ex. 14 states,

"If there is opportunity and she agrees, go ahead and transfer her." Eicher's original shorthand notes, however, state, "go ahead and transfer her." Eicher Dep. Ex. 14 also states, "Have you talked to Paula* about opportunities in another department or building?" Eicher's original shorthand notes, however, read, "Call Paula re opportunities in another department, building." Eicher Dep. Ex. 14 also states:

> DM: I have spoken to Paula. I would like to work in Housekeeping.
> CE: I will follow up on that as well.

This two line exchange, however, is not in Eicher's original shorthand notes. [Declaration of Claire Szostak at ¶¶ 11(i)-(k) (Pl. Ex. 3)].

174.   Undisputed. By way of further response, Plaintiff testified that Eicher "said to expect a transfer to housekeeping starting that Monday and to expect to hear from Jacquie Weyer, the head of housekeeping." Plaintiff did not want to transfer to the Housekeeping department because it was an entirely different job that she was interested in. Plaintiff never asked to be transferred to a job in the Housekeeping department. Plaintiff never applied for a job in the Housekeeping department. Plaintiff wanted to pursue a culinary career and Steffen was mentoring her. Plaintiff never told anyone she wanted to work in the Housekeeping department. [Pl. Dep. 139:4-12, 139:24-140:10, 143:7-15, 144:18-21, 145:5-8, 244:6-15 (Def. Ex. C)].

175.   Undisputed. By way of further response, Eicher never said anything else

about reaching out to Penn State's Affirmative Action Office to Plaintiff. [Pl. Dep. 155:13-20 (Def. Ex. C)]. By way of further response, Defendant's citations to Eicher's testimony do not support its statement.

176.   Undisputed. Eicher told Plaintiff that she would be reaching out to Penn State's Affirmative Action Office regarding Plaintiff's complaint. Eicher never said anything else about reaching out to Penn State's Affirmative Action Office to Plaintiff. [Pl. Dep. 155:13-20 (Def. Ex. C); Eicher Dep. Ex. 18 (Def. Ex. H at Appx. 821); Eicher Dep. Ex. 25 (Def. Ex. H at Appx. 833-834)].

177.   Undisputed.

178.   Undisputed.

179.   Disputed in part. Undisputed that Eicher testified she would also "reach out to the resources that are available within the university for whatever next steps need to take place," which are the Labor & Employee Relations Department and the Affirmative Action Office. [Eicher Dep. 57:10-58:23 (Def. Ex. H)]. Disputed that this is "[d]o ensure that all complaints are heard and investigated." Defendant's citation does not support this statement.

180.   Undisputed.

181.   Undisputed. By way of further response, Eicher spoke with Steffen on February 12, 2020, after speaking with Plaintiff. [Eicher Dep. 128:19-23, 131:7-12 (Def. Ex. H)].

182.   Disputed in part. Undisputed that Steffen told Eicher that Plaintiff was pregnant with Vanburen's baby. Disputed to the extent Defendant implies this was the first time Eicher learned that Plaintiff was pregnant with Vanburen's baby, as Steffen's Affidavit claims. According to Steffen, "[w]hen Ms. Eicher called me, she was unaware that Plaintiff and Mr. Vanburen were expecting a baby together." [Steffen Affidavit ¶¶ 137-138 (Def. Ex. E)]. Plaintiff, however, testified that when she first spoke with Eicher, she told Eicher that Vanburen sexually assaulted her and that she was pregnant. [Pl. Dep. 137:18-138:5 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1); Plaintiff hearing testimony 80:9-13 (Pl. Ex. 9 at Plaintiff 354)]. By way of further response, Eicher testified that the impression she got from Steffen was that Vanburen was the child's father and that she "never heard it from anybody else." [Eicher Dep. 95:4-8, 102:19-103:6 (Def. Ex. H)]. Eicher also testified that Steffen told her that Plaintiff "was in a relationship with a same sex domestic partner." [Eicher Dep. 197:10-15 (Def. Ex. H)].

183.   Disputed in part. Undisputed that Eicher and Steffen discussed the post-sexual assault work environment. Disputed to the extent that, by citing Steffen's "Timeline of events" [Steffen Affidavit Exhibit A (Def. Ex. E)], Defendant implies that Steffen's "Timeline of events" is accurate. Plaintiff testified that Steffen's timeline is not accurate. [Pl. Dep. 255:18-257:2 (Def. Ex. C)]. Further, disputed to the extent that, by citing Eicher's notes [Eicher Dep. Ex. 14 (Def. Ex. H)], Defendant

implies that Eicher's notes are accurate. As discussed above in response to Def. Fact ¶172, Plaintiff disputes that Eicher recorded all of the information that Plaintiff told Eicher and that Eicher accurately transcribed her original shorthand notes of her conversation with Plaintiff. By way of further response, Eicher testified that she became more concerned about the situation after speaking with Steffen because Plaintiff "had expressed concern that she didn't want to be around him at work." [Eicher Dep. 95:9-16 (Def. Ex. H)]. Eicher testified that Steffen told her that Plaintiff appeared to be "going off the rails in some way." [Eicher Dep. 95:17-96:96:4 (Def. Ex. H)]. Eicher testified that Steffen told her that "he had talked to Mr. Van Buren. He had made it very clear to Mr. Van Buren, that whatever went on outside of work was not to be brought into the workplace" and that "they should not be together at work." [Eicher Dep. 94:12-22, 151:24-152:6 (Def. Ex. H)].

184.   Disputed. Defendant's citation does not support this statement.

185.   Undisputed that Steffen's "Timeline of events" states this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.[10]

186.   Disputed in part. Undisputed that Steffen's "Timeline of events" states, in part, "2/7 she came to work at 5 pm, we discussed the amount of call offs that she

---

[10] Defendant does not allege that it made any employment decision based on the alleged messages.

had. Asked her what we could do to make this work. Adjust her schedule? She said that alternating days would be good. She left my office and returned to work, 50 minutes later she left work and sent me a text message that reads." [Steffen Affidavit Exhibit A (Def. Ex. E)]. Disputed that this is true. Steffen did not discuss Plaintiff's attendance on February 7, 2020. [Pl. Dep. 95:7-21, 256:21-257:2 (Def. Ex. C)]. Steffen discussed Plaintiff's work schedule with Plaintiff, but not on February 7, 2020. Steffen suggested cutting Plaintiff's hours. Plaintiff told Steffen no because she was pregnant and needed the money. Plaintiff told Steffen that working alternating days would be good for her, but not on February 7, 2020. This discussion occurred when Steffen first suggested moving Plaintiff to the dayshift. [Declaration of Destiny McGovern at ¶¶ 1-9 (Pl. Ex. 2)].

187.   Undisputed. The quoted text message in Steffen's "Timeline of events", however, is from a document that Steffen prepared, not the actual text message. [Steffen Affidavit Ex. A (Def. Ex. E)]. By way of further response, Steffen did not respond to Plaintiff's text message. [Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

188.   Undisputed.

189.   Disputed in part. Undisputed that Eicher called Penn State's Employee Relations Department to talk about Plaintiff. Disputed that Eicher called Penn State's Employee Relations Department to talk about Plaintiff's complaint.

Defendant's citation does not support that statement.

190. Disputed. Eicher testified that Penn State's Labor Relations "said have the manager, who is first-hand knowledge involved in this, complete the Share Report." [Eicher Dep. 138:16-139:16 (Def. Ex. H)]. By way of further response, Eicher testified that a Share Report is the reporting system used to report a Title IX issue to Penn State's Affirmative Action Office. [Eicher Dep. 139:1-8 and Eicher Dep. Ex. 17 (Def. Ex. H)]. Eicher understands that Title IX "has to do with sexual harassment." [Eicher Dep. 76:2-6 (Def. Ex. H)]. Eicher testified that submitting a Share Report to the Affirmative Action Office "triggers an investigation." [Eicher Dep. 139:14-16 (Def. Ex. H)].

191. Disputed in part. Disputed that Eicher told Steffen to report his "observations regarding" Plaintiff and Vanburen, as Steffen claims. [Steffen Affidavit at ¶ 139 (Def. Ex. E)].  By way of further response, Eicher's February 14, 2020 email instructing Steffen to file a Share Report "because of so many elements that fall under Title 9" and stated that since Steffen is "most aware of the whole picture, Employee Relations recommends that you complete the report":

**Eicher, Eldonna Carolyn**

| | |
|---|---|
| **From:** | Eicher, Eldonna Carolyn |
| **Sent:** | Friday, February 14, 2020 5:02 PM |
| **To:** | Steffen, Jamison M |
| **Subject:** | Confidential:  destiny mcgovern .docx |

Hi, Jamie;

Sorry I tried to call when you are so busy, but I did get to speak with Tom so he can fill you in.  I reviewed the situation with Employee Relations and because of so many elements that fall under Title 9, we need you to complete an online Share Report.  When received and evaluated, it will be determined if the Title 9 office will take over the issue or if it will remain an HR issue.  Because you are most aware of the whole picture, Employee Relations recommends that you complete the report.  You can find it online by clicking on the following site: https://studentaffairs.psu.edu/titleix.  There you will find instructions for completing a Share Report.   Please do so at your earliest opportunity.

With regard to the claims that Destiny has made that Trea has taken actions that are creating a hostile working environment, e.g. blocking her way in the workplace, making snide comments, etc., you can indicate those were reported to you although you have not personally observed them.  Provide as much detail as you can; the timeline you so helpfully provided should be included and will assist that office in making a determination.

You can also include that in addition to changing her schedule, NLI has proactively taken steps to reassign a work department to her.  You don't need to give great detail.

Let me know if you have any questions.

I hope your weekend meets your expectations.

Thank you for your help,
Carol

[Eicher Dep. Ex. 17 (Def. Ex. H at Apx. 820)]. Eicher does not recall speaking with Steffen after sending the February 14, 2020 email. [Eicher Dep. 140:4-7 (Def. Ex. H)].

192. Disputed in part. Undisputed that in mid-February 2020, Steffen prepared a "Timeline of events" per Eicher's request. Disputed that Steffen's "Timeline of events" is accurate. [Pl. Dep. 95:22-98:5, 254:18-257:2 (Def. Ex. C)]. Eicher testified that the only thing she verified in Steffen's "Timeline of events" was "her working schedule, the last few lines." [Eicher Dep. 130:15-131:6 and Eicher Dep. Ex. 15 (Def. Ex. H)]. By way of further response, Eicher's February 14, 2020

email instructing Steffen to file a Share Report "because of so many elements that fall under Title 9" and stated that since Steffen is "most aware of the whole picture, Employee Relations recommends that you complete the report." [Pl. Fact ¶ 191].

193.   Disputed in part. Undisputed that Steffen submitted a Share Report and attached his "Timeline of events" per Eicher's request. Disputed that Steffen's "Timeline of events" is accurate. [Pl. Dep. 95:22-98:5, 254:18-257:2 (Def. Ex. C)]. Eicher testified that the only thing she verified in Steffen's "Timeline of events" was "her working schedule, the last few lines." [Eicher Dep. 130:15-131:6 and Eicher Dep. Ex. 15 (Def. Ex. H)]. By way of further response, even though Plaintiff told Steffen numerous times that Vanburen was slamming/smashing her fingers and hands in the dish machine, standing in her way, talking about her, and being hostile and mean towards me because she would not abort the baby [Pl. Dep. 132:7-133:13 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)], Steffen submitted the following on the Share Report:

Provide a description of the incident or conduct being reported:
**please see attached sheet for time line of events. Destiny made the accusation that Trea was creating a hostile work environment. I had a conversation with Trea Vanburen and explained that such behavior would not be tolerate. No one on the management team has witnessed said behavior.**

[Pasko Dep. 22:1-5, 22:25-23:2 (Def. Ex. L) and Pasko Dep. Ex. 7-8 (Def. Ex. L)].

194.   Undisputed.

195.   Undisputed.

196.   Undisputed. By way of further response, the Affirmative Action Office

handles Title IX complaints when the respondent is an employee or volunteer. [Pasko Dep. 17:18-22 (Def. Ex. L)].

197. Undisputed. By way of further response, after a Share Report is submitted to the Affirmative Action Office, the Affirmative Action Office takes over the matter from Eicher and Eicher has no further involvement. [Eicher Dep. 139:17-140:2, 195:9-17 (Def. Ex. H)].

198. Disputed. Defendant has not cited to anything in the record to support its statement.

199. Disputed. Defendant's citation does not support its statement. Neely's e-mail states that Penn State's Employee Relations "would like for us to move Destiny" to Housekeeping, not that Neely approved Plaintiff's transfer:

From: Neely, Thomas E <ten10@psu.edu>
Sent: Friday, February 14, 2020 4:54 PM
To: Weyer, Jacki <jkw11@psu.edu>; Carter-Bechdel, Beverly <buc38@psu.edu>
Subject: Destiny McGovern

Jacki

As we had discussed yesterday, Carol just got back to me and Emp Relations would like for us to move Destiny, at our earliest convenience to the 3rd shift position that has come available in Housekeeping.

I let Carol know that you would reach out to her Monday coming to finalize those details..noting that Kitchen management is on board with this change.

Destiny's Phone is 814-441-9619 and her personal email is destmcg5757@gmail.com

Please let me know how it goes once you have touched base with her.

[Eicher Dep. Ex. 16 (Def. Ex. H)].

## K. Penn State's Attempts to Address Plaintiff's Complaint and Plaintiff's Refusal to Respond

200.   Disputed in part. Undisputed that Eicher left a voicemail for Plaintiff after their initial phone call. [Pl. Dep. 143:1-3 (Def. Ex. C)]. Disputed that the voicemail was left on February 14, 2020. Defendant's citation does not support this statement.

201.   Disputed in part. Disputed because Defendant's citation does not support this statement. Undisputed that Eicher left a voicemail for Plaintiff after their initial phone call. [Pl. Dep. 143:1-3 (Def. Ex. C)].

202.   Disputed in part. Undisputed that Eicher left a voicemail for Plaintiff after their initial phone call. [Pl. Dep. 143:1-3 (Def. Ex. C)]. Disputed that Plaintiff did not call Eicher back because Defendant's citation does not support this statement. By way of further response, Perry called Eicher on Plaintiff's behalf because Plaintiff was upset and emotional. [Pl. Dep. 143:20-23, 144:2-9, 147:5-7 (Def. Ex. C); Declaration of Kasha Perry at ¶¶ 13-22 (Pl. Ex. 4)]. Eicher denies speaking with Perry. [Eicher Dep. 144:11-22 (Def. Ex. H)].

203.   Disputed. Defendant mischaracterizes Plaintiff's testimony. Plaintiff testified that she told Eicher everything, including that Vanburen sexually assaulted her, and that Eicher "was very sympathetic. And like Carol kind of baffled me a little because like I felt the day I had the conversation with her that she was really going to do something about everything I came to her about, and then it was like a totally different Carol when she left me the voicemail. It wasn't the same woman I spoke

to." [Pl. Dep. 139:13-23 (Def. Ex. C)]. Further, Defendant's citation to Eicher's testimony does not support its statement. By way of further response, Perry called Eicher on Plaintiff's behalf because Plaintiff was upset and emotional. [Pl. Dep. 143:20-23, 144:2-9, 147:5-7 (Def. Ex. C); Declaration of Kasha Perry at ¶¶ 13-22 (Pl. Ex. 4)]. Eicher denies speaking with Perry. [Eicher Dep. 144:11-22 (Def. Ex. H)].

204.   Disputed. Defendant's citations do not support its statement. Nothing in the cited testimony supports Defendant's statement that "[e]ven though Plaintiff knew Ms. Eicher was going to work with the AAO to address her concerns . . ." Further, Perry called Eicher on Plaintiff's behalf because Plaintiff was upset and emotional. [Pl. Dep. 143:20-23, 144:2-9, 147:5-7 (Def. Ex. C); Declaration of Kasha Perry at ¶¶ 13-22 (Pl. Ex. 4)]. Eicher denies speaking with Perry. [Eicher Dep. 144:11-22 (Def. Ex. H)].

205.   Disputed. Defendant's citation does not support its statement. Further, as Plaintiff testified, in her voicemail message, Eicher "said to expect a transfer to housekeeping starting that Monday and to expect to hear from Jacquie Weyer, the head of housekeeping." [Pl. Dep. 143:1-15 (Def. Ex. C)].

206.   Disputed as stated. Plaintiff testified that Perry called Eicher back on her behalf "[b]ecause I was upset about the situation and how Carol [Eicher] like seemed like she was going to help me and my situation and then she had left that voicemail and email, and so Kasha [Perry] was upset about it and wanted to know

why Carol [Eicher] -- why Trea [Vanburen] wasn't -- there was no disciplinary action happening with Trea [Vanburen] and why I was being moved [to Housekeeping] and nothing was being done with Trea [Vanburen]." [Pl. Dep. 143:20-144:11 (Def. Ex. C)]. Eicher denies speaking with Perry. [Eicher Dep. 144:11-22 (Def. Ex. H)].

207.   Undisputed. By way of further response, Perry was engaged to Plaintiff and, as Plaintiff testified, "was speaking on my behalf because of the whole situation and the assault and everything. It was very emotional for me." [Pl. Dep. 144:14-19, 147:3-7 (Def. Ex. C); Declaration of Kasha Perry at ¶¶ 2-3, 11-22 (Pl. Ex. 4)].

208.   Disputed. Eicher denies ever speaking with Perry with certainty. When asked, "to the best of your recollection, you never spoke with Destiny's partner [Perry]?," Eicher answered, "I'm sure of it." Eicher even denies hearing Perry's name until this litigation. [Eicher Dep. 144:11-22 (Def. Ex. H)].

209.   Undisputed. By way of further response, Eicher sent the email to Plaintiff's personal email address (destmcg5757@gmail.com). [Eicher Dep. Ex. 18 (Def. Ex. H)].

210.   Disputed as stated. Defendant's citation does not support its claim that this was a "possible" transfer. Eicher's email states this was "a transfer to Housekeeping."

Eicher, Eldonna Carolyn

| | |
|---|---|
| From: | Eicher, Eldonna Carolyn |
| Sent: | Friday, February 14, 2020 5:12 PM |
| To: | destmcg5757@gmail.com |
| Subject: | work related issue |

Hello, Destiny;

As promised, I followed up on the information you provided. I tried to call you and left a voicemail so that I can update you. I left my phone number in case you have opportunity to call.

If we don't speak before Monday, be aware that you should be hearing from Jacki Weyer regarding a transfer to Housekeeping. I have provided her with your phone number and email address.

In the meantime, have a nice weekend,

Carol

[Eicher Dep. Ex. 18 (Def. Ex. H)].

211. Disputed. Perry called Eicher on Plaintiff's behalf because Plaintiff was upset and emotional. [Pl. Dep. 143:20-23, 144:2-9, 147:5-7 (Def. Ex. C); Declaration of Kasha Perry at ¶¶ 13-22 (Pl. Ex. 4)]. Eicher denies speaking with Perry. [Eicher Dep. 144:11-22 (Def. Ex. H)].

212. Undisputed.

213. Disputed. Plaintiff testified that Eicher left her one voicemail, which is the voicemail discussed above. [Pl. Dep. 126:15-18, 143:4-6, 246:15-18 (Def. Ex. C)].

214. Disputed. Weyer testified that she does not remember how many how many voicemails she left for Plaintiff. [Weyer Dep. 16:18-25 (Def. Ex. J]. Plaintiff testified that Weyer left her one voicemail in which she informed Plaintiff that she was being moved to the Housekeeping department. [Pl. Dep. 144:13-24, 246:10-14

(Def. Ex. C)].

215.   Disputed. Defendant's citation does not support its claim that this was "a possible move to Housekeeping." Plaintiff testified that she did not call Weyer back because she was told she was being moved to Housekeeping. It was not a possible move or an optional move. [Pl. Dep. 144:13-21, 145:1-8, 147:22-148:1 (Def. Ex. C)].

216.   Disputed. Weyer testified that she does not remember how many how many voicemails she left for Plaintiff. [Weyer Dep. 16:18-25 (Def. Ex. J]. Plaintiff testified that Eicher left her one voicemail, which is the voicemail discussed above, and that Weyer left her one voicemail. [Pl. Dep. 126:15-18, 144:13-24, 246:10-18 (Def. Ex. C)].

217.   Undisputed that Eicher testified to this. By way of further response, when Plaintiff spoke with Eicher, she told Eicher "that I did have future shifts scheduled like because I didn't want to look like I wasn't just going to show up at work. And she said that she was going to talk to Jamison and then get in contact with somebody else about my situation, and then she would follow up with me about what we would do." [Pl. Dep. 138:6-15 (Def. Ex. C)]. Eicher testified that Plaintiff told Eicher that she had not been back to work. [Eicher Dep. 118:18-20 (Def. Ex. H)].

218.   Disputed in part. Undisputed that Eicher wrote a letter addressed to Plaintiff that is dated March 9, 2020. Disputed that this letter was mailed to Plaintiff.

There is no postmark on the U.S. Postal Service Certified Mail Receipt evidencing the post office's receipt of this letter. [Eicher Dep. Ex. 25 at Penn State 10 (Def. Ex. H)]. Plaintiff testified that she never received the letter. [Pl. Dep. 146:4-15, 148:15-19 (Def. Ex. C)]. Eicher concedes that she has no proof the letter dated March 9, 2020 was delivered to Plaintiff.[11] Eicher concedes that she never received the certified green card back confirming delivery of the letter dated March 9, 2020. Eicher concedes that she has no record of sending the letter dated March 9, 2020 by any other method. Eicher concedes that she did not do anything after not hearing from Plaintiff by March 16, 2020. [Eicher Dep. 160:25-162:23 (Def. Ex. H)]. By way of further response, Eicher's letter falsely claims, "As you inquired, we are able to transfer you from Stewarding to the Housekeeping Department." As discussed above, Plaintiff never asked about transferring to the Housekeeping department. Eicher's letter also states, "If we do not hear from you by the end of business day on Monday, March 16, we will assume you have no interest in continuing your employment with The Nittany Lion Inn and will consider you to have voluntarily quit your employment." [Eicher Dep. Ex. 25 (Def. Ex. H)].

219.   Disputed in part. Undisputed that Eicher wrote a letter addressed to Plaintiff that is dated March 9, 2020. Disputed that this letter was actually sent to

---

[11] As Plaintiff pointed out, "you usually have to sign for certified mail." [Pl. Dep. 149:5-10 (Def. Ex. C)].

Plaintiff. Plaintiff testified that she never received the letter. [Pl. Dep. 146:4-15 (Def. Ex. C)]. Eicher concedes that she has no proof the letter dated March 9, 2020 was delivered to Plaintiff. Eicher concedes that she never received the certified green card back confirming delivery of the letter dated March 9, 2020. Eicher concedes that she has no record of sending the letter dated March 9, 2020 by any other method. Eicher concedes that she did not do anything after not hearing from Plaintiff by March 16, 2020. [Eicher Dep. 160:25-162:23 (Def. Ex. H)].

220.   Disputed in part. Undisputed that "no signature was ever returned on the letter." Disputed that the letter dated March 9, 2020 was actually sent to Plaintiff. Plaintiff testified that she never received the letter. [Pl. Dep. 146:4-15 (Def. Ex. C)]. Eicher concedes that she has no proof the letter dated March 9, 2020 was delivered to Plaintiff. Eicher concedes that she never received the certified green card back confirming delivery of the letter dated March 9, 2020. Eicher concedes that she has no record of sending the letter dated March 9, 2020 by any other method. Eicher concedes that she did not do anything after not hearing from Plaintiff by March 16, 2020. [Eicher Dep. 160:25-162:23 (Def. Ex. H)].

221.   Disputed in part. Undisputed that Plaintiff resided at 323 Strouse Avenue address in March 2020. Disputed as to Defendant's characterization of Plaintiff's testimony. In response to a speculative question, Plaintiff answered, "[i]t may be possible." [Pl. Dep. 148:20-149:3 (Def. Ex. C)]. By way of further response,

Perry did not throw the letter dated March 9, 2020 out. [Declaration of Kasha Perry at ¶¶ 24-25 (Pl. Ex. 4)]. Further, for Perry to have thrown the letter dated March 9, 2020 out, the letter would first have to be delivered. Eicher concedes that she has no proof the letter dated March 9, 2020 was delivered to Plaintiff. Eicher concedes that she never received the certified green card back confirming delivery of the letter dated March 9, 2020. Eicher concedes that she has no record of sending the letter dated March 9, 2020 by any other method. Eicher concedes that she did not do anything after not hearing from Plaintiff by March 16, 2020. [Eicher Dep. 160:25-162:23 (Def. Ex. H)].

222.   Disputed as stated. Plaintiff testified that Eicher told her that she would reach out to Penn State's Affirmative Action Office "but she never said anything else about it." [Pl. Dep. 155:13-24 (Def. Ex. C)]. By way of further response, none of Eicher's subsequent communications to Plaintiff mention anything about Eicher having reached out to Penn State's Affirmative Action Office. [Eicher Dep. Ex. 18 (Def. Ex. H at Appx. 821); Eicher Dep. Ex. 25 (Def. Ex. H at Appx. 833-834)].

223.   Disputed. Plaintiff testified that she never responded to the Affirmative Action Office emails because she never received them. When asked if Penn State's Affirmative Action Office reached out to her, Plaintiff answered, "I -- yeah, I guess." Plaintiff then explained Penn State's Affirmative Action Office only contacted her by emailing Plaintiff's work email address, which Plaintiff never used and which

Plaintiff does not believe she even had access to after. February 7, 2020. Plaintiff did not access the Penn State work email account in February, March, or April March 2020. [Pl. Dep. 151:24-153:13, 155:6-9 (Def. Ex. C)].

224.   Undisputed.

225.   Undisputed.

226.   Undisputed.

227.   Undisputed.

228.   Disputed. Defendant's citation does not support its statement. Pasko testified that she first heard Plaintiff's name "[w]hen I read report." [Pasko Dep. 21:21-23 (Def. Ex. L)].

229.   Undisputed. By way of further response, Pasko sent the February 18, 2020 email to Plaintiff's Penn State work email address (dmm6961@psu.edu), which Plaintiff did not use and does not believe she had access to after February 7, 2020. [Pl. Dep. 151:24-153:13, 153:17-154:6, 155:6-9 and Pl. Dep. Ex. 16 (Def. Ex. C)].

230.   Undisputed. By way of further response, Plaintiff did not use the Penn State work email address and does not believe she had access to it after February 7, 2020. Plaintiff did not see this email until discovery in this case. [Pl. Dep. 151:24-153:13, 153:17-154:6, 155:6-9, 245:15-17 (Def. Ex. C)]. Plaintiff first learned that Penn State's Title IX office reached out to her during discovery in this case. [Pl. Dep. 245:9-246:1 (Def. Ex. C)]. No one in Penn State's Title IX office tried to contact

Plaintiff using Plaintiff's cell phone number. [Pl. Dep. 246:2-5(Def. Ex. C)]. No one in Penn State's Title IX office tried to contact Plaintiff using Plaintiff's personal email address. [Pl. Dep. 246:6-9 (Def. Ex. C)].

231. Disputed. Defendant's citations do not support its statement. Penn State 320 does not state that Plaintiff had access to the Penn State work email address until June 30, 2020. [Penn State 320 (Def. Ex. G)]. Nor does Plaintiff's cited testimony. [Pl. Dep. 152:18-153:9 (Def. Ex. C)]. By way of further response, Plaintiff did not use the Penn State work email address and does not believe she had access to it after February 7, 2020. [Pl. Dep. 151:24-153:13, 153:17-154:6, 155:6-9 (Def. Ex. C)]. Plaintiff was also not aware that Penn State still listed her as an employee as of June 30, 2020.  [Pl. Dep. 159:24-160:8 (Def. Ex. C)].

232. Undisputed.

233. Undisputed.

234. Undisputed.

235. Undisputed.

236. Undisputed. By way of further response, Plaintiff did not respond to Pasko's February 18, 2020 email because Plaintiff never received it. [Pl. Dep. 151:24-153:13, 153:17-154:6, 155:6-9 (Def. Ex. C)]. Plaintiff first learned that Penn State's Title IX office reached out to her during discovery in this case. [Pl. Dep. 245:9-246:1 (Def. Ex. C)]. No one in Penn State's Title IX office tried to contact Plaintiff using

Plaintiff's cell phone number. [Pl. Dep. 246:2-5(Def. Ex. C)]. No one in Penn State's Title IX office tried to contact Plaintiff using Plaintiff's personal email address. [Pl. Dep. 246:6-9 (Def. Ex. C)].

237.   Undisputed. By way of further response, Pasko did not know if Plaintiff was still employed with Penn State when she sent the May 6, 2020 email. [Pasko Dep. 44:17-20 (Def. Ex. L)]. Plaintiff never saw Pasko's May 6, 2020 email "because I did not use my work email." Plaintiff did not see this email until discovery in this case. [Pl. Dep. 151:24-153:13, 154:10-23, 155:6-9, 245:23-246:1 (Def. Ex. C)]. Plaintiff first learned that Penn State's Title IX office reached out to her during discovery in this case. [Pl. Dep. 245:9-246:1 (Def. Ex. C)]. No one in Penn State's Title IX office tried to contact Plaintiff using Plaintiff's cell phone number. [Pl. Dep. 246:2-5(Def. Ex. C)]. No one in Penn State's Title IX office tried to contact Plaintiff using Plaintiff's personal email address. [Pl. Dep. 246:6-9 (Def. Ex. C)].

238.   Undisputed. By way of further response, Naviglia did not investigate the Share Report. Naviglia never spoke to Plaintiff. [Naviglia Dep. 43:23-44:1, 51:13-15 (Pl. Ex. 5)].

239.   Undisputed. By way of further response, Plaintiff did not respond to Pasko's May 6, 2020 email because Plaintiff never received it. [Pl. Dep. 151:24-153:13, 154:10-23, 155:6-9 (Def. Ex. C)].

240.   Disputed. Plaintiff did not testify that she "knew" that Eicher would be

"working with the AAO to address her concerns." Plaintiff testified that Eicher told her that she would reach out to Penn State's Affirmative Action Office "but she never said anything else about it." [Pl. Dep. 155:13-24 (Def. Ex. C)]. By way of further response, none of Eicher's subsequent communications to Plaintiff mention anything about Eicher having reached out to Penn State's Affirmative Action Office. [Eicher Dep. Ex. 18 and 25 (Def. Ex. H)].

241.   Disputed as stated. Defendant's citation to Plaintiff's testimony indicates only that Plaintiff did not check the Penn State email address in February, March, or April 2020 "because we didn't use that email for anything really." [Pl. Dep. 152:24-153:7 (Def. Ex. C)]. By way of further response, Plaintiff did not use the Penn State work email address and does not believe she had access to it after February 7, 2020. [Pl. Dep. 151:24-153:13, 153:17-154:6, 155:6-9 (Def. Ex. C)].

242.   Undisputed.

243.   Disputed. Defendant's citation to Plaintiff's testimony indicates only that Plaintiff did not respond to Pasko's two emails to Plaintiff's the Penn State email address because Plaintiff never received them. Also, that Plaintiff did not contact Penn State's Affirmative Action Office because Eicher told her she would reach out to the Affirmative Action Office "but she never said anything else about it." [Pl. Dep. 155:6-24 (Def. Ex. C)]. By way of further response, regarding Eicher, Perry spoke with Eicher on Plaintiff's behalf and said that she would get back in touch with

Plaintiff, which did not do. [Pl. Dep. 143:20-23, 147:5-7, 160:17-20 (Def. Ex. C); Perry Declaration at ¶¶ 18-23]. Further, none of Eicher's subsequent communications to Plaintiff mention anything about Eicher having reached out to Penn State's Affirmative Action Office. [Eicher Dep. Ex. 18 and 25 (Def. Ex. H)]. Regarding Weyer, Plaintiff testified that Weyer left her one voicemail and that she did not call Weyer back because she was told she was being moved to Housekeeping. It was not a possible move or an optional move. [Pl. Dep. 144:13-24, 145:1-8, 147:22-148:1 (Def. Ex. C)]. Regarding Naviglia, Naviglia never attempted to contact Plaintiff—he did not investigate the Share Report and he never spoke to Plaintiff. [Naviglia Dep. 43:23-44:1, 51:13-15 (Pl. Ex. 5)]. Regarding AAO, Plaintiff was not aware that AAO tried to contact her. [Pl. Dep. 160:10-16 (Def. Ex. C)].

### L. Plaintiff's Claims of Sexual Assault

244.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

245.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

246.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

247.    Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

248.    Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Undisputed that Plaintiff filed a filed a petition to obtain a Sexual Violence Protection Order ("SVPO") against Vanburen. Disputed that this filing was "[i]n response" to Vanburen's request for a paternity test. Defendant's citations do not support this statement, only that Plaintiff filed the SVPO in November 2020. [Pl. Dep. 124:15-125:2 (Def. Ex. C); Vanburen Affidavit at ¶ 94 (Def. Ex. F)].

249.    Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Around the end of January or beginning of February 2020, Plaintiff consulted with an attorney and reported the sexual assault to this attorney. This attorney advised Plaintiff not to file a police report, so Plaintiff did not initially file a police report. [Pl. Dep. 71:17-72:13, 124:10-14 (Def. Ex. C)]. Further, Plaintiff reported the sexual assault to Eicher. Plaintiff testified that she told Eicher "that I had been at a bar one night. I don't think I worked that -- no, I did not work that day and it was my day off. And I was at the bar with a friend for a birthday and I had told her about Trea [Vanburen] coming into that same bar and then that night being assaulted." [Pl. Dep. 136:3-11, 136:24-137:2, 137:18-21, 139:13-23 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1); Plaintiff hearing testimony 80:9-13 (Pl. Ex. 9 at Plaintiff 354)].

250.    Undisputed.

251.   Disputed. Plaintiff's Complaint alleges that "[o]n February 10, 2020, Plaintiff reported Mr. Roe's [Vanburen's] harassment of her to Carol Eicher, Human Resources Consultant. **Plaintiff told Ms. Eicher that Mr. Roe sexually assaulted her on December 13, 2019 and that Mr. Roe had been harassing her since he learned that she was pregnant**." [Def. Ex. 1 (Plaintiff's Complaint) at ¶¶ 66-67]. On April 6, 2021, Plaintiff testified that she reported the sexual assault to Eicher. [Plaintiff hearing testimony 80:9-13 (Pl. Ex. 9 at Plaintiff 354)]. Further, Eicher's February 14, 2020 email instructing Steffen to file a Share Report "because of so many elements that fall under Title 9" supports Plaintiff's testimony that she reported sexual assault to Eicher. [Pl. Fact ¶ 191].

252.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Vanburen instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Dep. 85:10-17, 119:6-12 (Def. Ex. C); Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)].

253.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Vanburen instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Dep. 85:10-17, 119:6-12 (Def. Ex. C); Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)].

254.   Undisputed. By way of further response, Vanburen instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Dep. 85:10-17, 119:6-12 (Def. Ex. C); Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)].

255.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff did not immediately report the sexual assault to the police because she was afraid for her job and her life. [Plaintiff hearing testimony 34:8-20 (Pl. Ex. 9 at Plaintiff 308)]. Around the end of January or beginning of February 2020, Plaintiff consulted with an attorney and reported the sexual assault to this attorney. This attorney advised Plaintiff not to file a police report, so Plaintiff did not initially file a police report. [Pl. Dep. 71:17-72:13, 124:10-14 (Def. Ex. C)].

256.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

257.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

258.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, around the end of January or beginning of February 2020, Plaintiff consulted with an attorney and reported the sexual assault to this attorney. This attorney advised Plaintiff not to

file a police report, so Plaintiff did not initially file a police report. [Pl. Dep. 71:17-72:13, 124:10-14 (Def. Ex. C)].

259.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

260.   Undisputed that Vanburen claims that he fully cooperated with the Patton Township Police; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Vanburen's attorney was present during the interview. [Vanburen hearing testimony 68:17-21 (Pl. Ex. 8 at Plaintiff 181)].

261.   Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Disputed that the Patton Township Police finalized its investigation. There is nothing in the record that establishes what the Patton Township Police investigation involved and whether or not it was ever "finalized."

262.   Undisputed that this is what Vanburen believes; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Further, there is nothing in the record that establishes that the court requested a copy of the police report.

263.   Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's statement leaves out

that Plaintiff reported to her doctor that she got pregnant from an assault. [Pl. Dep. 93:4-10 (Def. Ex. C)].

264.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

265.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

266.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

### M.   Plaintiff's Communications with NLI Coworkers About Her Pregnancy

267.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

268.   Undisputed that Peters was a witness at the SVPO hearing held on January 27, 2022; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(a)   Undisputed that Peters testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(b)   Undisputed that Peters testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(c)     Undisputed that Peters testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(d)     Disputed as stated; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Peters testified that Plaintiff was talking to her about Vanburen "not really giving her much attention and not really talking to her at work and kind of being standoffish or whatever." [Plaintiff 220 (Def. Ex. K)]. By way of further response, Plaintiff testified that she did <u>not</u> tell Amanda Peters that she was upset because Vanburen started ignoring her at work. [Pl. Dep. 115:9-13, 115:21-116:24 (Def. Ex. C)].

(e)     Disputed as stated; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Peters testified that Plaintiff "had actually started messaging me and saying things like he's not talking to me, he won't answer me." [Plaintiff 221 (Def. Ex. K)]. By way of further response, no alleged messages are part of the record.

(f)     Disputed as stated; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Peters testified that "[a]nd then at some point her girlfriend had found out  or she had told her and then it became kind of wishy-washy." [Plaintiff 221 (Def. Ex. K)].

(g)     Disputed as stated; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Peters testified that "[a]nd then at some point her girlfriend had found out  or she had told her and then it became kind of wishy-washy." [Plaintiff 221 (Def. Ex. K)].

(h)     Undisputed that Peters testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, there is nothing in the record that establishes that Peters has any firsthand knowledge of the alleged threats.

(i)     Disputed in part; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Disputed that Peters testified that the messages were sent on Facebook. Defendant's citations do not support this statement. Undisputed that Peters testified that she received these messages. By way of further response, the alleged messages are not part of the record.

(j)     Undisputed. By way of further response, Vanburen instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Dep. 85:10-17, 119:6-12 (Def. Ex. C); Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)].

269.   Disputed in part. Johnson was a kitchen worker and he also cooked. [Pl. Dep. 48:7-16 (Def. Ex. C)].

270.   Disputed as stated. Defendant's citation does not support Defendant's claim that the counseling was "often."

271.   Undisputed.

272.   Undisputed with clarification; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. The "First Active Warning Letter" is dated November 12, 2020—more than nine months after Plaintiff last worked for Penn State. [Pl. Dep. Ex. 4 (Def. Ex. C)].

273.   Undisputed that Johnson was a witness at the SVPO hearing held on January 27, 2022; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(a)   Undisputed that Johnson testified to this. By way of further response, Johnson testified that Plaintiff came up to him one day and "was just really sketched out . . . like she just felt uncomfortable. You could just tell she was uncomfortable." [Plaintiff 239 (Def. Ex. K)]. Further, Plaintiff testified that she did not tell Duane Johnson that she was upset because Vanburen started ignoring her at work. [Pl. Dep. 115:9-13, 115:21-116:24 (Def. Ex. C)].

(b)   Undisputed that Johnson testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(c)   Undisputed that Johnson testified to this; however, this is not

material to the Court's disposition of Defendant's Motion for Summary Judgment.

(d)    Undisputed that Johnson testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(e)    Undisputed that Johnson testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(f)    Undisputed that Johnson testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Vanburen instructed Plaintiff to tell everyone that she got pregnant after having a one-night stand. [Pl. Dep. 85:10-17, 119:6-12 (Def. Ex. C); Vanburen hearing testimony 76:13-19 (Pl. Ex. 8 at Plaintiff 189)].

274.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

275.   Undisputed that Eastwood was a witness at the SVPO hearing held on January 27, 2022; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(a)    Undisputed that Eastwood testified to this; however, this is not

material to the Court's disposition of Defendant's Motion for Summary Judgment.

(b)     Undisputed that Eastwood testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(c)     Undisputed that Eastwood testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(d)     Disputed as stated; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Eastwood testified that "it had more to do with how she was going to tell her girlfriend at the time or whether or not Trea should tell his wife that they had cheated on their significant others." [Plaintiff 212 (Def. Ex. K)].

(e)     Undisputed that Eastwood testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(f)     Undisputed that Eastwood testified to this; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

(g)     Disputed; however, this is not material to the Court's disposition

of Defendant's Motion for Summary Judgment. Defendant's statement misstates Eastwood's testimony. [Plaintiff 213-214 (Def. Ex. K)].

(h)   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's statement misstates Eastwood's testimony. Eastwood testified, "And I think she was also really scared about her relationship with her girlfriend at the time." [Plaintiff 214 (Def. Ex. K)].

(i)   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's statement misstates Eastwood's testimony. Eastwood testified, "I think it was she wanted better communication about it with him so that they could figure out how to work through this." [Plaintiff 214 (Def. Ex. K)].

(j)   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Defendant's statement misstates Eastwood's testimony. Eastwood testified, "In my view, it was after the act happened there wasn't much correspondence." [Plaintiff 216 (Def. Ex. K)].

### N. Plaintiff's Failure to Mitigate Damages

276.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

277.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

278.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

279.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

280.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff explained, "[t]hey gave my position away and since I was still in my probationary period, they had let me go. I was told that I was in my probationary period and my attendance was their reason. I was let go before I went on maternity leave. I did get approved unemployment since they were in the wrong for giving my position away and then letting me go." [Pl. Resp. to Def's Interrog. No. 8 (Def. Ex. D)].

281.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

282.   Disputed as stated; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Plaintiff testified that she did not apply for jobs during this period because "emotionally and everything, I needed to focus on my mental health" and "the mental health I was working on, taking care of my child." [Pl. Dep. 176:14-21, 182:7-20 (Def. Ex. C)].

283.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, UPS was a part time job. [Pl. Dep. 182:24-183:13 (Def. Ex. C)].

284.   Disputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Plaintiff did not testify that she quit the UPS job because of anxiety about leaving her child. Plaintiff testified that she quit the UPS job because of "[a]nxiety, a lot of stuff . . . Just being overwhelmed, leaving my child . . . Starting back at a job, everything that was going on in my life at the time. [Pl. Dep. 183:21-184:4, 184:14-19 (Def. Ex. C)]. As Plaintiff explained in her interrogatory responses, "[i]t was my first job since after I had gone on maternity leave. I left on the first day because I wasn't ready to go back to work with this whole situation and my other stuff I'm dealing with that ties into this situation. This all has affected so much of my life, even my motivation to get back to working and being the person I once was." [Pl. Resp. to Def's Interrog. No. 8 (Def. Ex. D)].

285.   Undisputed with clarification; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. Plaintiff also testified that she had anxiety about "[s]tarting back at a job, everything that was going on in my life at the time." [Pl. Dep. 184:14-19 (Def. Ex. C)].

286.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

287.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff testified that she could not accept the position at Eagle Valley Personal Care Home "[b]ecause it was third shift and I wouldn't have had childcare overnight." [Pl. Dep. 186:7-16 (Def. Ex. C); Pl. Resp. to Def's Interrog. No. 11 (Def. Ex. D)].

288.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

289.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, this was a part time position. [Pl. Dep. 187:15-19 (Def. Ex. C); Pl. Resp. to Def's Interrog. No. 11 (Def. Ex. D)].

290.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment. By way of further response, Plaintiff was unable to accept this part time position due to vaccination requirements. [Pl. Dep. 187:15-23 (Def. Ex. C); Pl. Resp. to Def's Interrog. No. 11 (Def. Ex. D)].

291.   Undisputed; however, this is not material to the Court's disposition of Defendant's Motion for Summary Judgment.

## **Additional Undisputed and Material Facts**

### *Penn State's Policies*

292.   Penn State maintains a policy titled "AD85 Title IX Sexual

Harassment" ("Policy AD85"). [Eicher Dep. 47:20-50:3; Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 715-739; Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 740-748)].

293.   According to Policy AD85, Penn State "prohibit[s] sexual harassment and misconduct, including, but not limited to, acts of sexual violence, sexual harassment, domestic violence, dating violence and stalking, in accordance with Title IX of the Education Amendments of 1972." [Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 716)].

294.   Policy AD85 applies to all Penn State "students, faculty, staff, affiliates, and other individuals participating or attempting to participate in University programs and activities." [Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 716)].

295.   Policy AD85 prohibits sexual assault, which Policy 85 defines as "any nonconsensual sexual act proscribed by Federal, tribal, or State law, including when the victim lacks capacity to consent." [Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 721)].

296.   According to Policy AD85, "[c]onsent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent must be informed, freely given and mutual. If intimidation, threats, or physical force are used there is no consent. If a person is mentally or physically incapacitated so that such person cannot understand the fact, nature or extent of the sexual situation, there is no consent. This includes incapacitation due to alcohol or drug consumption, or being asleep or unconscious, where the respondent knew or reasonably should have

known that the person was incapacitated. Inducement of incapacitation of another with the intent to affect the ability of an individual to consent or refuse to consent to sexual contact almost always, if not always, negates consent." [Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 719)].

297.   According to AD85, "[n]otice to the Title IX Coordinator, or to an official with authority to institute corrective measures on the University's behalf, triggers the University's response obligations under this Policy. Such officials include the Title IX Coordinator, Deputy Title IX Coordinators, the Office of Sexual Misconduct Prevention & Response, the Office of Student Conduct, the Affirmative Action Office, Human Resources, and other employees with Supervisory Authority." [Eicher Dep. Ex. 5 (Def. Ex. H at Appx. 720-721)].

298.   Penn State also maintains a policy titled "AD91 Discrimination and Harassment and Related Inappropriate Conduct," which Eicher is also familiar with. [Eicher Dep. 53:11-12, 54:19-55:21; Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 740-748)].

299.   According to Policy AD91, Penn State prohibits harassment and "because of age, race, color, ancestry, national origin, sex, sexual orientation, gender, perceived gender, gender identity, physical or mental disability, religion, creed, service in the uniformed services (as defined in state and federal law), veteran status, marital or family status, pregnancy, pregnancy-related conditions, genetic

information or political ideas." [Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 740)].

300. Policy AD91 defines discrimination as "conduct of any nature that denies an individual the opportunity to participate in or benefit from a University program or activity, or otherwise adversely affects a term or condition of an individual's employment, education, or living environment, because of the individual's age, race, color, ancestry, national origin, sex, sexual orientation, gender, perceived gender, gender identity, physical or mental disability, religion, creed, service in the uniformed services (as defined in state and federal law), veteran status, marital or family status, pregnancy, pregnancy-related conditions, genetic information or political ideas." [Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 741)].

301. Policy AD91 defines harassment as "behavior consisting of physical or verbal conduct that is sufficiently severe or pervasive such that it substantially interferes with an individual's employment, education or access to University programs, activities or opportunities and would detrimentally affect a reasonable person under the same circumstances. Harassment may include, but is not limited to, verbal or physical attacks, graphic or written statements, threats, or slurs. Whether the alleged conduct constitutes prohibited Harassment depends on the totality of the particular circumstances, including the nature, frequency and duration of the conduct in question, the location and context in which it occurs and the status of the individuals involved." [Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 742)].

302.   Policy AD91 specifically prohibits gender-based harassment, which it defines as "verbal, nonverbal, graphic, or physical aggression, intimidation, or hostile conduct based on sex, sex-stereotyping, sexual orientation or gender identity, but not involving conduct of a sexual nature, when such conduct is sufficiently severe, persistent, or pervasive that it interferes with or limits a person's ability to participate in or benefit from the University's education or work programs or activities. For example, persistent disparagement of a person based on a perceived lack of stereotypical masculinity or femininity or exclusion from an activity based on sexual orientation or gender identity also may violate this Policy." [Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 742)].

303.   Policy AD91 defines "sex-based harassment" as including sexual assault. [Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 742)].

304.   Policy AD91 also prohibits retaliation as defined in Policy AD67. [Eicher Dep. Ex. 6 (Def. Ex. H at Appx. 743)].

### *Steffen Mentors Plaintiff Who Wanted to Pursue a Culinary Career*

305.   During Plaintiff's employment at the NLI, Steffen oversaw the entire kitchen and also planned banquet dinners. [Pl. Dep. 41:18-42:12 (Def. Ex. C)].

306.   There was various positions in the kitchen, including hot line and cold line cooks, chefs, kitchen workers, and dish stewards. [Pl. Dep. 42:19-44:4 (Def. Ex. C)].

307.   Plaintiff testified that she spoke with Steffen about future careers within Penn State and told him she had an interest in culinary foods. [Pl. Dep. 239:1-13 (Def. Ex. C)].

308.   Steffen told Plaintiff his story about how he started out as a dish steward and worked his way up to a chef and that he was willing to mentor Plaintiff in doing that, if she was interested. [Pl. Dep. 28:13-19, 239:1-13 (Def. Ex. C)].

309.   Plaintiff moved to the second shift Steward position because she "wanted to pursue a culinary career" and Steffen "told me to start there and then he was mentoring me." [Pl. Dep. 24:6-13, 26:20-22, 27:17-24 (Def. Ex. C)].

310.   Around the time that Plaintiff became a dish steward, Steffen told her there was going to be a full-time dish steward position available that she would be moved into. [Pl. Dep. 24:18-24, 162:23-163:5, 241:3-9 (Def. Ex. C)]. Steffen did not tell Plaintiff that she would have to apply for this position. [Pl. Dep. 24:18-24, 162:23-163:5, 241:3-9 (Def. Ex. C)].

311.   After Plaintiff moved to the second shift Steffen mentored Plaintiff to help her learn and pursue a career in culinary. [Pl. Resp. to Def.'s Interrog. No. 14 (Pl. Ex. 1)].

312.   Steffen mentored Plaintiff two to three days per week. Plaintiff was in the dish room the rest of the time. [Pl. Dep. 239:23-240:5 (Def. Ex. C)].

313.   Plaintiff testified, that Steffen "showed me how to cut, he had me

prepping, he had me doing plate-up for events and banquets, he had me learning the cold bar, which is like all salad, he had me working with other cooks to learn like chef cooking skills. [Pl. Dep. 239:14-22 (Def. Ex. C)].

314.   Steffen also allowed Plaintiff to work some events where she carved the meat. [Pl. Dep. 240:6-9 (Def. Ex. C)].

315.   Plaintiff did these culinary duties in addition to her regular duties. [Pl. Dep. 240:11-20 (Def. Ex. C)].

316.   Plaintiff testified that in January 2020, after Steffen learned that Plaintiff was pregnant and Vanburen was the baby's father, Steffen stopped mentoring Plaintiff. [Pl. Dep. 240:21-241:2 (Def. Ex. C); Pl. Resp. to Def.'s Interrog. Nos. 14 and 22 (Pl. Ex. 1)].

### *Eicher is a Seasoned Human Resources Professional*

317.   In 1995, Eicher obtained a Senior Professional in Human Resources (SPHR) certification from Human Resources Certification Institute (HRCI). [Eicher Dep. 16:19-17:5 (Def. Ex. H)].

318.   Eicher maintains her SPHR certification by taking continuing education. [Eicher Dep. 17:5-19:4 (Def. Ex. H)].

319.   Eicher also obtained a Senior Certified Professional (SCP) certification from the Society of Human Resources Management (SHRM). [Eicher Dep. 19:6-20:21 (Def. Ex. H)].

320.   Eicher has worked in Human Resources since 1969. [Eicher Dep. 22:24-23:1 (Def. Ex. H)].

321.   Eicher has worked in Human Resources for Penn State since 1997. [Eicher Dep. 23:8-24:22 (Def. Ex. H)].

322.   Eicher has been Human Resources Consultant since 2017. [Eicher Dep. 25:2-6 (Def. Ex. H)].

323.   Eicher does not take any training regarding employment practices through Penn State. [Eicher Dep. 34:21-35:6 (Def. Ex. H)].

324.   Eicher understands that if a Penn State employee reports harassment to a supervisor or manager, the supervisor or manager has a duty to report it to "the Title IX representative at the Affirmative Action Office . . . [a]s soon as they can." [Eicher Dep. 56:16-57:8 (Def. Ex. H)].

325.   Eicher understands that if a Penn State employee reports harassment to a Human Resources representative, the Human Resources representative has a duty to talk to the employee "[w]ho is reporting it," the supervisor, and "[d]epending on the information that they gather," the employee "they're claiming was in error." [Eicher Dep. 57:10-58:15 (Def. Ex. H)].

326.   The Human Resources representative should also consult with the Labor & Employee Relations Department and the Affirmative Action Office "to ensure that all the bases are covered." [Eicher Dep. 58:16-23, 60:1-21 (Def. Ex. H)].

327.   The Labor & Employee Relations Department is "the area of expertise for all Labor & Employee Relations issues." [Eicher Dep. 58:24-59:3 (Def. Ex. H)].

328.   The Affirmative Action Office is "the area of expertise for all affirmative action situations across the university" and is "responsible for investigating claims that are made that fall under their purview." [Eicher Dep. 59:4-11 (Def. Ex. H)].

329.   If the Affirmative Action Office takes over an investigation, the Human Resources representative does not do anything else regarding the investigation. [Eicher Dep. 60:12-21 (Def. Ex. H)].

### *Eicher's Testimony About Her Call with Employee Relations*

330.   After speaking with both Plaintiff and Steffen, Eicher spoke with Penn State's Employee Relations. [Eicher Dep. 128:14-23 (Def. Ex. H)].

331.   Eicher testified that Employee Relations told her to "have the manager, who is first-hand knowledge involved in this, complete the Share Report." [Eicher Dep. 139:10-16 (Def. Ex. H)].

332.   Eicher testified that Employee Relations "requested" that they "go ahead and move" Plaintiff to the Housekeeping department, which is "a total different department." [Eicher Dep. 126:13-127:11, 127:23-128:3 (Def. Ex. H)].

333.   Employee Relations did not suggest moving Vanburen to another position. [Eicher Dep. 135:8-17 (Def. Ex. H)].

### *Eicher's Testimony About Her Shorthand Notes*

334.   Eicher took notes in shorthand of her conversation with Plaintiff on a printout of Plaintiff's February 10, 2020 email. [Eicher Dep. 106:1-22 and Eicher Dep. Ex. 12 (Def. Ex. H)].

335.   Eicher testified that she transcribed her shorthand notes of her conversation with Plaintiff. [Eicher Dep. 107:19-25, 113:22-114:3 and Eicher Dep. Ex. 14 at Penn State 25 (Def. Ex. H)].

336.   Eicher testified that her transcription of her shorthand notes of her conversation with Plaintiff is word-for-word what her shorthand notes say. [Eicher Dep. 113:22-114:9, 118:22-119:5 and Eicher Dep. Ex. 12 and 14 at Penn State 25 (Def. Ex. H)].

337.   Eicher also took notes in shorthand of her conversation with Steffen. [Eicher Dep. 111:15-24 and Eicher Dep. Ex. 13 (Def. Ex. H)].

338.   Eicher testified that she transcribed her shorthand notes of her conversation with Steffen. [Eicher Dep. 112:1-9, 114:11-15 and Eicher Dep. Ex. 14 at Penn State 24 (Def. Ex. H)].

339.   Eicher testified that the "top two-thirds" of the document Bates stamped Penn State 24 is the transcription of her shorthand notes of her conversation with Steffen. [Eicher Dep. 112:1-9 and Eicher Dep. Ex. 14 at Penn State 24 (Def. Ex. H)].

340.   Eicher testified that her transcription of her shorthand notes of her conversation with Steffen is word-for-word what her shorthand notes say. [Eicher Dep. 112:10-15 (Def. Ex. H)].

341.   Eicher also took shorthand notes of her conversation with Penn State's Employee Relations. [Eicher Dep. 112:22-113:17 and Eicher Dep. Ex. 13 at Penn State 21 (Def. Ex. H)].

342.   Eicher testified that she transcribed her shorthand notes of her conversation with Employee Relations, which are at the bottom of the document Bates stamped Penn State 24 beginning with the heading "Notes from Phone conversation with Employee Relations:" [Eicher Dep. 112:22-113:5, 114:11-15 and Eicher Dep. Ex. 14 at Penn State 24 (Def. Ex. H)].

343.   When asked, "is there anything from your handwritten notes in Exhibits 12 and 13, that does not appear in Exhibit 14?," Eicher answered:

(a)   "So I see right at the top [of Eicher Dep. Ex. 13], I had written that he needs to talk to Trey Van Buren . . . So that was like a note to myself, --- that's not here." [Eicher Dep. 114:22-115:16 and Eicher Dep. Ex. 13 and 14 (Def. Ex. H)].

(b)   "And then there is the word threatening him. And he --- he was saying that her --- her girlfriend had called and was making threatening calls to him . . . I thought that was in here though . .

. Yeah, I've been getting, oh, text messages from her and her girlfriend. But I have the word threatening him, like as an aside." [Eicher Dep. 115:18-116:5 and Eicher Dep. Ex. 13 and 14 (Def. Ex. H)].

344.   Eicher testified that she transcribed her shorthand notes "later" but cannot remember whether it was days or weeks later. [Eicher Dep. 129:22-130:7 (Def. Ex. H)]. Eicher does not know what the allegedly threatening text messages said or what the alleged threats were in the calls. [Eicher Dep. 116:7-14 (Def. Ex. H)].

### Eicher's Typed Notes Do Not Accurately Translate Eicher's Shorthand Notes

345.   Eicher wrote her notes in Gregg shorthand, is a form of shorthand. [Declaration of Claire Szostak at ¶¶ 3, 7 (Pl. Ex. 3)].

346.   Shorthand is a lost art. [Eicher Dep. 115:2-3 (Def. Ex. H)].

347.   Eicher's typed notes is not a fully accurate translation/transcription of her shorthand notes of her conversations with Plaintiff, Steffen, and Employee Relations. [Declaration of Claire Szostak at ¶¶ 8-10 (Pl. Ex. 3)].

348.   The differences between Eicher's shorthand notes and Eicher's typed translation/transcription are:

(a)   Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "I have spoken to Trea Van Buren." Eicher's original shorthand

notes read "I do think need to talk to Trey Van Buren." Also, not transcribed in Eicher's typed notes, but in Eicher's original shorthand is what looks like "threatening him." [Declaration of Claire Szostak at ¶ 11(a) (Pl. Ex. 3)].

(b)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "She was in their Friday, Saturday . . ." This could also say she was "not" there, since the symbol for "not" and "in" is the same. [Declaration of Claire Szostak at ¶ 11(b) (Pl. Ex. 3)].

(c)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "Notes from Phone conversation with Employee Relations:" This heading is not in Eicher's original shorthand notes. [Declaration of Claire Szostak at ¶ 11(c) (Pl. Ex. 3)].

(d)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "When talking to Destiny, ask her these questions:" This is not in Eicher's original shorthand notes. [Declaration of Claire Szostak at ¶ 11(d) (Pl. Ex. 3)].

(e)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "Ask Jamie to do a Share Report:" "Ask Jamie to do a" is not in Eicher's original shorthand notes. [Declaration of Claire Szostak at ¶ 11(e) (Pl. Ex. 3)].

(f)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "We have an obligation to report this to the Title 9 office. Don't be surprised if you hear from that office." Following this sentence, in Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21) is what looks like "on the basis of a relationship." [Declaration of Claire Szostak at ¶ 11(f) (Pl. Ex. 3)].

(g)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "Tell her she still has to work her job." In Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21), here is what looks like, "ER: do we have a solid grounds for terming?" This does not appear in Eicher's typed notes. [Declaration of Claire Szostak at ¶ 11(g) (Pl. Ex. 3)].

(h)     Following the sentence in Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24), which states, "Tell her she still has to work her job," in in Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21), here is what looks like, "should we go that route." [Declaration of Claire Szostak at ¶ 11(h) (Pl. Ex. 3)].

(i)     Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 24) state, "If there is opportunity and she agrees, go ahead and transfer her." "If there is opportunity and she agrees" is not in Eicher's

original shorthand notes. Eicher's original shorthand notes (Eicher Dep. Ex. 13 at Penn State 21) state, "go ahead and transfer her." [Declaration of Claire Szostak at ¶ 11(i) (Pl. Ex. 3)].

(j)   Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 25) state, "Have you talked to Paula* about opportunities in another department or building?" Eicher's original shorthand notes (Eicher Dep. Ex. 12 at Penn State 22) read, "Call Paula re opportunities in another department, building," not "Have you talked to Paula* about opportunities in another department or building?" [Declaration of Claire Szostak at ¶ 11(j) (Pl. Ex. 3)].

(k)   Eicher's typed notes (Eicher Dep. Ex. 14 at Penn State 25) state:

> DM: I have spoken to Paula. I would like to work in Housekeeping.
> CE: I will follow up on that as well.

This two line exchange is not in the original shorthand notes. [Declaration of Claire Szostak at ¶ 11(k) (Pl. Ex. 3)].

349.   Plaintiff does not know Paul Barton. [Pl. Dep. 244:16-22 (Def. Ex. C)].

350.   Plaintiff has never spoken with Barton. [Pl. Dep. 245:2-3 (Def. Ex. C)].

351.   Plaintiff never told anyone that. She spoke with Barton. [Pl. Dep. 245:6-8 (Def. Ex. C)].

### *The Housekeeping Position*

352.   The Housekeeping position was the third shift (overnight). The work hours were 11:30 p.m. to 7:00 a.m. [Eicher Dep. 134:1-4 (Def. Ex. H); Weyer Dep. 13:24-14:8 (Def. Ex. J)].

353.   Eicher testified that the Housekeeping position requires "[m]inimal skill" and that the duties are "primarily cleaning public space, vacuuming, dusting, cleaning, replenishing bathrooms" and sometimes doing "something in one of the rooms," which could be "cleaning it and preparing it for the next guest." [Eicher Dep. 171:6-23 (Def. Ex. H)].

354.   Jacqueline Weyer was Director of Housekeeping at the NLI for fifteen years. [Weyer Dep. 8:22-9:5 (Def. Ex. J)].

355.   As Director of Housekeeping, Weyer supervised twenty-seven technical service employees. [Weyer Dep. 9:15-19 (Def. Ex. J)].

356.   There were no other types of jobs in the Housekeeping department at the NLI. [Weyer Dep. 9:25-10:3 (Def. Ex. J)].

357.   Weyer does not know the pay scale for the technical service employees. [Weyer Dep. 11:2-4 (Def. Ex. J)].

358.   The overnight Housekeeping position's duties were "[d]eep cleaning the public space areas," which included scrubbing the carpet, floors, kitchen, and walls, running floor care, and waxing floors. [Weyer Dep. 14:12-21 (Def. Ex. J)].

359.   Weyer does not recall having any communication with Eicher regarding Plaintiff. [Weyer Dep. 15:12-20, 18:13-17 (Def. Ex. J)].

360.   Weyer never tried to contact Plaintiff by text message. [Weyer Dep. 17:1-2 (Def. Ex. J)].

361.   Weyer never tried to contact Plaintiff by emailing Plaintiff's personal Gmail address. [Weyer Dep. 17:4-7 (Def. Ex. J)].

362.   Weyer does not remember asking Plaintiff to contact her by a certain date. [Weyer Dep. 18:3-6 (Def. Ex. J)].

363.   Weyer did not have any not recall having any communication with Eicher regarding Plaintiff. [Weyer Dep. 15:12-20, 18:13-17 (Def. Ex. J)].

### *Penn State's Documents Show that Employee Relations Instructed Eicher and the NLI to Transfer Plaintiff to the Housekeeping Department*

364.   On February 14, 2020, Thomas Neely, General Manager of the NLI, sent the following email, which states that Employee Relations wanted the NLI to move Plaintiff to the Housekeeping department:

From: Neely, Thomas E <ten10@psu.edu>
Sent: Friday, February 14, 2020 4:54 PM
To: Weyer, Jacki <jkw11@psu.edu>; Carter-Bechdel, Beverly <buc38@psu.edu>
Subject: Destiny McGovern

Jacki

As we had discussed yesterday, Carol just got back to me and Emp Relations would like for us to move Destiny, at our earliest convenience to the 3rd shift position that has come available in Housekeeping.

I let Carol know that you would reach out to her Monday coming to finalize those details..noting that Kitchen management is on board with this change.

Destiny's Phone is 814-441-9619 and her personal email is destmcg5757@gmail.com

Please let me know how it goes once you have touched base with her.

Best,

Thomas E. Neely
General Manager | The Nittany Lion Inn
200 West Park Avenue |State College, PA 16803
Direct: 814-863-8531 | Cellular: 757-784-0647
Reservations: 800-233-7505

[Eicher Dep. Ex. 16 (Def. Ex. H); Weyer Dep. 12:23-13:3, 13:10-20 (Def. Ex. J)].

### *Penn State Does Not Investigate Plaintiff's Complaint*

365. Eicher concedes that she never spoke with Vanburen. [Eicher Dep. 98:11-13 (Def. Ex. H)].

366. Tetyana Pasko is an Administrative Support Assistant and Case Manager for Discrimination Complaints in Penn State's Affirmative Action Office. [Pasko Dep. 13:23-14:19 (Def. Ex. L)].

367. As a Case Manager for Discrimination Complaints, Pasko receives all complaints that Affirmative Action Office receives, enters them in an office database, sends Reach Out emails, schedules meetings with complainants, respondents, and witnesses, and assists with different areas of investigation. [Pasko Dep. 15:2-18,

18:20-19:11 (Def. Ex. L)].

368.   A Share Report is a report that someone can submit " if you suspect like sexual harassment or gender discrimination." [Pasko Dep. 23:18-24:14 (Def. Ex. L)].

369.   The Affirmative Action Office uses software to "handle sexual harassment complaints," which takes information from a Share Report and generates a form that is sent to the office. [Pasko Dep. 31:6-34:4 (Def. Ex. L); and Pl. Exhibits 7-8].

370.   Pasko recalls receiving and reviewing the report regarding Plaintiff. [Pasko Dep. 21:15-22:25, 23:18-24, 31:6-34:20 (Def. Ex. L) and Pasko Dep. Ex. 7-8 (Def. Ex. L)].

371.   Pasko recalls that Plaintiff "was claiming hostile work environment," but does not recall anything else about the report. [Pasko Dep. 22:1-5, 22:25-23:2 (Def. Ex. L)].

372.   Pasko does not recall who submitted the Share Report. [Pasko Dep. 25:22-26:1 (Def. Ex. L)].

373.   After receiving the Share Report, Pasko "reviewed the report and sent destiny Reach Out email." [Pasko Dep. 26:2-9 (Def. Ex. L)].

374.   Pasko does not know who Steffen is. [Pasko Dep. 26:23-25 (Def. Ex. L)].

375.   Pasko recalls that Vanburen was the respondent in Plaintiff's complaint.

[Pasko Dep. 27:1-12 (Def. Ex. L)].

376.  Pasko never spoke with Vanburen. [Pasko Dep. 27:13-15 (Def. Ex. L)].

377.  Pasko never emailed Vanburen. [Pasko Dep. 27:16-22 (Def. Ex. L)].

378.  Pasko testified that the investigator decides when to email the respondent. [Pasko Dep. 27:16-28:7 (Def. Ex. L)].

379.  Pasko never spoke with anyone about Vanburen. [Pasko Dep. 28:9-11 (Def. Ex. L)].

380.  Brian Naviglia is an Affirmative Action Specialist in Penn State's Affirmative Action Office. [Naviglia Dep. 14:17-25, 15:14-17 (Pl. Ex. 5)].

381.  Naviglia has worked in worked in Human Resources roles since 2007. [Naviglia Dep. 24:15-29:2 (Pl. Ex. 5)].

382.  As Affirmative Action Specialist, Naviglia responds "to a variety of different complaints that may come in," primarily Title VII and Title IX complaints. [Naviglia Dep. 15:18-16:4, 16:22-17:15 (Pl. Ex. 5)].

383.  Naviglia also supports "external complaint responses," such as EEOC or PHRC complaints. [Naviglia Dep. 16:5-10 (Pl. Ex. 5)].

384.  All employee complaints of discrimination or harassment go to the Affirmative Action Office. [Naviglia Dep. 22:6-9 (Pl. Ex. 5)].

385.  The Affirmative Action Office receives complaints through a hotline, its website, and the Share Report reporting system through the Office of Sexual

Misconduct Prevention and Resources. [Naviglia Dep. 22:16-23:16 (Pl. Ex. 5)].

386. Human Resources can also notify the Affirmative Action Office of a complaint. [Naviglia Dep. 24:4-14 (Pl. Ex. 5)].

387. Naviglia testified that "[o]nce a complaint is assigned to me and contact has been made with a complainant, the first step would be to have the complainant meet with me." [Naviglia Dep. 18:1-6 (Pl. Ex. 5)].

388. Naviliga was assigned to investigate the Share Report. [Naviglia Dep. 49:23-50:2 (Pl. Ex. 5); Pasko Dep. 44:21-22 (Def. Ex. L); Pasko Dep. Ex. 33 (Def. Ex. L)].

389. Naviglia testified that he would have received a notification when the Share Report was filed. [Naviglia Dep. 46:2-10, 50:3-15 (Pl. Ex. 5)].

390. Naviglia has no recollection about what the allegations were in the Share Report. [Naviglia Dep. 46:15-22 (Pl. Ex. 5)].

391. Naviglia did not investigate the allegations in the Share Report. [Naviglia Dep. 51:13-15 (Pl. Ex. 5)].

392. Naviglia never spoke to Plaintiff. [Naviglia Dep. 43:23-44:1 (Pl. Ex. 5)].

393. Naviglia never spoke to Steffen. [Naviglia Dep. 44:11-14 (Pl. Ex. 5)].

394. Naviglia never spoke to Vanburen. [Naviglia Dep. 44:21-23, 45:21-23 (Pl. Ex. 5)].

395. Naviglia never spoke to anyone about Vanburen. [Naviglia Dep. 45:24-

46:1 (Pl. Ex. 5)].

396.   Naviglia testified that "if a complainant has not contacted us, [the Share Report] stays with the Title IX Coordinator to make decisions on what to do there." [Naviglia Dep. 51:16-52:5 (Pl. Ex. 5)].

397.   The Title IX Coordinator in 2020 was Christopher Harris. [Naviglia Dep. 48:23-49:3 (Pl. Ex. 5)].

398.   Naviglia never spoke with Harris about Plaintiff. [Naviglia Dep. 52:6-9 (Pl. Ex. 5)].

399.   Naviglia never spoke with Pasko about Plaintiff. [Naviglia Dep. 52:10-19 (Pl. Ex. 5)].

400.   Naviglia never spoke with Pasko about Vanburen. [Naviglia Dep. 52:16-19 (Pl. Ex. 5)].

401.   Eicher never spoke with Pasko about either Plaintiff of Vanburen. [Eicher Dep. 175:4-14 (Def. Ex. H)].

402.   Eicher never spoke with Naviglia about either Plaintiff of Vanburen. [Eicher Dep. 175:15-176:1 (Def. Ex. H)].

403.   Eicher spoke with Finnecy about Plaintiff after Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. [Eicher Dep. 176:2-20 (Def. Ex. H)].

404.   Vanburen did not receive any discipline as a result of Plaintiff's

complaint. [Eicher Dep. 151:24-152:9 (Def. Ex. H)].

405.   Penn State still employs Steffen and Vanburen. [Eicher Dep. 83:3-4 (Def. Ex. H); Def. Facts ¶ 61].

### Eicher Testified That She Does Not Know if Vanburen's Alleged Conduct Would Violate Penn State's Policies

406.   When asked, "If Mr. Van Buren told Destiny to get an abortion, would that violate any of Penn State's policies?," Eicher answered, "I don't know. I don't know how to answer that." [Eicher Dep. 103:21-104:3 (Def. Ex. H)].

407.   When asked, "Do you think --- I mean, just based on your experience in Human Resources, do you believe that if Mr. Van Buren did in fact tell Destiny to get an abortion, that it would violate any of Penn State's policies?," Eicher answered, "I --- I don't know the answer." [Eicher Dep. 104:5-24 (Def. Ex. H)].

408.   When asked, "If Mr. Van Buren harassed Destiny at work because she was pregnant with his baby, would that violate any of Penn State's policies?," Eicher answered, "I can't answer that." [Eicher Dep. 153:3-154:15 (Def. Ex. H)].

409.   When asked, "Would --- if Mr. Van Buren harassed Destiny at work because she was pregnant with his baby, would that violate Penn State's Sexual Harassment Policy?," Eicher testified, "Yeah, I --- I don't --- I don't know." [Eicher Dep. 154:19-155:15 (Def. Ex. H)].

### Finnecy's Testimony

410.   In 2020, Alan Finnecy was a Senior Affirmative Action Specialist in

Penn State's Affirmative Action Office. [Finnecy Dep. 23:3-24:6 (Pl. Ex. 6)].

411.   Finnecy has a law degree and previously practiced law, including employment law. [Finnecy Dep. 12:16-13:13 (Pl. Ex. 6)].

412.   As a Senior Affirmative Action Specialist, Finnecy's primary job duty was investigating and responding to EEOC and PHRC complaints on Penn State's behalf. [Finnecy Dep. 16:10-17:15, 17:25-18:11, 18:25-19:15, 23:19-23, 28:18-30:10 (Pl. Ex. 6)].

413.   In December 2020, Finnecy was responsible for preparing Penn State's response to Plaintiff's EEOC Charge. [Finnecy Dep. 26:18-27:5 (Pl. Ex. 6)].

414.   In order to respond to Plaintiff's EEOC complaint, Finnecy spoke with Eicher, Steffen, Pasko, and Naviglia. [Finnecy Dep. 32:17-33:8 (Pl. Ex. 6)].

415.   Finnecy testified:

[Eicher] explained that --- what had happened, and her contact with Destiny, and the offer of an alternate job in housekeeping, and that Destiny did not respond to their letters, or phone calls about that job and that she had talked to Jamison Steffen about the case as well.

She summarized that --- how the parties knew each other from the job, and that they were spending time outside of work together, and that -- that Destiny became pregnant and the --- **she said the coworker was pressuring her to have an abortion, which she didn't want.**

And then she had complained to --- or talked to Carol about the situation. And that's when Carol checked on the possibility of moving her to a different job.

[Finnecy Dep. 33:9-34:16 (Pl. Ex. 6) (Emphasis added)].

416.     When asked, "If Mr. Van Buren was pressuring Destiny to have an abortion, would that violate any of Penn State's policies?," Finnecy answered, "I --- I don't know." [Finnecy Dep. 62:11-19 (Pl. Ex. 6)].

417.     Finnecy testified that Steffen told him "the same pattern of facts . . ." [Finnecy Dep. 37:19-38:4 (Pl. Ex. 6)].

418.     Finnecy testified that Steffen told him that when Plaintiff complained to him about Vanburen, "he moved her to different days so that she wouldn't overlap with [Vanburen]. And that he talked to [Vanburen]about, you know, what would be unacceptable behavior." [Finnecy Dep. 38:5-11 (Pl. Ex. 6)].

419.     Finnecy prepared Defendant's response to Plaintiff's EEOC Charge. [Finnecy Dep. 42:22-43:5 (Pl. Ex. 6) and Finnecy Dep. Ex.  36 (Pl. Ex. 7)].

420.     Finnecy testified that Steffen indicated that Plaintiff and Vanburen had been in a romantic relationship. [Finnecy Dep. 45:20-25 (Pl. Ex. 6)].

421.     Finnecy testified that Eicher told him that Plaintiff was in a same sex relationship at the time. [Finnecy Dep. 46:5-11 (Pl. Ex. 6)].

422.     According to Penn State's response to Plaintiff's EEOC Charge, "Ms. Eicher talked to McGovern about the situation and McGovern indicated she had always wanted to move to housekeeping." [Finnecy Dep. 47:3-10 (Pl. Ex. 6) and Finnecy Dep. Ex.  36 at Penn State 61 (Pl. Ex. 7)].

433.     Finnecy testified that Eicher told him that Plaintiff indicated she had

always wanted to move to housekeeping. [Finnecy Dep. 47:3-10 (Pl. Ex. 6)].

434.   According to Penn State's response to Plaintiff's EEOC Charge, "Based on McGovern's claims about Vanburen creating a hostile work environment, Jamison Steffen filed a Title IX report with the University's Affirmative Action Office (AAO) on February 17, 2020. Brian Naviglia, Affirmative Action Specialist, was assigned to the case." [Finnecy Dep. 47:19-48:6 (Pl. Ex. 6) and Finnecy Dep. Ex. 36 at Penn State 62 (Pl. Ex. 7)].

435.   According to Defendant's response to Plaintiff's EEOC Charge, "At no time prior to this EEOC charge did McGovern characterize her contact with Vanburen outside of work as a "sexual assault." If she had, University employees would have referred her to the police in addition to investigating the allegations under Title IX." [Finnecy Dep. Ex. 36 at Penn State 62 (Pl. Ex. 7)].

436.   Finnecy testified that he learned this from Steffen and/or Eicher. [Finnecy Dep. 48:7-20 (Pl. Ex. 6)].

437.   Finnecy testified that both Steffen and Eicher told him that "the relationship appeared to be consensual." [Finnecy Dep. 50:20-51:1, 52:18-53:6 (Pl. Ex. 6)].

438.   When defense counsel asked Finnecy, "Are you certain that Carol [Eicher] mentioned anything about an abortion to you?," Finnecy answered, "I don't recall." [Finnecy Dep. 57:24-58:2 (Pl. Ex. 6)].

439.   When Plaintiff's counsel re-examined Finnecy and asked, "So when you told us earlier that Ms. Eicher told you that Mr. Van Buren was pressuring Destiny to have an abortion, are you saying now that you don't remember that, whether she did or not?," Finnecy answered, "I don't remember which one or if both told me that." [Finnecy Dep. 60:17-24 (Pl. Ex. 6)].

440.   When Plaintiff's counsel re-examined Finnecy and asked, "What do you mean? If --- if Mr. Steffen told you?," Finnecy answered, "Yes, I don't remember which -- whether Jamison Steffen, or Carol Eicher or both mentioned that." [Finnecy Dep. 60:25-61:4 (Pl. Ex. 6)].

441.   When defense counsel re-examined Finnecy and asked, "you don't have personal knowledge about whether or not Trey pressured Destiny. Right?," Finnecy answered, "That's correct." [Finnecy Dep. 63:22-64:1 (Pl. Ex. 6)].

442.   When defense counsel re-examined Finnecy and asked, "Your knowledge is about what Destiny alleged occurred. Right?," Finnecy answered, "Yes." [Finnecy Dep. 64:2-4 (Pl. Ex. 6)].

443.   When defense counsel re-examined Finnecy and asked, "And that's knowledge that you received from a complaint made by Destiny with the PHRC. Right?," Finnecy answered, "Yes, with the EEOC." [Finnecy Dep. 64:10-17 (Pl. Ex. 6)].

### *Plaintiff's Emotional Distress*

444.    Vanburen knew how important Plaintiff's job was to her. [Vanburen hearing testimony 46:8-21 (Pl. Ex. 8 at Plaintiff 159)].

445.    On several occasions, Plaintiff cried at work. [Plaintiff hearing testimony 44:14-15 (Pl. Ex. 9 at 318)].

446.    Some of Plaintiff's co-workers commented to Plaintiff about how Vanburen was treating her at work. [Plaintiff hearing testimony 103:21-104:32 (Pl. Ex. 9 at 377-378)].

447.    Plaintiff testified that she felt "[d]epressed, full of anxiety, overwhelmed" as a result of what happened at Penn State, that Vanburen's treatment of her made her feel "awful," and that "it kind of spilled over into work because he brought it to work." [Pl. Dep. 248:12-249:2 (Def. Ex. C)].

448.    Plaintiff testified that how her employment with Penn State ended made her feel "[s]hitty." [Pl. Dep. 249:3-5 (Def. Ex. C)].

449.    Plaintiff has been going to counseling at Centre Safe for the December 2019 assault and what happened at work after the December 2019 assault. [Pl. Resp. to Def.'s Interrog. No. 10 (Pl. Ex. 1)].

Respectfully submitted,

Dated: July 26, 2023

/s/ Stephanie J. Mensing
Stephanie Mensing
Mensing Law LLC
PA ID No. 89625
1515 Market Street, Suite 1200
Philadelphia, PA 19102
215-586-3751; 215-359-2741 (fax)
stephanie@mensinglaw.com
Attorney for Plaintiff