IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANE DOE,

        Plaintiff,

    v.

THE PENNSYLVANIA STATE
UNIVERSITY,

        Defendant.

No. 4:21-CV-01862

(Chief Judge Brann)

**MEMORANDUM OPINION**

**NOVEMBER 3, 2023**

Plaintiff Jane Doe claims that she was sexually assaulted by a coworker, became pregnant as a result, and then was the victim of ongoing harassment at work when she refused to terminate the pregnancy. Doe's employer, The Pennsylvania State University, moves for summary judgment, arguing that Doe is not credible, and has failed to offer evidence in support of her claims. Though the Court agrees with Penn State as to the latter with respect to three of Doe's five claims, it may not make credibility determinations on a motion for summary judgment. Therefore, the Court will grant Penn State's motion in part, and deny it in part.

## I.    BACKGROUND

### A.    Undisputed Facts

On April 29, 2019, Doe began working as a part-time "overnight cleaner" at the Nittany Lion Inn ("NLI"), an on-campus hotel owned by The Pennsylvania State

University.[1] At her request, Doe was transferred to a daytime dishwashing shift at the NLI by Jamison Steffen, a sous chef and Doe's supervisor, in September 2019.[2] One of Doe's coworkers at the NLI was Trea Vanburen, a full-time dishwasher who also worked as a Team Lead dishwasher.[3] Between November 6, 2019 and December 6, 2019, while Vanburen's wife was visiting family in China, Vanburen and Doe had sex and conceived a child.[4] Doe informed Vanburen of the pregnancy on January 7, 2020.[5]

Vanburen, scared about the pregnancy and its potential impact on his marriage, asked Doe to have an abortion.[6] Eventually, after receiving several text messages from Doe and her fiancée, Ms. Kasha Perry, Vanburen told his wife about the pregnancy.[7] Concurrent with this dialogue between Doe, Perry, and Vanburen, Doe asked Steffen if she could be scheduled to work different shifts than Vanburen.[8] Though Steffen was able to reduce the number of shifts that Doe and Vanburen worked together, he was unable to completely accommodate her request.[9]

On February 7, 2020, less than an hour into a shift that Doe and Vanburen were working together, Doe left the NLI for the last time.[10] After walking out, Doe sent a

---

[1]   Statement of Material Facts ("SMF"), Doc. 31 ¶¶ 17, 22; Response to Statement of Material Facts ("RSMF"), Doc. 40-1 ¶¶ 17, 22.
[2]   SMF ¶¶ 33, 44; RSMF ¶¶ 33, 44.
[3]   SMF ¶¶ 57, 62; RSMF ¶ 57.
[4]   SMF ¶¶ 74-76; RSMF ¶¶ 74-76.
[5]   SMF ¶ 77; RSMF ¶ 77.
[6]   SMF ¶¶ 101, 103; RSMF ¶¶ 101, 103.
[7]   SMF ¶¶ 105-109; RSMF ¶¶ 105-109.
[8]   SMF ¶¶ 119-20; RSMF ¶¶ 119-20.
[9]   SMF ¶¶ 122-23; RSMF ¶¶ 122-23.
[10]   SMF ¶ 140; RSMF ¶ 140.

text message to Steffen stating that she felt she was "being pushed out the door."[11] On February 10, 2020, Doe sent an email to Penn State Human Resources Consultant Carol Eicher.[12] During discussions with Eicher, Doe complained that Vanburen had been harassing her at work and that Steffen had been unable to adequately remedy the situation.[13] Eicher and Jackie Weyer, Manager of the NLI Housekeeping Department, reached out to Doe regarding a transfer to housekeeping; however Doe never responded.[14] In early March, 2020, Eicher assumed that Doe's silence meant Doe was no longer interested in working at the NLI.[15] Doe never returned to work for Penn State.[16]

Doe gave birth to hers and Vanburen's child on August 11, 2020.[17] In late October or early November 2020, Vanburen filed a request for a paternity test.[18] On November 4, 2020, Doe filed a petition to obtain a Sexual Violence Protection Order ("SVPO") against Vanburen, claiming that their child was the product of a sexual assault.[19] Coworkers of Doe and Vanburen testified during the SVPO proceedings.[20] Doe's request for a SVPO was subsequently denied.[21]

---

[11]   SMF ¶ 141; RSMF ¶ 141.
[12]   SMF ¶ 155; RSMF ¶ 155.
[13]   SMF ¶¶ 160-170; RSMF ¶ 160-170.
[14]   SMF ¶¶ 210, 216; RSMF ¶¶ 210, 216.
[15]   SMF ¶ 216; RSMF ¶ 216.
[16]   SMF ¶ 242; RSMF ¶ 242.
[17]   SMF ¶ 244; RSMF ¶ 244.
[18]   SMF ¶ 246; RSMF ¶ 246.
[19]   SMF ¶ 248; RSMF ¶ 248.
[20]   SMF Section M; RSMF Section M.
[21]   SMF ¶ 266; RSMF ¶ 266.

### B.     Procedural History

Doe initiated this suit on November 1, 2021, alleging violations of Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.[22] Penn State timely Answered on December 30, 2021.[23] The parties engaged in discovery, and Penn State filed a Motion for Summary Judgment on May 31, 2023.[24] Penn State's Motion is fully briefed and ripe for disposition.[25]

## II.    LAW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  As expressed by the Supreme Court of the United States in *Celotex Corp. v. Catrett*, summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[26] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[27]

---

[22] Compl., Doc. 1.
[23] Ans., Doc. 6.
[24] Mot. Summ. J. ("MSJ"), Doc. 30.
[25] MSJ Br., Doc. 35; MSJ Opp., Doc. 40; MSJ Reply, Doc. 44; MSJ Sur-Reply, Doc. 51.
[26] 477 U.S. 317, 322 (1986).
[27] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[28] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved by only a finder of fact because they may reasonably be resolved in favor of either party."[29] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[30] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[31]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[32] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[33] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[34] Finally, although "the court

---

[28]   *Celotex*, 477 U.S. at 323.

[29]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[30]   *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[31]   *Port Auth. Of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[32]   *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 422, 448 (1871)).

[33]   *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[34]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

need consider only the cited materials, . . . it may consider other materials in the record."[35]

## III.   ANALYSIS

### A.   Evidentiary Issues

Before turning to the merits, the Court first addresses global evidentiary issues presented by Penn State's Motion for Summary Judgment and the parties' papers.

#### 1.   Motion to Strike

After Doe left the NLI for the last time on February 7, 2020, she contacted Penn State Human Resources Consultant Carol Eicher to discuss the alleged harassment she had experienced. Penn State's, and therefore Eicher's response to Doe's complaint is an issue central to Doe's claims. During discovery, Penn State produced Eicher's handwritten notes[36]—written in Gregg shorthand[37]—as well as Eicher's typed transcription of those notes.[38] During her deposition, Eicher testified that she could not recall when she transcribed the notes[39] and that, though she intended for her typed notes

---

[35]   Fed. R. Civ. P. 56(c)(3).

[36]   Def. Ex. H, Doc. 32-10 ("Eicher Dep. Exs.") at 114-118.

[37]   Gregg shorthand is a system of pen stenography that gained popularity in the early twentieth century. It would fall out of favor with the invention of mechanical stenography, the Dictaphone, and eventually the arrival of the personal computer. In recent years, the use of Gregg shorthand has been primarily restricted to that of hobbyists or as a personal tool. *See* Dennis Hollier, *How to Write 225 Words Per Minute With a Pen*, THE ATLANTIC (June 24, 2014) available at https://www.theatlantic.com/technology/archive/2014/06/yeah-i-still-use-shorthand-and-a-smartpen/373281/; GREGG SHORTHAND, https://gregg-shorthand.com/ (last visited Oct. 27, 2023).

[38]   Eicher Dep. Exs. at 119-120.

[39]   Def. Ex. H, Doc. 32-9 ("Eicher Dep. Tr.") at 130:1-8.

to be a word-for-word transcription,[40] there were certain discrepancies between her handwritten notes and her transcription.[41]

Doe asserts that the discrepancies involve key issues regarding Penn State's response to Doe's complaint.[42] In support, Doe filed with her opposition to summary judgment a declaration of Claire Szostak.[43] Szostak, a paralegal at a law firm with no other involvement in this case, declares that she studied Gregg shorthand in high school from 1968-1970 and that she used Gregg shorthand as a stenographer for the FBI from 1970-72 and then for some time after transitioning to the private sector.[44] She further notes that, while she "ha[s] not used Gregg Shorthand in a business setting for about twenty years [she] continue[s] to use Gregg Shorthand for [her] own personal use on a limited basis. For example, if [she is] doing research and making notes, about half of [her] notes will be in Gregg shorthand."[45]

Penn State has moved to strike Szostak's declaration,[46] arguing that Doe failed to disclose Szostak as a fact witness as required by Rule 26 or, to the extent she is offered as an expert witness, her opinion is inadmissible under *Daubert*.[47] Doe counters

---

[40]  *Id.* at 114:10-15.
[41]  *Id.* at 114:5-16.
[42]  MSJ Opp. Section II. P.
[43]  Pl. Ex. 3, Doc. 40-4 ("Szostak Decl.").
[44]  *Id.* ¶¶ 2-4.
[45]  *Id.* ¶ 5.
[46]  Mot. to Strike ("MTS"), Doc. 45.
[47]  *See generally* MTS Br., Doc. 46.

that she was not required to disclose Szostak under Rule 26 because she is being offered solely for impeachment and that a *Daubert* analysis is premature.[48]

Though Gregg shorthand is not a foreign language, it may as well be. It is a "well-established rule that a document in a foreign language is generally inadmissible unless accompanied by a certified English translation."[49] Translated statements are generally admissible provided "that there is no showing of unreliability or a motive to mislead."[50] Courts evaluating the reliability or bias of a translation consider: "(1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead or distort, (3) the interpreters qualifications and language skill, and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated."[51] If the accuracy of a transcript is contested, the parties may submit competing transcripts.[52] Further, Federal Rule of Evidence 604 "does not require that the interpreter be qualified as *an expert*, it merely requires that they be *qualified*."[53]

---

[48]  *See generally* MTS Opp., Doc. 49.

[49]  *ABC Corp. v. Partnerships and Unincorporated Assoc. Identified on Schedule A*, 2022 WL 18937941, at *1 (N.D. Ill. Dec. 19, 2022) (collecting cases); *accord Huang v. Bai Wei LLC*, 2023 WL 5243364, at *7 (E.D. Pa. Aug. 14, 2023) (collecting cases).

[50]  *Comm. Assoc. Underwriters of Am. Inc., v. Queensboro Flooring Corp.*, 2016 WL 1728381, at *7 (M.D. Pa. Apr. 29, 2016) (collecting cases).

[51]  *Id.* (quoting *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991)).

[52]  *See U.S. v. Ben-Shimon*, 249 F.3d 98, 101 (2d Cir. 2001) (discussing admission of transcripts of a recorded conversation conducted in a foreign language).

[53]  *United States v. Columbie*, 2022 WL 17156048, at *12 (D.N.M. 2022) (citing *United States v. Verdin-Garcia*, 516 F.3d 884, 893 (10th Cir. 2008)). *But see Dogu Yayin Grubu A.S. v. DFH Network, Inc.*, 2014 WL 12585785, at *4 (C.D. Cal. 2014) ("Foreign language translation is considered specialized knowledge and subject to the requirements of Rule 702 of the Federal Rules of Evidence.").

It is also "well-established that the Court has the discretion to allow undisclosed rebuttal witnesses to testify," even those "not discussed in a pre-trial order," let alone a Rule 26 disclosure.[54] The nature of rebuttal or impeachment testimony cannot always be determined until the opposing party has presented their case, here, via a motion for summary judgment.

Taking these principles together, the Court finds that Doe is entitled to introduce a competing transcription of Eicher's notes prepared by a qualified interpreter. Though Penn State has assumed that Szostak's testimony would need to be admissible under Rule 702, the Court is less certain that is the case, or that Szostak (or any other interpreter) would need to testify at all. To the extent that testimony would be necessary, Doe has not waived her opportunity to introduce it. Szostak (or any translator) is not introducing fact evidence, rather interpreting evidence that is already in the record. Significantly, for the purposes of evaluating the parties' arguments for summary judgment, the Court finds that Szostak's declaration is not that of a testifying witness— it merely provides a competing translation of Eicher's notes. Further, the Court finds that it is likely that Szostak's competing transcription would be admissible at trial, and therefore can be considered in evaluating Penn State's motion for summary judgment.[55] Szostak used Gregg shorthand in a professional setting for almost 20 years and has since

---

[54] *Federal Trade Comm'n v. Innovative Designs, Inc.*, 2019 WL 13434840, at *1 (W.D. Pa. July 17, 2019) (collecting cases).

[55] *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F. 3d 231, 238 (3d Cir. 2016).

9

used it for her own personal notetaking.[56] This may be insufficient to qualify her as an expert witness, but the Court is unwilling to find that it would preclude her from offering a competing transcription. Penn State makes much of the fact that Szostak has not used Gregg shorthand professionally in 20 years. However, adopting that standard, would mean that *nobody* would be qualified as Gregg shorthand fell out of favor decades ago.

The Court will therefore deny Penn State's motion to strike without prejudice to Penn State's right to bring a subsequent challenge.

### 2.    Competing Testimony

Throughout its briefing, Penn State argues that summary judgment is appropriate because Doe "fails to offer any evidence, beyond [her] own testimony, to support [her] claims."[57] Conclusory, self-serving affidavits and deposition testimony are insufficient to withstand a motion for summary judgment.[58] "However, the issue is not whether [Doe] has relied solely on [her] own testimony to challenge the Motion[], but whether [her] testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit [her] testimony, despite its self-serving nature."[59]

Here, the bulk of the "other evidence" offered by Penn State in support of its motion are deposition testimony and affidavits of Penn State employees. Penn State

---

[56] Szostak Aff. ¶¶ 4-5.

[57] MSJ Br. 3; *see also id.* at 20, 42, 46.

[58] *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012) (citing *Gonzalez v. Sec'y of the Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009); *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011)).

[59] *Id.* (citing *Gonzalez*, 678 F.3d at 263; *Irving*, 439 F. App'x at 127).

repeatedly asks the Court to "give[] great weight" to the testimony of Doe's coworkers in favor of Doe's "own self-serving and questionably credible statements."[60] This Court cannot weigh the evidence or  "make credibility-related findings when ruling on a motion for summary judgment."[61] Therefore, in the absence of other evidence, the Court cannot credit the testimony offered by Penn State where it would require discrediting the testimony of Doe.[62]

### B.    Title VII (Count I) and Title IX (Count IV) Hostile Work Environment Claims

To survive summary judgment on her hostile work environment claims, Doe must show that there is a material issue of fact that 1) she suffered intentional discrimination because of her gender; 2) that was severe or pervasive; 3) detrimentally affected her; 4) and would detrimentally affect a reasonable person in like circumstances; 5) for which Penn State is liable.[63] As to the fifth prong, the threshold for employer liability under Title VII is *respondeat superior* while Title IX imposes a higher standard of deliberate indifference.[64]

---

[60]   *E.g.*, MSJ Br. 17; *see also id.* at 19 (referring to the "sworn testimony of four other NLI employees"), 20 ("Plaintiff is, therefore, far from credible.").

[61]   *Howard v. Blalock Elec. Svc. Inc.*, 742 F. supp. 2d 681, 707 (W.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1024 (3d Cir. 2008)).

[62]   *Id.*

[63]   *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). *See also Kahan v. Slippery Rock Univ. of Penn.*, 50 F. Supp. 3d 667, 696-97 (W.D. Pa. 2014) (observing that the "operative elements" of a hostile work environment claim under Title VII and Title IX are "essentially the same").

[64]   *Kahan*, 50 F. Supp. 3d at, 696-97.

### 1.     Intentional Discrimination

Doe alleges that, after Vanburen learned Doe was pregnant, he began harassing her at work.[65] Doe says that Vanburen pressured her to get an abortion and verbally and physically harassed her.[66] Penn State argues that there is no evidence in the record of verbal or physical harassment and that "difficult family planning conversations do not necessarily constitute gender-based harassment."[67] Further, Penn State suggests that, to the extent Vanburen may have harassed Doe, it was due to their personal situation, "their shared circumstance of having a child together," and not because of Doe's gender.[68]

Title VII prohibits employment discrimination based on an individual's gender.[69] The Pregnancy Discrimination Act, codified within Title VII, provides that "because of sex" or "on the basis of sex" includes "on the basis of pregnancy, childbirth, or related medical conditions."[70] This includes harassment based on a woman's decision not to abort her pregnancy.[71] Penn State acknowledges that Doe and Vanburen "discuss[ed] all aspects of their situation" including "potentially obtaining an abortion" "both inside

---

[65]   *E.g.*, Compl. ¶¶ 50-51.
[66]   MSJ Opp. 27.
[67]   MSJ Br. 10-11.
[68]   *Id.* at 11.
[69]   *Doe v. C.A.R.S. Protection Plan Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) (citing 42 U.S.C. § 2000e-2(a)).
[70]   42 U.S.C. § 2000(e)(k).
[71]   *Cf. C.A.R.S.*, 527 F.3d at 364 (holding that Title VII prohibits discrimination based on a woman's decision to have an abortion).

and outside of work."[72] Though, as the baby's father, Vanburen "would be well within his right to communicate with the mother about how he thought their pregnancy should be handled," it does not follow that he may exercise this right in the workplace.[73] Doe's willingness to have such conversations away from work "does not constitute a waiver of . . . her legal protections against unwelcome and unsolicited sexual harassment."[74] This is not a dispute over mere vulgarities that threatens to "trivialize the important values protected by Title VII and elevate a gross workplace dispute into a federal case."[75] Vanburen's alleged harassment of Doe based on her pregnancy is expressly prohibited by the text of the statute, and thus, among the core "important values protected by Title VII."

The issue then becomes whether the alleged comments by Vanburen were unwelcome. On or about January 7, 2020, Doe told Vanburen that she was pregnant.[76] Doe also told coworkers Amanda Peters, Jill Eastwood, and Duane Johnson that she was upset Vanburen was ignoring her.[77] Later, in mid-January, Vanburen told his wife

---

[72]  MSJ Br. 8. Penn State also takes the contradictory position that Vanburen did not tell Doe to get an abortion at work. *Id.* at 9. As discussed below, even if Penn State did not intend to concede that Vanburen did make such comments at work, a reasonable juror could find that he did.

[73]  *Id.* at 9.

[74]  *See Katz v. Dole*, 708 2d. 251, 254 n.3 (4th Cir. 1983).

[75]  *Cf. Davis v. Coastal Intern. Sec., Inc.*, 275 F.3d 1119, 1126 (D.C. Cir. 2002).

[76]  SMF ¶ 78; RSMF ¶ 78.

[77]  *See* Def. Ex. K, Doc. 32-13 ("SVPO Tr.") at 107:12-108:22 (Peters testifying that Doe discussed the pregnancy with her in December 2019), 126:10-20 (Johnson testifying regarding the conversation when he first learned Doe was pregnant), 100:17-101:10 (Eastwood testifying regarding a conversation with Doe about Vanburen ignoring her prior to him telling his wife about the pregnancy).

of the pregnancy.[78] At some point, Doe "told Mr. Steffen that she did not want to work around Mr. Vanburen anymore."[79] Doe claims that, on multiple occasions, she told Steffen that Vanburen had called her a whore and told her that she "really needed to think about getting an abortion."[80] In response, Steffen attempted to change Doe's schedule to limit the shifts the two worked together.[81]

Viewing the limited evidence available in the light most favorable to Doe, the Court finds that a reasonable jury could conclude that Vanburen harassed Doe because of her gender. Even crediting their coworkers' testimony, all it shows is that, at some point in early-January 2020, Vanburen was ignoring Doe.[82] It does not follow that, because Vanburen allegedly ignored Doe in the first half of January, he continued to do so until Doe left the NLI on February 7, 2020. Penn State suggests "Mr. Vanburen's alleged hostility at work [is] without any support in the record."[83] Not so. Doe testified

---

[78]   Def. Ex. F, Doc. 32-7 ("Vanburen Aff.") ¶¶ 73-77 (stating that Vanburen told his wife about the pregnancy and began keeping to himself at work "[i]n the middle of January 2020"). Each of the conversations with Peters, Eastwood, and Johnson occurred before Vanburen had informed his wife of the pregnancy.

[79]   SMF ¶¶ 119-120; RSMF ¶¶ 119-120.

[80]   Def. Ex. C, Doc. 32-4 ("Pl. Dep. Tr.") at 111:13-114:24.

[81]   SMF ¶ 122; RSMF ¶ 122. In his Affidavit, Steffen says that he made the scheduling change in an attempt to "prevent employees' personal drama from becoming a distraction at work." Def. Ex. E, Doc. 32-6 ("Steffen Aff.") ¶¶ 106-108.

[82]   Doe disputes the testimonies of Peters, Eastwood, and Johnson. ROSF ¶ 116. Peters testified that she remembered the conversation with Doe happening in late December. SVPO Tr. at 107:12-108:22. This would contradict Doe's claim that she learned she was pregnant on January 7, 2020. However, there is insufficient record evidence for the Court to determine whether Peters may be misremembering the timing of a conversation that occurred over a year prior or Doe suspected she was pregnant in December 2019 but had not yet taken a pregnancy test confirming as much. *Contra* SVPO Tr. 110:3-17 (Peters testifying that she received Facebook messages from Doe "somewhere right before, like, New Year's Eve").

[83]   MSJ Br. 11.

at her deposition regarding the alleged hostility. Deposition testimony is evidence, and the Court cannot, on a motion for summary judgment, look past it in favor of the affidavits of Steffen and Vanburen.

## 2.      Severe or Pervasive Discrimination

Penn State advances two arguments that any harassment is not sufficiently severe or pervasive: 1) "any workplace harassment at the NLI was, contrary to [Doe's] claims, perpetrated by her;"[84] and 2) "[e]ven if Mr. Vanburen engaged in the behavior [Doe] describes, [it] is a stark contrast from the frequent harassment required by the courts to meet the severe and pervasive prong."[85]

*First*, though Penn State may "respectfully disagree," the Court does find that the narrative of Doe's alleged harassment of Vanburen is irrelevant.[86] As discussed above, the testimony of Vanburen's and Doe's coworkers reveals that Doe "wanted better communication with Mr. Vanburen . . . after they had sexual intercourse," but says nothing about the time period after Vanburen notified his wife of the pregnancy.[87] Steffen's statements that Vanburen "began speaking to [Doe] at the NLI much less frequently than he did before their pregnancy" and that Doe "appeared angry that Mr. Vanburen stopped speaking with her in a social manner" are no more definitive.[88] Again, even if the Court were to credit the statements of their co-workers they, viewed

---

[84]    *Id.* at 19.
[85]    *Id.* at 21.
[86]    *Cf. id.* 21.
[87]    *Id.* 17.
[88]    Steffen Aff. ¶ 99-100.

in the light most favorable to Doe, paint an incomplete picture of the environment at the NLI and the relationship between Vanburen and Doe from mid-January until February 7, 2020. A jury may "give[] great weight"[89] to the testimony of Doe's co-workers and find that Doe herself is "far from credible,"[90] but the Court may not.[91]

*Second*, a reasonable juror could find that the alleged harassment was sufficiently pervasive or severe. "[S]everity and pervasiveness are alternate possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable conduct will contaminate the workplace only if it is pervasive."[92] "Whether an environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[93] The inquiry is guided by whether the harassment "amount[s] to a change in the terms and conditions of employment."[94]

Penn State makes much of the fact Doe "admits [she and Vanburen] worked together only four times after he learned she was pregnant."[95] Penn State suggests that

---

[89] MSJ Br. 17.
[90] *Id.* at 20.
[91] *See Liberty Lobby*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]").
[92] *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).
[93] *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).
[94] *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).
[95] MSJ Br. 21.

16

"three shifts plus fifty minutes is a stark contrast from the frequent harassment required by the courts to meet the severe and pervasive prong."[96] In support, Penn State cites *Brown-Baumbach v. B & B Automotive, Inc.* (ten alleged instances of harassment over the course of four months);[97] *Martinez v. Rapidgm, Inc.* (four alleged instances of harassment over three years);[98] and *Austin v. Norfolk Southern Corp.* (three alleged instances of harassment over seven months).[99] Three (or four) shifts over a period of three-and-a-half weeks[100] is *more* pervasive than the examples cited by Penn State and, if the alleged harassment is sufficiently severe, enough to meet the severe or pervasive prong.

As discussed above, the alleged harassment is more severe than "occasional insults, teasing, or episodic instances of ridicule."[101] In his affidavit, Steffen states that he "believed that scheduling [Doe] and Mr. Vanburen for different shifts at the NLI would prevent employees' personal drama from becoming a distraction at work."[102] The parties may dispute who is to blame for the "distraction," or whether it rose to the level of severity required to support a claim for a hostile work environment. However, there is insufficient record evidence for the Court to resolve that dispute on a motion for summary judgment.

---

[96] *Id.*
[97] 2010 WL 2710543, at *8 (E.D. Pa. July 7, 2010).
[98] 290 F. App'x 521, 524-25 (3d Cir. 2008).
[99] 158 F. App'x 374, 378-79 (3d Cir. 2005).
[100] SMF ¶ 123; RSMF ¶ 123.
[101] *Martinez*, 290 F. App'x at 525 (quoting *Jensen*, 435 F.3d at 451).
[102] Steffen Aff. ¶ 107.

### 3.    Detrimental Impact

To meet the third prong of the hostile work environment test, Doe must show that the alleged harassment "actually altered the conditions of [her] employment."[103] The parties agree that, at some point, Doe "told Mr. Steffen that she did not want to work around Mr. Vanburen anymore" and asked to be moved to different shifts.[104] Though he was able to reduce the number of shifts Doe and Vanburen worked together, he was unable to grant the request entirely.[105] After Doe left the NIL on February 7, 2020, she sent Steffen text messages stating that she had "been . . . the adult in this situation but [was] tired of the harassment" and that she "loved [her] job" and felt that she was "being pushed out the door."[106] A reasonable juror could find that the alleged harassment detrimentally affected Doe and altered the conditions of her employment.

### 4.    Reasonable Person

Whether the alleged harassment would have detrimentally impacted a reasonable person in like circumstances "substantially overlaps with the third and fourth elements" of a hostile work environment claim.[107] As the Court has concluded that there are issues of material fact regarding whether Doe was subject to harassment that was severe or pervasive enough to have a detrimental impact on her, the inquiry here is essentially whether Doe's subjective perception of the harassment was objectively unreasonable.

---

[103] *Harris*, 510 U.S. at 21-22.
[104] SMF ¶ 119-20.
[105] SMF ¶¶ 121-22; RSMF ¶¶ 121-22
[106] Steffen Aff. ¶¶ 125-26.
[107] *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 776 n.5 (3d Cir. 2009) (citing *Jensen*, 435 F.3d at 451).

The Court does not find that it was. A reasonable person in Doe's position could have been detrimentally impacted by repeatedly being called a whore and told that she should get an abortion.[108]

At a minimum, the alleged harassment suffered by Doe was at least as abusive as the harassment that Penn State accuses Doe of engaging in at the NLI. Penn State suggests that it is Doe who created a hostile work environment when she, "in direct contradiction to Mr. Vanburen's wishes," "share[d] the news about his infidelity with their NLI coworkers."[109] The Court is skeptical that Doe sharing the news, even against Vanburen's wishes, that he had conceived a child with Doe out of wedlock is sufficient to create a hostile work environment, either in the colloquial or legal sense. But to the extent that Penn State maintains that it is, the Court cannot then accept the argument that the alleged harassment by Vanburen of Doe would not offend a reasonable person.

### 5.   *Respondeat Superior* (Title VII)

Under Title VII, "[a]n employer will be liable for the harassing conduct of the alleged victim's coworker" if the employer "knew or should have known about the harassment, but failed to take prompt remedial action.[110] "Even if the remedial action does not stop the alleged harassment, it is 'adequate' if it is 'reasonably calculated' to

---

[108] Pl. Dep. Tr. 111:13-114:24.
[109] MSJ Br. 15.
[110] *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997); *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 (3d Cir. 1994); *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006)).

end the harassment."[111] It is undisputed that Doe asked Steffen to work different shifts than Vanburen.[112] Penn State argues Doe cannot claim that Steffen's "moving her away from her alleged harasser, per her request, was not reasonably calculated to address her concerns."[113] This overstates Steffen's response. Though Steffen "made an effort to alter [Doe's] schedule to meet that request," he was unable to do so entirely. Making an effort to take remedial action is not the same as actually taking remedial action.

As Penn State notes, after Doe left the NIL for the last time on February 7, 2020, she texted Steffen: "I come to you about a problem. You addressed it."[114] From January 13, 2020 to January 27, Doe worked seven shifts, and only one with Vanburen.[115] Then, the next three times Doe went to work, Vanburen was there.[116] A reasonable juror could read Doe's text, look at the timeline, and conclude that Steffen had temporarily addressed the problem, only for it to recur when Steffen could no longer accommodate her request. Penn State concedes as much, asserting that Steffen "could not consistently provide [Doe] the morning shift because she was a part-time employee who was not in

---

[111] *Id.* (citing *Jensen*, 435 F.3d at 453; *Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir. 1997)).

[112] MSJ Br. 32; SMF ¶ 120; RSMF ¶ 120.

[113] MSJ Br. 32.

[114] SMF ¶ 141; RSMF ¶ 141. Doe does not dispute that she sent a text but notes that "[t]he quoted text, however, is from a document that Steffen prepared, not the actual text message." If Doe intended to raise an objection about the quoted text, this is insufficient to do so.

[115] Steffen Aff. Ex. C, Doc. 32-6 at 32; Steffen Aff. Ex. D, Doc. 32-6 at 35-36.

[116] *Id.* This includes a shift on February 1, 2020, when their shifts overlapped for just under one hour.

the Teamsters Union," unlike Vanburen.[117] Remedial action is adequate where it is reasonably calculated to *end*, not postpone the alleged harassment.

Therefore, the Court will deny Penn State's Motion for Summary Judgment as to Count I.

### 6.    Deliberate Indifference (Title IX)

An employer is deliberately indifferent where the "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."[118] The employer must "merely respond to known . . . harassment in a manner that is not clearly unreasonable."[119] Though the Court has found that a reasonable juror could find Steffen's response was ultimately inadequate, Steffen's attempt to remedy the situation was not clearly unreasonable. In the text message Doe sent to Steffen after she left the NIL on February 7, 2020, she acknowledges that Steffen had, at least initially, addressed the "problem" and she "want[ed] to talk to [Steffen]" about it.[120] Steffen cannot have acted with deliberate indifference where Doe expressed that she was initially satisfied with his response, and a desire to discuss it further.

Therefore, the Court will grant Penn State's Motion for Summary Judgment as to Count IV.

---

[117]  SMF ¶ 121-22.
[118]  *See Davis Next Friend LaShonda D. v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 644 (1999) (defining deliberate indifference in a case of student-on-student sexual harassment).
[119]  *Id.* at 649.
[120]  SMF ¶ 141; RSMF ¶ 141.

## C.    Constructive Discharge (Count II)

To prevail on a hostile environment constructive discharge claim, Doe must show "working conditions so intolerable that a reasonable person would have felt compelled to resign."[121] Doe concedes that, after she left work on February 7, 2020, "she intended to remain employed with Penn State because she wanted a career at Penn State."[122] On February 10, 2020, Doe, having not heard back from Steffen, reached out to Penn State Human Resources Consultant, Carol Eicher.[123] At this point, it cannot be said that the environment at the NLI "present[ed] a 'worst case' harassment scenario, harassment ratcheted up to the breaking point."[124]

The Third Circuit has identified a number of other circumstances, if present, would permit a reasonable jury to "find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign:"[125]

> Whether the employer (1) "threatened the employee with discharge" or "urged or suggested that she resign or retire," (2) "demoted her," (3) "reduced her pay or benefits," (4) "involuntarily transferred her to a less desirable position," (5) altered her "job responsibilities," or (6) gave "unsatisfactory job evaluations."[126]

---

[121] *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).

[122] MSJ Opp. 9.

[123] SMF ¶ 155; RSMF ¶ 155.

[124] *Suders*, 542 U.S. at 147-48. *See also* SMF ¶ 170-1; RSMF ¶ 170-1 (Doe "did not tell Ms. Eicher that she quit her job" when she walked out of work on February 7, 2020.)

[125] *Colwell v. Ride Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).

[126] *Id.* at 503 (quoting *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993)).

It is undisputed that Penn State ultimately proposed a transfer to the Housekeeping department at NLI.[127] The parties diverge on the issue of whether this proposal rises to the level of an involuntary transfer to a less desirable position. Penn State argues that Doe fails to support her claim "that she was being forced to return to work in a position of less pay and less professional advancement."[128] Instead, Penn State avers that "[t]he transfer to Housekeeping was simply an option presented to Plaintiff that went without response."[129] For her part, Doe notes that "[a]ccording to Jacqueline Weyer, Director of Housekeeping at the NLI for fifteen years, there was only one job (technical service) in the Housekeeping department at the NLI, so there was no opportunity to move up."[130] Doe contrasts that with the careers of Steffen and Vanburen, whose "career advancement show that culinary offered significant professional advancement."[131]

The Court finds that a reasonable juror could conclude that the transfer to Housekeeping was less desirable.[132] Doe need not present evidence that NLI

---

[127] SMF ¶ 210; RSMF ¶ 210.
[128] MSJ Reply 19.
[129] *Id.* at 20.
[130] MSJ Opp. 36.
[131] MSJ Sur-reply at 11 (citing SMF ¶¶ 54-62).
[132] Penn State suggests that Doe's argument that a Housekeeping position is less desirable is foreclosed by Doe having applied to that position in the past. However, both applications predate her transfer to her transfer to her position at the time she left the NLI. Further, Doe appears to raise a colorable argument regarding the accuracy of Penn State's records on this point. RSMF ¶ 34.

housekeepers are paid less than dishwashers.[133] Nor is it a requirement that she accept the transfer and show up for work as a housekeeper to show that she had, in fact, been transferred.[134] The only record evidence regarding the potential transfer are the competing testimonies of Doe, Perry, Weyer, and Eicher, which, as explained above, precludes a grant of summary judgment.

Therefore, the Court will deny Penn State's Motion for Summary Judgment as to Count II.

### D.     Title VII (Count III) and Title IX (Count V) Retaliation

To establish a *prima facie* retaliation case under Title VII or Title IX, a plaintiff must prove (1) "she engaged in activity protected" by Title VII or Title IX; (2) "she suffered an adverse action;" and (3) "there was a causal connection between the two."[135] As discussed above, Doe has testified that she complained to Steffen multiple times regarding harassment by Vanburen. It is also undisputed that Doe complained to Eicher regarding the alleged harassment. As the Court has found that the alleged harassment is prohibited by Title VII and Title IX, Doe's complaints about the harassment are sufficient to satisfy the first prong. [136]

---

[133]  *See Colwell*, 602 F.3d at 503 (listing circumstances which, independently, are sufficient to establish a constructive discharge claim including reduction in pay *or* a transfer to a less desirable position).

[134]  *See Sullivan v. Widener University*, 2022 WL 3030725, at *7 (E.D. Pa. Aug. 1, 2022) (denying summary judgment on the grounds that the plaintiff may "feel[] compelled to retire after being given a notice of demotion but leaves prior to any paperwork effectuating the change is filed).

[135]  *Doe v. Mercy Catholic Medical Center.*, 850 F.3d 545, 564 (3d Cir. 2017).

[136]  *See Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 139 (E.D. Pa. 2020) (observing that complaining about prohibited conduct is protected activity).

As to the second prong, Doe must "must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[137] Doe argues that after "she complained to Steffen, he stopped mentoring her and spoke to her about her attendance for the first time, despite alleged documented prior absences."[138] As to the latter, a reasonable juror could find a loss of mentoring opportunities to be materially adverse.[139] However, the same cannot be said of a mere discussion about attendance issues. Doe also argues that she was transferred to housekeeping because of her complaint to Eicher which, as discussed above, a reasonable juror could find to be materially adverse.[140]

Penn State argues that there is no evidence other than Doe's testimony that Steffen had discontinued mentoring her or that she would have been transferred to housekeeping. Doe's testimony is sufficient to survive summary judgment where it is not contradicted by any non-testimonial record evidence. Further, the Court has already addressed, and rejected Penn State's argument that it had not actually transferred Doe to housekeeping.

---

[137] *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006))
[138] MSJ Opp. 39.
[139] *See Burlington*, 548 U.S. at 70 (observing that "retaliat[ing] by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination").
[140] MSJ Opp. 40.

"Because retaliation is almost never subject to proof by direct evidence" a plaintiff will generally have to "rely on circumstantial evidence to prove a retaliatory motive."[141] Doe can satisfy her burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism with timing that suggests a causal link."[142] Doe testified that Steffen ceased mentoring her "[a]fter Trea had gone to him and told him that I was having Trea's baby," *not* when she complained to Steffen.[143] Therefore, even if the Court assumes that Steffen did stop mentoring Doe, it cannot be the case that he did so in retaliation for complaint she had not yet made. Conversely, assuming *arguendo* that Penn State had transferred Doe to housekeeping, it is undisputed that the alleged transfer occurred shortly after her complaint to Eicher. Therefore, Doe has established a *prima facie* case of retaliation as to the transfer.

The burden shifts to Penn State to present evidence that, if true, "would permit the conclusion that there was a nondiscriminatory reason" for the transfer.[144] Penn State argues that the transfer was motivated by a desire to "accommodate [Doe's] request to not work with Mr. Vanburen."[145] The burden then shifts back to Doe to show that Penn State's explanation for her transfer is pretextual, that is "*both* that the reason was false, *and* that discrimination was the real reason."[146] She "cannot simply show that [Penn

---

[141] *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).
[142] *Id.*
[143] Doe Dep. Tr. 241:1-2.
[144] *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994).
[145] MSJ Br. 52.
[146] *Fuentes*, 32 F.3d at 763.

State's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[147] The Court finds that Doe has not met this burden. Though the Court has found that a reasonable juror could find that the transfer was materially adverse, perhaps even sufficient to support a constructive discharge claim, there is nothing in the record that suggests Penn State's decision to transfer Doe was motivated by discriminatory animus. A reasonable juror could conclude that Penn State's response was unwise or imprudent, but not that it was discriminatory.

Therefore, the Court will grant Penn State's Motion for Summary Judgment as to Counts III and V.

## IV.   CONCLUSION

For the foregoing reasons, Penn State's Motion to Strike is denied. Penn State's Motion for Summary Judgment is Granted as to Counts III, IV, and V, and denied as to Counts I and II.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[147] *Id.* at 765.